Daniel Michael
Osman Nawaz
Alexander Vasilescu
Neal Jacobson
Joshua I. Brodsky
Lee A. Greenwood
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**(212) 336-1060 (Greenwood)**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **19 Civ. 661** |
| Plaintiff, | |
| v. | **Complaint** |
| **ROBERT C. MORGAN, MORGAN MEZZANINE FUND MANAGER LLC, and MORGAN ACQUISITIONS LLC,** | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Robert C. Morgan ("Morgan"), Morgan Mezzanine Fund Manager LLC (the

"Fund Manager"), and Morgan Acquisitions LLC ("Morgan Acquisitions") (collectively,

"Defendants"), alleges as follows:

## SUMMARY

1.      The Commission brings this emergency action to halt ongoing misconduct by

Defendants in connection with a series of fraudulent private securities offerings, which

Defendants have operated in a Ponzi scheme-like manner by using investor funds to make

interest and principal redemption payments back to prior investors, and to cover up other mortgage fraud-related conduct.

2.     Morgan is a developer of residential and commercial real estate projects located primarily in the Northeastern United States.  Morgan has financed these projects using four basic sources of capital:  (a) sales of securities directly to retail investors, on which this action focuses; (b) institutional mortgage loan financing, where the loans are then typically securitized as part of commercial mortgage-backed securities issued by either government-sponsored entities such as The Federal Home Loan Mortgage Corporation ("Freddie Mac") or private entities; (c) mezzanine financing; and (d) construction loans.  Between 2013 and September 2018, Morgan raised more than $110 million from investors through sales of securities directly to retail investors.  Of this amount, Morgan has raised at least $80 million from investors in four sets of purported funds (the "Notes Funds").

3.     The Notes Funds were supposed to help Morgan and his companies acquire multifamily residential properties and other real estate development projects.  Morgan managed the first three Notes Funds through the Fund Manager, while he operated the fourth Notes Fund through another entity, Morgan Acquisitions.

4.     Through offering memoranda and other communications, Defendants told investors in the three Notes Funds managed by the Fund Manager that their investments would be used to make unsecured subordinated loans ("Portfolio Loans") to affiliated Morgan-controlled entities ("Affiliate Borrowers") so that those entities could either acquire, manage, or operate existing multifamily properties or so that they could acquire new real estate development properties.  Defendants told investors in the Notes Fund operated by Morgan Acquisitions that their investments would be used in a substantially similar manner.

2

5.      Defendants further told investors that they would be paid a target return of 11%. For the Notes Funds managed by the Fund Manager, Morgan personally guaranteed the repayment of each Portfolio Loan by each Affiliate Borrower, which he charged interest at a rate sufficient to meet the Notes Funds' target return to investors.  For the Notes Funds managed by Morgan Acquisitions, Morgan personally guaranteed the investor notes issued by Morgan Acquisitions to the individual investors.

6.      Over time, more than 200 individuals and entities located in at least 17 states have invested in the Notes Funds, many of whom are residents of this District.  Approximately three dozen investors used their retirement accounts to invest directly in the Notes Funds.  A pension plan for an electrical workers union based in this District also invested in the Notes Funds.

7.      Many of the Affiliate Borrower properties in which the Notes Funds invested did not generate sufficient cash flow to either service or repay both their secured lenders and the Notes Funds.

8.      As a result, Defendants have used the Notes Funds as a single, fraudulent slush fund, repeatedly using the funds for purposes inconsistent with the representations and disclosures made to investors.  To conceal their fraudulent conduct, and to mislead their auditors, Defendants papered these transfers using sham loan documents designed to make the transfers appear legitimate.

9.      Defendants have engaged in at least three types of fraudulent conduct with respect to the Notes Funds.  *First*, Defendants have used later-formed Notes Funds to facilitate Ponzi scheme-like redemptions of earlier investors and to repay non-performing, maturing loans made by earlier-formed Notes Funds.  *Second*, lacking sufficient funds from the Affiliate Borrowers themselves, and instead of making good on Morgan's personal guaranty, Defendants have used

the Notes Funds, again in a Ponzi scheme-like manner, to make the 11% interest payments back to investors. *Third*, in connection with Morgan's efforts to repay an inflated, fraudulently-obtained loan concerning The Eden Square Apartments in Cranberry Township, Pennsylvania ("Eden Square"),[1] and in order to conceal that fraud, Morgan improperly used more than $11 million in Notes Fund assets to help pay off the prior loan along with more than $2.6 million in prepayment penalties.

10.     Emergency relief is necessary in order to protect investors in the Notes Funds. Though investors are owed more than $63 million, the Notes Funds have few if any assets beyond the receivables from the Portfolio Loans they have already made to Affiliate Borrowers. Accordingly, a freeze of Morgan's assets, which includes his equity interests in these Affiliate Borrowers, will help preserve the status quo and protect against the dissipation of further assets, while also maximizing the value of Morgan's existing assets for the benefit of investors. Indeed, news reports indicate that, a day after the recent guilty plea of an individual who used to work for Morgan, and who implicated Morgan in an insurance fraud conspiracy,[2] Morgan listed his primary residence for sale. Additionally, with the properties in the Morgan portfolio in various stages of marketing and sale, and Morgan's own superseding indictment that was returned in the Morgan Criminal Action on the afternoon of May 21, 2019, a Court-appointed receiver is necessary to administer and unwind the Notes Funds, make payments authorized by the governing documents, and pursue claims on behalf of the Notes Funds (including claims against Morgan on his personal guaranties).

---

[1] *See United States v. Frank Giacobbe, et al.*, No. 18 Cr. 108 (W.D.N.Y.) (the "Morgan Criminal Action").

[2] *See United States v. Scott Cresswell*, No. 19 Cr. 99 (W.D.N.Y.).

## VIOLATIONS

11.     Through the conduct alleged herein, Defendants are each liable for violating Sections 17(a)(1), (2), and (3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)(1), (2), and (3)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

12.     Through the conduct alleged herein, Morgan is liable as a control person for the Fund Manager's and Morgan Acquisitions' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

13.     Unless Defendants are permanently restrained and enjoined, Defendants will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and permanently enjoin Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein, and such other and further relief as the Court may deem just and appropriate.

15.     The Commission seeks final judgments ordering Defendants to:  (a) disgorge their ill-gotten gains, together with prejudgment interest thereon; and (b) pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

16.     The Commission also seeks a temporary restraining order and preliminary and permanent injunctions:  (a) enjoining Defendants from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (b) freezing Morgan's assets; (c) appointing a receiver over the Notes Funds and the Fund Manager; (d) enjoining the filing of any bankruptcy, foreclosure, or receivership actions by or against the Notes Funds or the Fund Manager; (e) requiring Defendants to submit a verified accounting of their assets, including the use of the Notes Funds assets, and the disposition of any assets of the current Affiliate Borrowers to or for the direct or indirect benefit of Morgan; (f) granting expedited discovery; and (g) preventing Defendants from destroying or altering any relevant documents.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

18.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and transactions constituting violations alleged in this Complaint occurred within the Western District of New York.  For example, certain offers and sales of the securities comprising the Notes Funds occurred within this District, including offers and sales to investors located in counties (such as Genesee and Wyoming) that are part of the Buffalo Division.  Additionally, certain Affiliate Borrowers have received Portfolio Loans from the Notes Funds for properties located in this District, including counties (such as Erie) that are part of the Buffalo Division; these Portfolio Loans have been used to facilitate the fraudulent conduct described herein.

19.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of transportation or communication in, and the means or instrumentalities of, interstate commerce.

## DEFENDANTS

20.     **Morgan**, age 62, resides in Pittsford, New York.  Through his various companies, for more than thirty years, Morgan has owned, operated, and developed residential and commercial real estate, including multifamily properties, located primarily in the Northeastern United States.  From 1998 until April 2018, Morgan managed his portfolio of multifamily properties through Morgan Management, LLC ("Morgan Management"); in April 2018, Morgan sold Morgan Management to Grand Atlas Property Management, LLC ("Grand Atlas").  On May 21, 2019, Morgan was indicted in the Morgan Criminal Action on 46 counts of wire fraud, bank fraud, conspiracy to commit wire and bank fraud, and conspiracy to commit money laundering.

21.     The **Fund Manager** is a New York limited liability company formed in 2013 with its principal place of business in Pittsford, New York.  The Fund Manager was formed to manage and control the business affairs of the first three Notes Funds, including by making Portfolio Loans to Affiliate Borrowers and by making distributions to investors.  Morgan is the managing member and sole owner of the Fund Manager.

22.     **Morgan Acquisitions** is a New York limited liability company formed in 1998 with its principal place of business in Pittsford, New York.  Morgan has used Morgan Acquisitions to put properties he planned to acquire under contract; Morgan then later transferred ownership of these properties to another entity, such as an Affiliate Borrower.  Morgan has also used Morgan Acquisitions to raise investor funds, which constitute the fourth Notes Fund, in

parallel to the other three Notes Funds.  Morgan is the managing member and sole owner of Morgan Acquisitions.

## FACTS

**Background on the Notes Funds**

23.     Between October 2013 and September 2018, on a near-continuous basis, Morgan raised at least $80 million from investors in connection with four, separate Notes Funds.

24.     The first three Notes Funds—Notes Funds I, II, and III—were and are managed by the Fund Manager and are each divided into investments by either purportedly accredited investors (an "AI Fund") or qualified purchasers (a "QP Fund").

25.     The definition of accredited investor is contained in Securities Act Rule 501(a) [17 C.F.R. § 230.501(a)], while the definition of qualified purchaser is contained in Section 2(a)(1) of the Investment Company Act of 1940 [15 U.S.C. § 80a-2(a)(51)].  Generally speaking, an investor must have a higher net worth to be considered a qualified purchaser ($5,000,000) than they do to be considered an accredited investor ($1,000,000).

26.     Morgan formed two separate Delaware limited liability companies for each of the first three Notes Funds—one for each AI Fund and one for each QP Fund—and served as the managing member of each such company.  Investors then purchased membership interests in either an AI Fund or a QP Fund pursuant to a subscription agreement with the Fund Manager and signed by Morgan.

27.     For the first three Notes Funds, another individual who worked at both Morgan Management and Grand Atlas and was an officer of the Fund Manager ("Executive-1") typically sent potential investors a subscription package by email.  The package contained an offering memorandum, the operating agreement for the limited liability company in which the investor

was purchasing a membership interest, a subscription agreement with the Fund Manager, a copy of Morgan's personal guaranty agreement, and the redemption policy.  Investors were then required to sign and return signature pages for both the subscription agreement and the operating agreement.

28.     The fourth Notes Fund was structured differently than the other three.  Morgan, on behalf of Morgan Acquisitions, entered into a loan agreement with each investor and issued a promissory note to the investor in the amount of the loan.

29.     Each loan agreement advises that the corresponding promissory note has not been registered with the Commission under the Securities Act, and requires the investor to represent that he or she is an accredited investor for purposes of Securities Act Rule 501.

30.     The first Notes Fund had an initial term of five years, whereas the second and third Notes Funds had initial terms of seven years.  The Fund Manager was authorized to extend these initial terms by exercising up to two one-year extensions.  As for the fourth Notes Fund, the Morgan Acquisitions promissory notes contain terms ranging from two to seven years.

31.     The dates of each Notes Fund offering, along with the amounts raised in each offering, are summarized in the chart below.

| Name | Offering Dates | Amounts Raised | Amounts Outstanding |
|------|----------------|----------------|---------------------|
| Notes Fund I | October 2013 – October 2015 | $24.9 million[3]<br><br>AI Fund ($7.6 million); QP Fund ($17.3 million) | $13.6 million<br><br>AI Fund ($0, fully redeemed on August 1, 2017); QP Fund ($13.6 million) |
| Notes Fund II | February 2015 – February 2016 | $24.9 million<br><br>AI Fund ($8.9 million); QP Fund ($16.0 million) | $22.0 million<br><br>AI Fund ($8.3 million); QP Fund ($13.7 million) |
| Notes Fund III | January 2016 – September 2018 | $22.3 million<br><br>AI Fund ($9.0 million); QP Fund ($13.3 million) | $19.6 million<br><br>AI Fund ($7.6 million); QP Fund ($12.0 million) |
| Morgan Acquisitions | September 2015 – May 2018 | $7.9 million | $7.9 million |
| **Totals** | | **$80.0 million** | **$63.1 million** |

32.     Since January 2017, Morgan, through the Fund Manager, has returned approximately $16.9 million in principal back to investors, with the last such redemption in February 2019.  Approximately $7.6 million of this amount is attributable to the full redemption of the first AI Fund, though more than $4.9 million of this redemption was reinvested back into Notes Fund III just days later.

33.     Though Notes Fund III received its last initial investments in or about September 2017, thereafter, Morgan and the Fund Manager accepted new investors, and also satisfied additional redemption requests, by facilitating assignments of membership interests.

---

[3] Of this amount, approximately $13.7 million was raised within the last five years ($4.8 million for the AI Fund, $8.9 million for the QP Fund).

34.     To effectuate these assignments, a new investor sent his or her investment, an amount equal to that of a redeeming investor, to a Notes Fund bank account.  The redeeming investor then received his or her principal back from the Notes Fund and assigned his or her membership interest to the new investor.  Morgan, on behalf of the Fund Manager, signed documents formally admitting the new investor into the Notes Fund.

35.     Since February 2018, Notes Fund III has received at least $1.2 million in additional investments by virtue of such assignments and redemptions, which the Fund Manager then used to satisfy further redemption requests.

36.     More than 200 individuals and entities have invested in the Notes Funds over time, including between 10 and 65 individuals and entities per Notes Fund.  Many of these individuals and entities invested in the Notes Funds on multiple occasions.

37.     Morgan and Executive-1 typically met, spoke with, and/or emailed potential investors in the Notes Funds.  Executive-1 interfaced directly with current and potential investors in the Notes Funds and then relayed questions and other developments to Morgan.

38.     Executive-1 often set up meetings and dinners with potential investors, which Executive-1 and Morgan attended, and at which Executive-1 and Morgan presented and discussed the investment opportunity in the Notes Funds.

39.     Morgan then urged Executive-1 to raise as much money as possible from these investors.  For example, in emails on or about June 30, 2015, in which Morgan and Executive-1 discussed Executive-1's efforts to obtain additional investments in the Notes Funds, Morgan told Executive-1 to "put the hammer down and raise more funds" and to "push as hard as you can."

**Representations and Disclosures to Investors**

40.     For the first three Notes Funds, in both the offering memoranda and various emails, Defendants told investors that their investments would be used to make Portfolio Loans to Affiliate Borrowers so that those Affiliate Borrowers could more efficiently acquire, manage, operate, hold, or sell multifamily properties, or in connection with their acquisition of real estate development projects.

41.     Defendants told investors in the first three Notes Funds that they would make Portfolio Loans at rates sufficient to meet 11% target returns to investors, which the Notes Funds paid in monthly installments.  Defendants further told investors that the Notes Funds would make interest payments to them using the interest income generated by the Portfolio Loans, which were interest-only until maturity.  The maturities of the Portfolio Loans typically ranged from 18 to 24 months.

42.     The offering memoranda for later Notes Funds stated that Portfolio Loans made by prior Notes Funds were performing such that the interest generated by these Portfolio Loans had always been sufficient to fund the 11% interest payments to investors.

43.     For example, in its sections describing the performance of Notes Fund I, the offering memorandum for Notes Fund II stated that "[a]ll of the Fund I Portfolio Loans are paying the 11% target return on schedule," and that "[s]ince its inception Fund I has paid, and is paying, its investors the 11% target return as projected therein totaling more than $1.7 million in distributions to date."

44.     Similarly, in the offering memorandum for Notes Fund III, Defendants told investors that "[a]ll of the Fund I Portfolio Loans are paying the 11% target return on schedule," "[a]ll of the Fund II Portfolio Loans are paying the 11% target return on schedule," and "[s]ince

12

its inception Fund I and Fund II have paid, and are paying, investors the 11% target return as projected therein totaling more than $5.0 million in distributions to date."

45.     Morgan personally guaranteed the repayment of each Portfolio Loan, including all principal and interest due by the Affiliate Borrower, back to the Notes Funds.

46.     The package of documents Defendants provided to investors in the fourth Notes Fund, which was operated by Morgan Acquisitions, provided a similar but less detailed description of the nature of the investment they were offering.

47.     Like the first three Notes Funds, the fourth Notes Fund typically required Morgan Acquisitions to pay monthly 11% interest payments, with both interest and the return of principal personally guaranteed by Morgan.

48.     The loan agreements between investors and Morgan Acquisitions specified a particular property owned by a Morgan-controlled entity for which the investor's funds would be used for acquisition, rehabilitation, or development or, otherwise, for similar uses with comparable properties.

49.     As the architect of the Notes Funds, Morgan both designed and understood the permissible uses of Notes Fund assets, as those uses were represented to investors—that is, to make Portfolio Loans to generate value for Affiliate Borrowers by supplying the funds necessary to acquire or rehabilitate existing properties or to develop new real estate projects.

50.     Morgan also advised other Morgan Management and Grand Atlas employees on the permissible uses of Notes Fund assets on an ongoing basis.

**The Portfolio Loan Process**

51.     The investment strategy of all four Notes Funds was to make Portfolio Loans to Affiliate Borrowers, and to use the proceeds of those Portfolio Loans to make the 11% interest

payments back to investors and, ultimately, to return their principal.  Though the Morgan

Acquisitions investor documents do not use or define the terms "Portfolio Loans" or "Affiliate

Borrowers," because all four Notes Funds were operated in a substantially similar manner, this

Complaint uses those terms to refer to the fourth Notes Fund as well.

52.     First, either Morgan or another senior employee with Morgan's knowledge and

approval requested funds from the Notes Funds on behalf of an Affiliate Borrower.

53.     Next, the accounting personnel at Morgan Management or Grand Atlas reviewed

the account balances of the various Notes Funds to determine which Notes Funds, if any, had

available cash to lend.

54.     Morgan then approved the transfer of any funds from the Notes Funds to the

Affiliate Borrower, or to other entities on behalf of the Affiliate Borrower.

55.     Morgan had and has signature authority on all bank accounts associated with the

Notes Funds, the Affiliate Borrowers, and all other Morgan-related entities.

56.     After the funds were transferred from the Notes Funds to an Affiliate Borrower—

*i.e.*, a Portfolio Loan was funded—Executive-1 typically prepared a form promissory note

memorializing the Portfolio Loan.  In many instances, and in preparation for Notes Fund audits,

Executive-1 prepared such promissory notes several months after the Portfolio Loan was actually

funded.  Executive-1 then presented the promissory note to the managing member of the

Affiliate Borrower, typically Morgan, for the managing member's signature.

57.     These promissory notes typically had a two-year term and provided for a 5%

penalty if an Affiliate Borrower did not repay a Portfolio Loan by its maturity date.

58.     Though the Portfolio Loan process played out similarly with respect to Morgan

Acquisitions, upon information and belief, Morgan Acquisitions did not memorialize its

Portfolio Loans in written promissory notes.  No audits were performed of the Notes Fund operated by Morgan Acquisitions.

59.     Members of the accounting department at Morgan Management or Grand Atlas maintained spreadsheets for each Notes Fund that tracked, among other things, all investments, assignments, or redemptions; the status of each Portfolio Loan; and the interest payments to investors attributable to each Portfolio Loan.

60.     When Morgan determined to repay a Portfolio Loan, either the Affiliate Borrower or another entity acting on its behalf transferred the principal amount of the loan back to the relevant Notes Fund bank account.

**Defendants' Fraudulent Conduct**

61.     Though the Commission's investigation remains ongoing, it has identified at least three types of fraudulent conduct by Defendants.  The net effect of Defendants' conduct was to turn the four Notes Funds into a single slush fund that they used for whatever purposes they needed, regardless of the representations and disclosures they made and were making to investors.

*Fraudulent Loan Payoffs*

62.     Morgan used Notes Funds created later in time to repay Portfolio Loans made to Affiliate Borrowers by previously-created Notes Funds, either to facilitate the redemptions of earlier investors or to pay off non-performing or maturing loans.  To date, the Commission has identified at least $15.6 million that Defendants have improperly transferred in this manner.

63.     The representations and disclosures Defendants made to investors concerning how their investments would be used, and how the Notes Funds would operate, did not permit such Ponzi scheme-like payments.

64.     This conduct began in at least February 2016, as the auditor for Notes Fund I ("Auditor-1") began its audit work for fiscal year 2015.  Auditor-1 identified certain Portfolio Loans that Notes Fund I made in late 2013 or early 2014 that had either already matured or were about to mature and had not been paid back.  As a result, the Fund Manager faced the prospect of 5% late payment penalties on these Portfolio Loans.

65.     Morgan signed the original promissory notes for these Portfolio Loans, which were each dated as of early 2014.

66.     In or about early February 2016, just as Notes Fund II was in the process of closing, Morgan used Notes Fund II assets to pay off nearly $2 million in existing Portfolio Loans made by Notes Fund I to two Affiliate Borrowers.  These Portfolio Loans had either already matured or were about to mature.

67.     To pay off these loans, and in order to disguise the true nature of these transfers, Morgan signed multiple promissory notes that transferred or "flipped" these unpaid Portfolio Loans from Notes Fund I to Notes Fund II.  That is, Morgan signed new promissory notes purportedly borrowing from Notes Fund II the same amounts of money owed by the two Affiliate Borrowers to Notes Fund I.  In reality, Notes Fund II invested no new money in these Affiliate Borrowers but instead paid the money to Notes Fund I.

68.     Over the course of three days, in or about early February 2016, Notes Fund II transferred nearly $2 million directly to the bank accounts of Notes Fund I.  In its tracking spreadsheets, the Fund Manager recorded these transfers as payoffs of the prior Portfolio Loans by Notes Fund I and new Portfolio Loans by Notes Fund II in the same amounts and to the same Affiliate Borrowers.

69.     Upon information and belief, as was his practice with all transfers of funds into or out of the Notes Funds, Morgan authorized and approved these transfers.

70.     By the summer of 2017, with the initial five-year term of Notes Fund I expiring in less than a year and a half (in December 2018), Morgan and the Fund Manager sought to effect a full redemption of the nearly $7.6 million owed to investors in the associated AI Fund.  As they did previously in or about February 2016, Morgan and the Fund Manager funded more than $6.5 million of this redemption using the assets of other Notes Funds.

71.     On or about July 21, 2017, a Morgan Acquisitions bank account received more than $8 million from the refinancing of a property ("Property-1") that had itself received Portfolio Loans from all four Notes Funds, including each of the AI and QP Funds.  The same day, Morgan Acquisitions sent these funds back out to the four Notes Funds to repay the respective Portfolio Loans.  While approximately $1.1 million of the proceeds from the refinancing of Property-1 was paid back to the first AI Fund (which was the amount owed on the Portfolio Loans it had previously made), the remaining proceeds were paid back to the other Notes Funds.

72.     Shortly thereafter, on or about July 27, 2017, Morgan and the Fund Manager caused the other Notes Funds to pay back the remaining Portfolio Loans owed to the first AI Fund—more than $6.5 million.  First, Morgan and the Fund Manager caused the other Notes Funds to transfer amounts totaling the principal owed on each of the Portfolio Loans from their bank accounts to the bank account of each Affiliate Borrower.  Then, Morgan and the Fund Manager caused each Affiliate Borrower to transfer amounts equaling repayment of the principal owed on each Portfolio Loans from their bank accounts to the bank account for the first AI Fund.

73.     On or about August 1, 2017, the full amount of the redemption of the first AI Fund—$7.6 million—was paid back to investors.  Included among these investors were Executive-1 and another individual who helped raise capital from investors for Morgan, Executive-2.  Like Executive-1, Executive-2 was also an officer of the Fund Manager.

74.     Thereafter, like he did previously and in order to make the transactions seem legitimate, Morgan signed new promissory notes, dated August 1, 2017, evidencing new Portfolio Loans made by each of the Notes Funds that had funded the redemption.  In reality, Morgan was flipping older, unpaid Portfolio Loans made by the first AI Fund to Notes Fund III. Included among these loans was nearly $3.4 million owed by the Affiliate Borrower that owned Eden Square.  The original issuance of these Eden Square-related Portfolio Loans is described in further detail below.

75.     Because of persistent cash flow issues facing his companies, Morgan sought to keep as much of this redemption invested in other Notes Funds as possible.  Morgan pushed Executive-1 to obtain reinvestments of the redeemed funds into Notes Fund III, which was still accepting new investments.  As a result, in or about August 2017, Morgan and the Fund Manager obtained reinvestments in Notes Fund III of more than $4.9 million of the $7.6 million redemption of the first AI Fund (approximately 65%).

76.     Neither Executive-1 nor Executive-2 reinvested their portions of the redemption back into the Notes Funds.

77.     Morgan and the Fund Manager did not, however, use the $4.9 million in Notes Fund III reinvestments to make permissible Portfolio Loans.  Rather, they used nearly $4.7 million of these funds to flip additional Portfolio Loans from the first QP Fund to Notes Fund III, using the same process described above, with new promissory notes signed by Morgan.

78.     On or about September 26, 2017, Executive-1, on behalf of Morgan and the Fund

Manager, sent a notice to investors in the Notes Funds concerning recent press coverage

"reporting that Morgan Communities and perhaps other developers are the subject of a pending

federal investigation."

79.     Thereafter, Morgan and the Fund Manager began receiving additional redemption

requests from Notes Fund investors.  Because Executive-1 typically interfaced directly with

investors in the Notes Funds, Executive-1 received redemption requests and then relayed them to

Morgan for his review and approval as to if, when, and how the requests would be honored.

80.     Like they did previously, Morgan and the Fund Manager satisfied many of these

redemption requests by using the assets of other Notes Funds to make payments to investors.

Morgan and the Fund Manager then papered the transfers as a purported Portfolio Loan payoff

by an Affiliate Borrower to the redeeming fund and a new Portfolio Loan to the same Affiliate

Borrower by the Notes Fund providing the cash.

81.     For example, in or about March 2018, Morgan and the Fund Manager used

approximately $275,000 in Notes Fund assets from the first three QP Funds to fund investor

redemptions in the third AI Fund.  In or about October 2018, Morgan and the Fund Manager

used nearly $1.9 million in Notes Fund assets from Notes Fund II, Notes Fund III, and Morgan

Acquisitions to fund investor redemptions in Notes Funds I.

82.     Morgan and the Fund Manager have continued to facilitate investor redemptions

in the manner described above as recently as February 2019, when they facilitated a redemption

of $200,000 invested in the third QP Fund using investor assets from Notes Fund II and the third

AI Fund.

*Fraudulent Interest Payments*

83.     Defendants have also engaged in Ponzi scheme-like activity with respect to their interest payments to Notes Fund investors, at times using additional Notes Fund assets to make the 11% interest payments back to investors.  Defendants' representations and disclosures to investors did not permit this use of Notes Fund assets.

84.     Defendants accomplished this misuse of Notes Fund assets by making new Portfolio Loans to Affiliate Borrowers in need of cash to satisfy, among other things, the interest they owed back to the Notes Funds on existing Portfolio Loans.  Defendants then used the Affiliate Borrowers' interest payments to make the 11% monthly interest payments by the Notes Funds to investors.

85.     At times, Defendants used Notes Fund assets to set up "interest reserves" intended to fund Affiliate Borrower interest payments on their Portfolio Loans back to the Notes Funds for several months.

86.     As such, Defendants caused transfers of funds from the Notes Funds to multiple Affiliate Borrowers in order to cover existing and future interest payments that those Affiliate Borrowers owed on outstanding Portfolio Loans.  Over the next several months, each of the Affiliate Borrowers made the interest payments owed pursuant to the outstanding Portfolio Loans to the relevant Notes Funds, with the Notes Funds then using those funds to make the 11% interest payments owed to their investors.

87.     Defendants misused Notes Fund assets in this manner because Morgan's multifamily business empire was in constant need of cash.  Morgan routinely used the Notes Funds to put up the equity necessary to obtain mortgage financing on his properties.  As result,

and as described by Executive-2 in an email to Executive-1, Morgan was essentially "leveraging up to 100% by using Notes [Funds] as our equity."

88.     By at least April 2016, Morgan used Notes Fund assets to cover monthly operating deficits on multiple properties.  These operating deficits included Portfolio Loan interest owed by various Affiliate Borrowers.

89.     For example, on or about April 19, 2016, a member of the Morgan Management accounting department ("Employee-1") wrote an email to Morgan and others requesting funding from the Notes Funds for three Affiliate Borrowers to cover accounts payable and payroll. Employee-1 wrote that "[a]ll of these accounts are negative today due to the notes fund interest checks clearing yesterday."

90.     By January 2017, the Affiliate Borrowers were collectively running a monthly deficit attributable to the interest payments they owed to the Notes Funds (which the Notes Funds would then use to make interest payments to investors) of more than $120,000.

91.     In order to use Notes Fund assets to make these interest payments back to investors, Defendants moved the funds through multiple bank accounts.

92.     For example, on or about July 22, 2016, Morgan Acquisitions received three separate investments of $170,000.  Soon thereafter, in or about August 2016, Morgan transferred these funds to, among other entities, two Affiliate Borrowers, which then used the funds to make interest payments on their Portfolio Loans to the Notes Funds.  The Notes Funds then used these funds to make the 11% interest payments back to their investors.

93.     Morgan authorized the use of Notes Fund assets to pay Notes Fund interest to investors.  For example, on or about January 9, 2017, Employee-1 wrote an email to Morgan and others stating that "[w]e need funds today to cover the 11% notes fund loan interest checks that

are clearing today," and then listing three Affiliate Borrowers with cash needs totaling $52,000. In response, Morgan wrote "Im good."  Thereafter, the Fund Manager transferred $52,000 from Notes Fund III to these three Affiliate Borrowers, which used the funds to cover their interest payments back to the Notes Funds on other Portfolio Loans.

94.      In or about February 2017, another executive at Morgan Management ("Executive-3"), at the direction of Morgan, directed the disbursement of approximately $755,000 from Notes Fund I to four separate Affiliate Borrowers for the purpose of pre-funding interest reserves for six Affiliate Borrowers for periods ranging from two to ten months.

95.      Similarly, in or about December 2017, Morgan Acquisitions received four investments totaling $460,000.  On or about December 18, 2017, Morgan Acquisitions transferred approximately $395,000 from these investments to the bank account of an Affiliate Borrower.  On or about December 20, 2017, that Affiliate Borrower then sent these funds to at least three other Affiliate Borrowers, which each used the funds to cover the interest payments they owed back to the Notes Funds (as well as for other operating deficits).

96.      In an email to Morgan seeking approval for these transfers, on or about December 13, 2017, Executive-3 explained this conduct as follows:  "It is a zero sum game but cleans up some of the questionable notes loans."  Morgan approved these transfers.

*Fraudulent Payments Concerning Eden Square*

97.      Morgan improperly used Notes Fund assets to cover a shortfall of more than $11 million, including prepayment penalties, to pay off a loan on Eden Square.

98.      Kevin Morgan is Morgan's nephew and a former executive at Morgan Management.

99.     On or about May 22, 2018, Kevin Morgan and others were indicted in the Morgan Criminal Action.  The original indictment charged Kevin Morgan and his co-defendants with bank fraud, wire fraud, and conspiracy to commit bank and wire fraud.

100.    On or about December 21, 2018, Kevin Morgan pleaded guilty to a one-count superseding information for conspiracy to commit bank fraud.

101.    Both the indictment and the Kevin Morgan superseding information in the Morgan Criminal Action contain certain allegations and facts related to Eden Square.

102.    In or about late 2016, in connection with efforts to obtain financing from Berkadia Commercial Mortgage, LLC ("Berkadia") for Eden Square, Kevin Morgan conspired with others to falsify rent rolls and other property financial information, to alter lease contracts to misstate rents and fees, and to provide those documents to Berkadia.

103.    On or about December 21, 2016, Kevin Morgan and others caused Berkadia to issue a $42 million loan to effect a refinancing of Eden Square (the "Berkadia Loan").  The Berkadia Loan was subsequently purchased by Freddie Mac.

104.    In or around early March 2017, an employee of Eden Square provided an inspector conducting a pre-securitization inspection on behalf of the master servicer for a securitized package of loans, which was to include Eden Square, an accurate rent roll showing the true occupancy of the property and told the inspector that the property had never reached the occupancy that had been represented.

105.    Thereafter, on or about April 26, 2017, Freddie Mac sent Kevin Morgan a set of document requests concerning the operating history of Eden Square, including requests for historical rent rolls, leases, general ledgers, and bank statements.  Freddie Mac also sought to

schedule a site visit of the Eden Square property for May 4, 2017.  Kevin Morgan forwarded

emails containing both the document requests and the request for a site visit to Morgan.

106.    Because Morgan knew that the documentation that had previously been provided

was fraudulent, Morgan knew he could not provide the requested documents (in their original,

unaltered form) to Freddie Mac or permit Freddie Mac to conduct a site visit of Eden Square.

107.    Accordingly, on or about April 28, 2017, Morgan sent Freddie Mac an email

acknowledging receipt of Freddie Mac's document requests and stating, among other things, the

following:

> We understand that Freddie Mac has not yet securitized [the Eden Square] loan.
> Sensing that Freddie Mac may have some concerns about the performance of the
> property, we would be willing to consider immediately paying off the loan at par,
> assuming we are able to reach agreement on an appropriate yield maintenance
> payment, in order to save Freddie Mac some time and inconvenience.  We have
> the funds necessary to fully retire the debt without the need to place replacement
> mortgage financing on the property.

> We would thus like to change the focus to an immediate payment (and would
> therefore propose that we cancel the May 4th meeting at the property that you
> requested).  Please let us know as soon as you can whether Freddie Mac would
> consider relaxing the yield maintenance fee under the circumstances, and whether
> we need to issue a formal prepayment notice.

108.    In reality, Morgan did not have the "funds necessary to fully retire the debt

without the need to place replacement mortgage financing on the property."

109.    Morgan immediately began to seek, and ultimately obtained, a refinancing of

Eden Square from another lender ("Lender-1").  On or about May 18, 2017, Lender-1 issued a

new mortgage loan for Eden Square of approximately $35.8 million.

110.    Because of how quickly Morgan sought to pay off the Berkadia Loan—less than

five months after it was issued—Morgan was required to pay "yield maintenance" (*i.e.*, a

prepayment penalty) pursuant to a formula described in the loan documents.

111.    Though the formula would have resulted in yield maintenance of more than $5.2 million, Freddie Mac agreed to a 50% reduction, or more than $2.6 million, for the payoff of the Berkadia Loan.

112.    Even with this reduction in yield maintenance, however, with closing costs, Morgan was facing a shortfall for the payoff of the Berkadia Loan of more than $11 million.

113.    On or about May 18, 2017, Morgan received instructions in connection with the Lender-1 refinancing of Eden Square to wire $11.3 million to the settlement agent handling the closing related to the transaction ("Settlement Agent-1").

114.    Also on or about May 18, 2017, Morgan personally directed Employee-1 to wire $11.3 million from the Notes Funds to Settlement Agent-1.  Morgan then approved four wires from four separate Notes Funds—$3.5 million from the first AI Fund, $5.3 million from the first QP Fund, $1.0 million from the third AI Fund, and $1.5 million from the third QP Fund—to fund the shortfall payment to Settlement Agent-1.

115.    As was their practice, the Morgan Management accounting department recorded these transfers as new Portfolio Loans made to the Affiliate Borrower that owned Eden Square. Thereafter, Morgan signed promissory notes reflecting these Portfolio Loans for at least three of these four Notes Fund transfers.

116.    Nearly $11.2 million of these funds were used to pay off the Berkadia Loan; at Morgan's direction, Settlement Agent-1 wired the remaining funds back to the first AI Fund.

117.    As described above, the Fund Manager was supposed to make Portfolio Loans in order to add value to properties or projects.  In this case, Morgan and the Fund Manager used Notes Fund assets not to add value to Eden Square but to pay off a loan that was under water,

along with more than $2.6 million in prepayment penalties, to prevent further detection of the fraud by Morgan and his employees.

118.    Morgan understood the permissible uses of Notes Fund assets at the time he authorized the payoff of the Berkadia Loan using the Notes Funds.

119.    Though Morgan and the Fund Manager have transferred portions of the $11.3 million in Eden Square indebtedness to other Notes Funds, these amounts remain outstanding.

120.    Currently, the Notes Funds are owed more than $11.3 million by the Affiliate Borrower that owns Eden Square, which is the largest set of debts associated with a single Affiliate Borrower and is more than 18% of all current Portfolio Loans.

121.    The Eden Square-related Portfolio Loans likely have little if any value.  In an email to Kevin Morgan dated on or about February 12, 2019, Morgan states: "Eden square we will lose approximately 11 -$12 million on the sale so we will be responsible for notes funds of $12 million plus interest."

**Status of the Notes Funds**

122.    The Notes Funds currently have Portfolio Loans outstanding to at least 45 Affiliate Borrowers.  Other than these receivables, which are personally guaranteed by Morgan, the Notes Funds have few if any assets.

123.    The Notes Funds have monthly debt service obligations to investors of approximately $620,000.  More than $63 million in investor principal remains invested.

124.    Within the last month, Morgan closed on the sale of a property by an Affiliate Borrower.  That Affiliate Borrower used approximately $3 million from the proceeds of that sale to repay its Notes Fund Portfolio Loans.  Those funds are now awaiting disbursement.

## FIRST CLAIM FOR RELIEF

### Morgan, the Fund Manager, and Morgan Acquisitions Violated
### Sections 17(a)(1), (2), and (3) of the Securities Act

125.    The Commission realleges paragraphs 1 through 124, above.

126.    Defendants each violated Section 17(a)(1), (2), and (3) of the Securities Act [15

U.S.C. § 77q(a)(1), (2), and (3)].

127.    From at least 2016 to the present, Defendants, directly or indirectly, by use of the

means or instruments of interstate commerce, or of the mails, or the facility of a national

securities exchange, in connection with the offer or sale of securities, and with knowledge,

recklessness, or negligence, (a) employed devices, schemes, or artifices to defraud; (b) obtained

money or property by means of untrue statements of material fact or by omitting to state material

facts necessary to make the statements made, in light of the circumstances under which they

were made, not misleading; and/or (2) engaged in acts, practices or courses of business which

operated or would operate as a fraud or deceit upon the purchasers of the securities being offered

or sold.

## SECOND CLAIM FOR RELIEF

### Morgan, the Fund Manager, and Morgan Acquisitions Violated
### Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c) Thereunder

128.    The Commission realleges paragraphs 1 through 124, above.

129.    Defendants each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

130.    From at least 2016 to the present, Defendants, directly or indirectly, by use of the

means or instruments of interstate commerce, or of the mails, or the facility of a national

securities exchange, in connection with the purchase or sale of securities, and with knowledge or

recklessness, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts practices, or courses of business which operates or would operate as a fraud or deceit upon any person.

## THIRD CLAIM FOR RELIEF

### Control Person Liability as to Morgan

131.     The Commission realleges paragraphs 1 through 124, above.

132.     As alleged, the Fund Manager and Morgan Acquisitions violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

133.     At all relevant times, Morgan was a control person of the Fund Manager and Morgan Acquisitions for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

134.     At all relevant times, Morgan exercised power and control over the Fund Manager and Morgan Acquisitions, including by directing and causing the direction of the management and policies of those persons, and by directing and participating in the acts constituting the violation.

135.     By reason of the foregoing, Morgan is liable as a control person, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by the Fund Manager and Morgan Acquisitions.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court grant the following relief:

### I.

An order temporarily and preliminarily, through final judgments, restraining and enjoining Defendants from directly or indirectly committing future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

An order temporarily and preliminarily, through final judgments, freezing Morgan's assets;

### III.

An order temporarily and preliminarily, through final judgments, appointing a receiver over the Notes Funds and the Fund Manager;

### IV.

An order temporarily and preliminarily, through final judgments, enjoining the filing of any bankruptcy, foreclosure, receivership actions by or against the Notes Funds or the Fund Manager;

### V.

An order requiring Defendants to submit a verified accounting of their assets, including the use of the Notes Funds assets, and the disposition of any Affiliate Borrower assets to or for the direct or indirect benefit of Morgan;

**VI.**

An order temporarily and preliminarily, through the Court's decision on the

Commission's application for a preliminary injunction, permitting expedited discovery;

**VII.**

An order temporarily, and preliminarily through final judgments, restraining and

enjoining Defendants and any person or entity acting at their direction or on their behalf, from

destroying, altering, concealing, or otherwise interfering with the access of the Commission to

relevant documents, books and records;

**VIII.**

Final judgments permanently restraining and enjoining Defendants from directly or

indirectly, or by aiding and abetting, committing future violations of Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**IX.**

Final judgments ordering Defendants to disgorge all ill-gotten gains or unjust enrichment,

plus prejudgment interest thereon;

**X.**

Final judgments ordering Defendants to pay civil monetary penalty pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)]; and

**XI.**

Granting such other and further relief as the Court deems just, equitable, or necessary in

connection with the enforcement of the federal securities laws and for the protection of investors.

## DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury pursuant to Rule 38(b) of the Federal

Rules of Civil Procedure.

Dated:   New York, New York
        May 22, 2019

                              Respectfully submitted,


                         By:  /s/ Daniel Michael
                              Daniel Michael
                              Osman Nawaz
                              Alexander Vasilescu
                              Neal Jacobson
                              Joshua I. Brodsky
                              Lee A. Greenwood
                              Attorneys for the Plaintiff
                              SECURITIES AND EXCHANGE
                                COMMISSION
                              New York Regional Office
                              200 Vesey Street, Suite 400
                              New York, NY 10281-1022
                              (212) 336-1060 (Greenwood)