**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                    **Plaintiff,**

      **v.**

**ROBERT C. MORGAN, MORGAN**
**MEZZANINE FUND MANAGER LLC, and**
**MORGAN ACQUISITIONS LLC,**

                    **Defendants.**

**19 Civ. 661**

## DECLARATION OF LEE A. GREENWOOD

    I, Lee A. Greenwood, pursuant to 28 U.S.C. § 1746, declare as follows:

    1.    I am a member of the bar of the State of New York, and I am employed as Senior

Counsel in the Division of Enforcement in the New York Regional Office of plaintiff Securities

and Exchange Commission (the "Commission"). I submit this Declaration in support of

Plaintiff's Emergency Application for a Temporary Restraining Order, Preliminary Injunction,

Asset Freeze, Receiver, and Other Relief (the "Motion").

    2.    Plaintiff is seeking emergency relief because Defendants have engaged in Ponzi

scheme-like conduct and other fraudulent activity with investor assets for more than three years,

and investors in the Notes Funds[1] have more than $63 million in principal still invested.

Additionally, Morgan, who was himself charged in a 46-count superseding indictment on May

21, 2019, with wire fraud, bank fraud, conspiracy to commit wire and bank fraud, and conspiracy

to commit money laundering, has been seeking and may continue to seek to dissipate assets.

---

[1] All terms not otherwise defined herein shall have the meanings ascribed to them in the Motion and/or the
Complaint. Citations to "Greenwood Decl." are to this Declaration, whereas citations to "Palen Decl." are to the
Declaration of Kerri L. Palen, which is also being submitted in support of the Motion.

3.      I am familiar with the facts and circumstances herein.  I make this Declaration based upon, among other things, my review and analysis of emails, spreadsheets, and other documents produced to the Commission staff in connection with its investigation, including by M&T Bank, PNC Bank, Grand Atlas, Freddie Mac, Stewart Title Guaranty Corporation ("Stewart Title"), Kevin Morgan, EFPR Group, LLP ("EFPR"), and The Bonadio Group.

**Background on Defendants**

4.      Morgan resides in Pittsford, New York.  Through his various companies, for more than thirty years, Morgan has owned, operated, and developed commercial real estate, including multifamily properties, located primarily in the Northeastern United States.  From 1998 until April 2018, Morgan managed his portfolio of multifamily properties through Morgan Management; in April 2018, Morgan sold Morgan Management to Grand Atlas.

5.      The Fund Manager is a New York limited liability company formed in 2013 with its principal place of business in Pittsford, New York.  The Fund Manager was formed to manage and control the business affairs of the first three Notes Funds, including by making Portfolio Loans to Affiliate Borrowers and by making distributions to investors.  Morgan is the managing member and sole owner of the Fund Manager.

6.      Morgan Acquisitions is a New York limited liability company formed in 1998 with its principal place of business in Pittsford, New York.  Morgan has used Morgan Acquisitions to put properties he planned to acquire under contract; Morgan then later transferred ownership of these properties to another entity, such as an Affiliate Borrower.  Morgan has also used Morgan Acquisitions to raise investor funds, which constitute the fourth Notes Fund, in parallel to the other three Notes Funds.  Morgan is the managing member and sole owner of Morgan Acquisitions.

2

**Structure of the Notes Funds**

7.      Based on my review of the tracking spreadsheets produced by Grand Atlas, and corresponding bank records, between October 2013 and September 2018, on a near-continuous basis, Morgan raised approximately $80 million from investors in connection with four, separate Notes Funds.  Attached hereto as Exhibit 1 is a true and correct copy of a summary chart I prepared concerning these securities offerings.

8.      Morgan manages the first three Notes Funds—Notes Funds I, II, and III— through the Fund Manager.  Each of these Notes Funds are divided into investments by either purportedly accredited investors (an "AI Fund") or qualified purchasers (a "QP Fund").

9.      Morgan formed two separate Delaware limited liability companies for each of the first three Notes Funds—one for each AI Fund and one for each QP Fund—and served as the managing member of each such company.  Investors then purchased membership interests in either an AI Fund or a QP Fund pursuant to a subscription agreement with the Fund Manager and signed by Morgan.

10.     David Rumsey ("Rumsey") worked at both Morgan Management and Grand Atlas in an investor relations role.  Rumsey also was the general counsel of those companies at various points in time and was an officer of the Fund Manager.

11.     For the first three Notes Funds, Rumsey typically sent potential investors a subscription package by email.  The package contained an offering memorandum, the operating agreement for the limited liability company in which the investor was purchasing a membership interest, a subscription agreement with the Fund Manager, a copy of Morgan's personal guaranty agreement, and the redemption policy.  Investors were then required to sign and return signature pages for both the subscription agreement and the operating agreement.

3

12.     Attached hereto as Exhibits 2 through 7 are true and correct copies of the subscription packages for the first AI Fund (Exhibit 2), the first QP Fund (Exhibit 3), the second AI Fund (Exhibit 4), the second QP Fund (Exhibit 5), the third AI Fund (Exhibit 6), and the third QP Fund (Exhibit 7).  The Fund Manager also sent a supplement to the original offering memorandum to potential investors in Notes Fund III, a true and correct copy of which is attached hereto as Exhibit 8.

13.     As for the fourth Notes Fund, Morgan, on behalf of Morgan Acquisitions, entered into a loan agreement with each investor and issued a promissory note to the investor in the amount of the loan.  Attached hereto as Exhibit 9 is true and correct copy of a representative loan agreement and promissory note concerning an investment into the fourth Notes Fund.

14.     Each loan agreement advises that the corresponding promissory note had not been registered with the Commission under the Securities Act, and requires the investor to represent that he or she is an accredited investor for purposes of Securities Act Rule 501.  (*See* Greenwood Decl. Ex. 9 at 3.)

15.     Attached hereto as Exhibit 10 are true and correct copies of representative cover emails Rumsey sent to potential investors in the first three Notes Funds, followed by a representative email from Rumsey concerning the execution of the loan agreements for investment into the fourth Notes Fund.

16.     The first Notes Fund had an initial term of five years, whereas the second and third Notes Funds had initial terms of seven years.  (*See id.* Ex. 2 at 12; Ex. 4 at 12; Ex. 6 at 13.) The Fund Manager was authorized to extend these initial terms by exercising up to two one-year extensions.  (*See id.* Ex. 2 at 12; Ex. 4 at 12; Ex. 6 at 13.)  As for the fourth Notes Fund, the

Morgan Acquisitions promissory notes contain terms ranging from two to seven years.  (*See id.* Ex. 9 at 10 (three years).)

17.     Since January 2017, Morgan, through the Fund Manager, has returned approximately $16.9 million in principal back to investors, with the last such redemption in February 2019.  (*See id.* Ex. 1; Palen Decl. ¶ 28.)  Approximately $7.6 million of this amount is attributable to the full redemption of the first AI Fund, though more than $4.9 million of this redemption was reinvested back into Notes Fund III just days later.  (*See* Palen Decl. ¶¶ 15-20.)

18.     Though Notes Fund III received its last initial investments in or about September 2017, thereafter, Morgan and the Fund Manager accepted new investors, and also satisfied additional redemption requests, by facilitating assignments of membership interests.  To effectuate these assignments, a new investor sent his or her investment, an amount equal to that of a redeeming investor, to a Notes Fund bank account.  The redeeming investor then received his or her principal back from the Notes Fund and assigned his or her membership interest to the new investor.  Morgan, on behalf of the Fund Manager, signed documents formally admitting the new investor into the Notes Fund.

19.     Since February 2018, Notes Fund III has received at least $1.2 million in additional investments by virtue of such assignments, which the Fund Manager then used to satisfy redemption requests.

20.     More than 200 individuals and entities have invested in the Notes Funds over time (many of them on multiple occasions), including between 10 and 65 individuals and entities per Notes Fund.

21.     Attached hereto as Exhibit 11 are true and correct copies of representative emails between among Morgan, Rumsey, and various investors and potential investors in the Notes Funds concerning the investment opportunity.

22.     Morgan and Rumsey typically met, spoke with, and/or emailed potential investors in the Notes Funds.  Rumsey interfaced directly with current and potential investors in the Notes Funds and then relayed questions and other developments to Morgan.  Rumsey often set up meetings and dinners with potential investors, which Rumsey and Morgan attended, and at which Rumsey and Morgan presented and discussed the investment opportunity in the Notes Funds. Morgan then urged Rumsey to raise as much money as possible from these investors.  (*See* Greenwood Decl. Ex. 11.)

**Representations and Disclosures to Investors**

23.     For the first three Notes Funds, in both the offering memoranda and various emails, Defendants told investors that their investments would be used to make Portfolio Loans to Affiliate Borrowers so that those Affiliate Borrowers could more efficiently acquire, manage, operate, hold, or sell multifamily properties, or in connection with their acquisition of real estate development projects.  (*See id.* Ex. 2 at 13; Ex. 4 at 13; Ex. 6 at 14.)

24.     Defendants told investors in the first three Notes Funds that they would use their investments to make Portfolio Loans at rates sufficient to meet the 11% target returns to investors, which the Notes Funds paid in monthly installments.  (*See id.* Ex. 2 at 13; Ex. 4 at 14; Ex. 6 at 14.)  Defendants further told investors that the Notes Funds would make interest payments to them using the interest income generated by the Portfolio Loans.  (*See id.* Ex. 2 at 11; Ex. 4 at 11; Ex. 6 at 11.)  The Portfolio Loans were interest-only loans until their maturity. (*See id.* Ex. 2 at 15; Ex. 4 at 16; Ex. 6 at 16.)

6

25.     The offering memoranda for later Notes Funds stated that Portfolio Loans made by prior Notes Funds were performing such that the interest generated by these Portfolio Loans had always been sufficient to fund the 11% interest payments to investors.

26.     For example, in its sections describing the performance of Notes Fund I, the offering memorandum for Notes Fund II stated that "[a]ll of the Fund I Portfolio Loans are paying the 11% target return on schedule," and that "[s]ince its inception Fund I has paid, and is paying, its investors the 11% target return as projected therein totaling more than $1.7 million in distributions to date."  (*See id.* Ex. 4 at 11, 23.)

27.     Similarly, in the offering memorandum for Notes Fund III, Defendants told investors that "[a]ll of the Fund I Portfolio Loans are paying the 11% target return on schedule," "[a]ll of the Fund II Portfolio Loans are paying the 11% target return on schedule," and "[s]ince its inception Fund I and Fund II have paid, and are paying, investors the 11% target return as projected therein totaling more than $5.0 million in distributions to date."  (*See id.* Ex. 6 at 11-12, 24.)

28.     Morgan personally guaranteed the repayment of each Portfolio Loan, including all principal and interest due by the Affiliate Borrower, back to the various Notes Funds.  (*See id.* Ex. 2 at 121-22; Ex. 4 at 126-27; Ex. 6 at 133-34.)

29.     The package of documents Defendants provided to investors in the fourth Notes Fund, which was operated by Morgan Acquisitions, provided a similar but less detailed description of the nature of the investment being offered.

30.     Like the first three Notes Funds, the fourth Notes Fund typically required Morgan Acquisitions to pay monthly 11% interest payments, with both interest and the return of principal personally guaranteed by Morgan.  (*See id.* Ex. 9 at 10, 17.)

7

31.     The loan agreements between investors and Morgan Acquisitions specified a particular property owned by a Morgan-controlled entity for which the investor's funds would be used for acquisition, rehabilitation, or development or, otherwise, for similar uses with comparable properties.  (*See id.* Ex. 9 at 1.)

**The Portfolio Loan Process**

32.     The investment strategy of all four Notes Funds was to make Portfolio Loans to Affiliate Borrowers, and to use the proceeds of those Portfolio Loans to make the 11% interest payments back to investors and, ultimately, to return their principal.  (*See id.* Ex. 2 at 13; Ex. 4 at 14; Ex. 6 at 14.)  Though the Morgan Acquisitions investor documents do not use or define the terms "Portfolio Loans" or "Affiliate Borrowers," because all four Notes Funds were operated in a substantially similar manner, I use those terms herein to refer to the fourth Notes Fund as well.

33.     Attached hereto as Exhibit 12 are true and correct copies of representative emails between Morgan and other employees of Morgan Management and Grand Atlas that reflect various aspects of the Portfolio Loan process.

34.     First, either Morgan or another senior employee with Morgan's knowledge and approval requested funds from the Notes Funds on behalf of an Affiliate Borrower.  (*See id.* Ex. 12 at 1, 3, 6, 16, 19.)

35.     Next, the accounting personnel at Morgan Management or Grand Atlas reviewed the account balances of the various Notes Funds to determine which Notes Funds, if any, had available cash to lend.  (*See id.* Ex. 12 at 16, 19.)

36.     Morgan then approved the transfer of any funds from the Notes Funds to the Affiliate Borrower, or to other entities on behalf of the Affiliate Borrower.  (*See id.* Ex. 12 at 1, 3, 6, 16, 19.)

37.     Morgan had and has signature authority on all bank accounts associated with the Notes Funds, the Affiliate Borrowers, and all other Morgan-related entities.  Attached hereto as Exhibit 13 are true and correct copies of portions of the account opening documents for all seven of the Notes Fund bank accounts at M&T Bank.

38.     Once the funds were transferred from the Notes Funds to an Affiliate Borrower— *i.e.*, a Portfolio Loan was funded—Rumsey typically prepared a form promissory note memorializing the Portfolio Loan.  (*See id.* Ex. 12 at 3, 6.)  In many instances, Rumsey prepared such promissory notes several months after the Portfolio Loans were actually funded.  Rumsey then presented the promissory note to the managing member of the Affiliate Borrower, typically Morgan, for the managing member's signature.

39.     Members of the accounting department at Morgan Management or Grand Atlas maintained spreadsheets for each Notes Fund that tracked, among other things, all investments, assignments, or redemptions; the status of each Portfolio Loan; and the interest payments to investors attributable to each Portfolio Loan.  In preparing this Declaration, I have reviewed and analyzed copies of these spreadsheets, which were dated either as of September 15, 2017, for the first AI Fund, or as of April 15, 2019, for all other Notes Funds.

**Fraudulent Loan Payoffs**

40.     Morgan used Notes Funds created later in time to repay Portfolio Loans made to Affiliate Borrowers by previously-created Notes Funds, either to facilitate the redemptions of earlier investors or to pay off non-performing or maturing loans.  To date, the Commission staff have identified at least $15.6 million that Defendants have improperly transferred in this manner. (*See* Palen Decl. ¶ 9.)

41.     This conduct began in at least February 2016 as EFPR was beginning its audit work on Notes Fund I for fiscal year 2015.  EFPR identified certain Portfolio Loans that Notes Fund I made in late 2013 or early 2014 that had either already matured or were about to mature and had not been paid back.  As a result, the Fund Manager faced the prospect of 5% late payment penalties on these Portfolio Loans.  Attached hereto as Exhibit 14 is a true and correct copy of an email from Rumsey, without the attachment (which is Greenwood Decl. Ex. 6), concerning one of these Portfolio Loans (Ellison Heights).

42.     Morgan signed the original promissory notes for these Portfolio Loans, which were each dated as of early 2014.  Attached hereto as Exhibit 15 is a true and correct copy of a promissory note from Morgan 11% Notes Fund QP LLC to Morgan Ellison Heights LLC in the amount of $1,100,637.35 and dated as of March 27, 2014.

43.     In or about early February 2016, Morgan used Notes Fund II assets to pay off nearly $2 million in existing Portfolio Loans made by Notes Fund I to two Affiliate Borrowers, one of which was Ellison Heights.  (*See id.* ¶ 13.)

44.     To do so, and in order to disguise the true nature of these transfers, Morgan signed multiple promissory notes that transferred or "flipped" these unpaid Portfolio Loans from Notes Fund I to Notes Fund II.  That is, Morgan signed new promissory notes purportedly borrowing from Notes Fund II the same amounts of money owed by the two Affiliate Borrowers to Notes Fund I.  In reality, Notes Fund II invested no new money in these Affiliate Borrowers but instead paid the money to Notes Fund I.  Attached hereto as Exhibit 16 is a true and correct copy of a promissory note from Morgan Notes Fund QP II LLC to Robert C. Morgan in the amount of $1,100,637.35 and dated February 3, 2016.  Paragraph 16 of the note references the Ellison Heights property.

45.     Over the course of three days in or about early February 2016, Notes Fund II transferred nearly $2 million directly to the bank accounts of Notes Fund I.  In its tracking spreadsheets, the Fund Manager recorded these transfers as payoffs of the prior Portfolio Loans by Notes Fund I and new Portfolio Loans by Notes Fund II in the same amounts and to the same Affiliate Borrowers.

46.     By the summer of 2017, with the initial five-year term of Notes Fund I expiring in less than a year and a half (in December 2018), Morgan and the Fund Manager sought to effect a full redemption of the nearly $7.6 million owed to investors in the first AI Fund.  (*See id.* ¶ 15.) As they did previously in or about February 2016, Morgan and the Fund Manager funded more than $6.5 million of this redemption using the assets of other Notes Funds.  (*See id.* ¶ 18.)

47.     On or about July 21, 2017, a Morgan Acquisitions bank account received more than $8 million from the refinancing of a property, Eastside Bond, which had itself received Portfolio Loans from all four Notes Funds, including each of the AI and QP Funds.  (*See id.* ¶ 17.)  The same day, Morgan Acquisitions sent those funds back out to the four Notes Funds to repay the respective Portfolio Loans.  (*See id.* ¶ 18.)  While approximately $1.1 million of the proceeds from the refinancing of Eastside Bond was paid back to the first AI Fund (which was the amount owed on the Portfolio Loans it had previously made to the relevant Affiliate Borrower), the remaining proceeds were paid back to the other Notes Funds.  (*See id.* ¶ 17.)

48.     Shortly thereafter, on or about July 27, 2017, Morgan and the Fund Manager caused the other Notes Funds to pay back the remaining Portfolio Loans owed to the first AI Fund—more than $6.5 million.  (*See id.* ¶ 18.)  First, Morgan and the Fund Manager caused the other Notes Funds to transfer amounts totaling the principal owed on each of the Portfolio Loans from their bank accounts to the bank account of each Affiliate Borrower.  (*See id.*)  Then,

Morgan and the Fund Manager caused each Affiliate Borrower to transfer amounts equaling repayment of the principal owed on each Portfolio Loans from their bank accounts to the bank account for the first AI Fund.  (*See id.*)

49.     On or about August 1, 2017, the full amount of the redemption of the first AI Fund—$7.6 million—was paid back to investors.  (*See id.* ¶ 15.)

50.     Thereafter, Morgan signed new promissory notes, each dated as of August 1, 2017, evidencing new Portfolio Loans made by each of the Notes Funds that had funded the redemption.  In reality, Morgan was flipping older, unpaid Portfolio Loans made by the first AI Fund to other Notes Funds.  Included among these loans was nearly $3.4 million owed by the Affiliate Borrower that owned Eden Square.  Attached hereto as Exhibit 17 are true and correct copies of those promissory notes, each of which are dated August 1, 2017, and are signed by Morgan.

51.     Because of persistent cash flow issues facing his companies, Morgan sought to keep as much of this redemption invested in other Notes Funds as possible.  As a result, in or about August 2017, Morgan and the Fund Manager obtained reinvestments in Notes Fund III of more than $4.9 million, or approximately 65%, of the $7.6 million redemption of the first AI Fund.  (*See id.* ¶ 20.)

52.     Morgan and the Fund Manager did not, however, use the $4.9 million in Notes Fund III reinvestments to make permissible Portfolio Loans.  Rather, they used nearly $4.7 million of these funds to flip additional Portfolio Loans from the first QP Fund to Notes Fund III, using the same process described above, with new promissory notes signed by Morgan.  (*See id.* ¶ 14.)  Attached hereto as Exhibit 18 are true and correct copies of examples of such promissory notes, which relate to the Publisher Apartments property.

12

53.     Thereafter, Morgan and the Fund Manager began receiving additional redemption requests from Notes Fund investors.  Because Rumsey typically interfaced directly with investors in the Notes Funds, Rumsey received redemption requests and then relayed them to Morgan for his review and approval as to if, when, and how the requests would be honored. Attached hereto as Exhibit 19 are true and correct copies of representative emails between Morgan, Rumsey, and others at Morgan Management or Grand Atlas concerning investor redemption requests.

54.     Like they did previously, Morgan and the Fund Manager satisfied many of these redemption requests by using the assets of other Notes Funds to make payments to investors. Morgan and the Fund Manager then papered the transfers as a purported Portfolio Loan payoff by an Affiliate Borrower to the redeeming fund and a new Portfolio Loan to the same Affiliate Borrower by the Notes Fund providing the cash.

55.     For example, in or about March 2018, Morgan and the Fund Manager used approximately $275,000 in Notes Fund assets from the first three QP Funds to fund investor redemptions in the third AI Fund.  (*See id.* ¶ 24.)

56.     In or about October 2018, Morgan and the Fund Manager used nearly $1.9 million in Notes Fund assets from Notes Fund II, Notes Fund III, and Morgan Acquisitions to fund investor redemptions in Notes Funds I.  (*See id.* ¶ 26.)  Attached hereto as Exhibit 20 is a true and correct copy of an email from Paul White ("White"), the former Chief Financial Officer of Grand Atlas, to Morgan, Rumsey, and others concerning the mechanics of this set of investor redemptions.

57.     Morgan and the Fund Manager have continued to facilitate investor redemptions in this manner as recently February 2019, when they facilitated a redemption of $200,000 from the third QP Fund using investor assets from Notes Fund II and the third AI Fund.

**Fraudulent Interest Payments**

58.     Defendants have also engaged in Ponzi scheme-like activity with respect to their interest payments to Notes Fund investors, at times using additional Notes Fund assets to make the 11% interest payments back to investors.

59.     Defendants accomplished this misuse of Notes Fund assets by making new Portfolio Loans to Affiliate Borrowers in need of cash to satisfy, among other things, the interest they owed back to the Notes Funds on existing Portfolio Loans.  Defendants then used the Affiliate Borrowers' interest payments to make the 11% monthly interest payments by the Notes Funds to investors.

60.     By at least April 2016, Morgan used Notes Fund assets to cover monthly operating deficits on multiple properties.  These operating deficits included Portfolio Loan interest owed to the Notes Funds by various Affiliate Borrowers.  For example, on or about April 19, 2016, Kristy Trombley ("Trombley"), a member of the Morgan Management accounting department, wrote an email to Morgan and others requesting funding from the Notes Funds for three Affiliate Borrowers to cover accounts payable and payroll.  Trombley wrote that "[a]ll of these accounts are negative today due to the notes fund interest checks clearing yesterday." Attached hereto as Exhibit 21 is a true and correct copy of this email chain.

61.     By January 2017, the Affiliate Borrowers ran a monthly deficit attributable to the interest owed on Portfolio Loans (which the Notes Funds would then use to make interest payments to investors) of more than $120,000.  Attached hereto as Exhibit 22 is a true and

14

correct copy of an email chain, dated January 14, 2017, between White, Morgan, and others, to which White attaches a spreadsheet analysis of, among other things, the Notes Fund interest obligations that are not paid by the respective properties.  For January 2017, White lists this amount as $124,563 spread across fifteen properties.

62.     In order to use the Notes Funds to make these interest payments back to investors, Defendants moved the funds through multiple bank accounts.

63.     For example, on or about July 22, 2016, Morgan Acquisitions received three separate investments of $170,000.  (*See id.* ¶ 30.)  Soon thereafter, in or about August 2016, Morgan transferred these funds to, among other entities, two Affiliate Borrowers, which then used the funds to make interest payments back to investors in other Notes Funds that had extended Portfolio Loans to those Affiliate Borrowers.  (*See id.* Ex. 5.)

64.     Morgan authorized the use of Notes Fund assets to pay Notes Fund interest to investors.  For example, on or about January 9, 2017, Trombley wrote an email to Morgan and others stating that "[w]e need funds today to cover the 11% notes fund loan interest checks that are clearing today," and then listing three Affiliate Borrowers with cash needs totaling $52,000.  In response, Morgan wrote "Im good."  Attached hereto as Exhibit 23 is a true and correct copy of this email chain.  Thereafter, the Fund Manager transferred $52,000 from Notes Fund III to these three Affiliate Borrowers, which used the funds to cover their interest payments back to the Notes Funds on other Portfolio Loans.  (*See id.* ¶ 31.)

65.     On or about February 3, 2017, White directed the disbursement of approximately $755,000 from Notes Fund I to four separate Affiliate Borrowers for the purpose of pre-funding interest reserves for six Affiliate Borrowers for periods ranging from two to ten months.  White

states that the transfers are "as reviewed and agreed upon by Robert [Morgan] and Kevin [Morgan]."  Attached hereto as Exhibit 24 is a true and correct copy of this email chain.

66.     Similarly, in or about December 2017, Morgan Acquisitions received four investments totaling $460,000.  (*See id.* ¶ 33.)  On or about December 18, 2017, Morgan Acquisitions transferred approximately $395,000 from these investments to the bank account of an Affiliate Borrower.  (*See id.* Ex. 6.)  On or about December 20, 2017, that Affiliate Borrower then sent these funds to at least three other Affiliate Borrowers, which each used the funds to cover the interest payments they owed back to the Notes Funds (as well as for other operating deficits).  (*See id.*)  Attached hereto as Exhibit 25 is a true and correct copy of an email chain between White, Morgan, Rumsey, and others concerning these transfers.

**Fraudulent Payments Concerning Eden Square**

67.     Morgan used Notes Fund assets to cover a shortfall of more than $11 million, including prepayment penalties, to pay off a loan on Eden Square.

68.     Kevin Morgan is Morgan's nephew and a former executive at Morgan Management.

69.     On or about May 22, 2018, Kevin Morgan and others were indicted in the Morgan Criminal Action.  The indictment charged Kevin Morgan and his co-defendants with bank fraud, wire fraud, and conspiracy to commit bank and wire fraud.  Attached hereto as Exhibit 26 is a true and correct copy of the original indictment filed in the Morgan Criminal Action.

70.     On or about December 21, 2018, Kevin Morgan pleaded guilty to a one-count superseding information for conspiracy to commit bank fraud.  Attached hereto as Exhibit 27 are true and correct copies of the Kevin Morgan superseding information and plea agreement.

71.     Both the indictment and the Kevin Morgan superseding information in the Morgan Criminal Action contain certain allegations and facts related to Eden Square.  (*See* Greenwood Decl. Ex. 26 at 14-15; Ex. 27 at 10-11.)

72.     On May 21, 2019, Morgan was indicted in the Morgan Criminal Action on 46 counts of wire fraud, bank fraud, conspiracy to commit wire and bank fraud, and conspiracy to commit money laundering.  Attached hereto as Exhibit 28 is a true and correct copy of the Morgan superseding indictment in the Morgan Criminal Action.

73.     In or about late 2016, in connection with efforts to obtain financing from Berkadia for Eden Square, Kevin Morgan conspired with others to falsify rent rolls and other property financial information, to alter lease contracts to misstate rents and fees, and to provide those documents to Berkadia.  (*See id.* Ex. 27 at 10.)

74.     On or about December 21, 2016, Kevin Morgan and others caused Berkadia to issue a $42 million loan to effect a refinancing of Eden Square (the "Berkadia Loan").  The Berkadia Loan was subsequently purchased by Freddie Mac.  (*See id.* Ex. 27 at 11.)

75.     In or around early March 2017, an employee of Eden Square provided an inspector conducting a pre-securitization inspection on behalf of the master servicer for a securitized package of loans, which was to include Eden Square, an accurate rent roll showing the true occupancy of the property and told the inspector that the property had never reached the occupancy that had been represented.  (*See id.* Ex. 27 at 11.)

76.     Thereafter, on or about April 26, 2017, Freddie Mac sent Kevin Morgan a set of document requests concerning the operating history of Eden Square, including requests for historical rent rolls, leases, general ledgers, and bank statements.  Freddie Mac also sought to schedule a site visit of the Eden Square property for May 4, 2017.  Attached hereto as Exhibit 29

are true and correct copies of emails between Kevin Morgan and Freddie Mac, dated April 24,

25, and 26, 2017, concerning these issues.

77.     On or about April 28, 2017, after Kevin Morgan forwarded the emails contained

in Exhibit 29 to Morgan, Morgan sent Freddie Mac a response email, a true and accurate copy of

which is attached hereto as Exhibit 30.  In that email, Morgan acknowledged receipt of Freddie

Mac's document requests and stated, among other things, the following:

> We understand that Freddie Mac has not yet securitized [the Eden Square] loan.
> Sensing that Freddie Mac may have some concerns about the performance of the
> property, we would be willing to consider immediately paying off the loan at par,
> assuming we are able to reach agreement on an appropriate yield maintenance
> payment, in order to save Freddie Mac some time and inconvenience.  We have
> the funds necessary to fully retire the debt without the need to place replacement
> mortgage financing on the property.
>
> We would thus like to change the focus to an immediate payment (and would
> therefore propose that we cancel the May 4th meeting at the property that you
> requested).  Please let us know as soon as you can whether Freddie Mac would
> consider relaxing the yield maintenance fee under the circumstances, and whether
> we need to issue a formal prepayment notice.

78.     Morgan immediately began to seek, and ultimately obtained, a refinancing of

Eden Square from another lender, Ladder Capital.  On or about May 18, 2017, Ladder Capital

issued a new mortgage loan for Eden Square of approximately $35.8 million.  Attached hereto as

Exhibit 31 are true and correct copies of various documents produced by Stewart Title related to

the closing of the new Eden Square loan and the payoff of the Berkadia Loan.

79.     Because of how quickly Morgan sought to pay off the Berkadia Loan—less than

five months after it was issued—Morgan was required to pay "yield maintenance" (*i.e.*, a

prepayment penalty) pursuant to a formula described in the loan documents.  (*See id.* Ex. 30 at 1;

Ex. 31 at 2.)

80.     Though the formula would have resulted in yield maintenance of more than $5.2 million, Freddie Mac agreed to a 50% reduction, or more than $2.6 million in connection with the payoff of the Berkadia Loan.  (*See* Ex. 31 at 2.)  Attached hereto as Exhibit 32 is a true and correct copy of an email from Freddie Mac to Morgan dated May 2, 2017, describing Freddie Mac's agreement to waive yield maintenance ("YM") by 50%.

81.     Even with this reduction in yield maintenance, however, with closing costs, Morgan was facing a shortfall on the Berkadia Loan of more than $11 million.  (*See id.* Ex. 31 at 4 ("VIII. Net Loan Proceeds from Borrower ($11,190,789.52)").)

82.     On or about May 18, 2017, Morgan received instructions in connection with the Ladder Capital refinancing of Eden Square to wire $11.3 million to Stewart Title.  Attached hereto as Exhibit 33 is a true and correct copy of a series of emails, dated May 18, 2017, related to this wire transfer.

83.     Also on or about May 18, 2017, Morgan personally directed Trombley to wire $11.3 million from the Notes Funds to Stewart Title.  (*See id.* Ex. 33 at 1.)  Morgan then approved four wires from four separate Notes Funds—$3.5 million from the first AI Fund, $5.3 million from the first QP Fund, $1.0 million from the third AI Fund, and $1.5 million from the third QP Fund—to fund the payment.  Attached hereto as Exhibit 34 are true and correct copies of additional emails dated May 18, 2017, concerning these wire transfers.

84.     As was their practice, the Morgan Management accounting department recorded these transfers as new Portfolio Loans made to the Affiliate Borrower that owned Eden Square. Thereafter, Morgan signed promissory notes for at least three of the four Notes Fund transfers. Attached hereto as Exhibit 35 are true and correct copies of these promissory notes.

85.     Though Morgan and the Fund Manager have transferred portions of the $11.3 million in Eden Square indebtedness to other Notes Funds, these amounts remain outstanding.

86.     Currently, the Notes Funds are owed more than $11.3 million by the Affiliate Borrower that owns Eden Square, which is the largest set of debts associated with a single Affiliate Borrower and is more than 18% of all current Portfolio Loans.

87.     The Eden Square-related Portfolio Loans likely have little if any value.  In an email to Kevin Morgan dated February 12, 2019, Morgan states: "Eden square we will lose approximately 11 -$12 million on the sale so we will be responsible for notes funds of $12 million plus interest."  Attached hereto as Exhibit 36 is a true and correct copy of this email.

**Status of the Notes Funds and Recent Developments**

88.     Among other Grand Atlas tracking spreadsheets I have reviewed in preparing this Declaration is a spreadsheet entitled "Notes Fund Loan/Use Summary," which is dated as of April 6, 2019 (the "Loan/Use Summary").  This spreadsheet contains information about the current Portfolio Loans outstanding and the amounts of those loans categorized by both Affiliate Borrower and Notes Fund.

89.     Attached hereto as Exhibit 37 is a true and correct copy of a summary chart I prepared using the Loan/Use Summary of the remaining Affiliate Borrowers and the Notes Funds to which they owe Portfolio Loans.  As reflected on this chart, the Notes Funds currently have Portfolio Loans outstanding to at least 45 Affiliate Borrowers.

90.     Based on my review of the Loan/Use Summary, the Notes Funds have monthly debt service obligations to investors of approximately $620,000 and cash balances in their bank accounts of less than $150,000.

91.     Investors have more than $63 million in principal remaining in the Notes Funds. As of February 15, 2019, investors had submitted redemption requests of more than $20 million. Attached hereto as Exhibit 38 is a true and correct copy of an email from Rumsey concerning the status of Notes Fund redemption requests.

92.     On April 22, 2019, during a meeting with counsel to Grand Atlas (Derek Cohen of Goodwin Procter LLP) and certain of its employees, I was informed that Morgan had closed on the sale of the Copper Chase property located in York, Pennsylvania the week prior.  The seller of Copper Chase was an Affiliate Borrower that owed the Notes Funds approximately $3 million in Portfolio Loans.  I was further advised that $3 million from the proceeds of the sale of Copper Chase would soon be deposited into the relevant Notes Fund bank accounts, and that those funds would be used for additional investor redemptions.

93.     During a phone call on April 24, 2019, and a meeting on May 2, 2019, with Morgan's counsel (Joel Cohen of Gibson, Dunn & Crutcher LLP), I was advised that Morgan did not intend to distribute the $3 million in proceeds from the sale of Copper Chase to investors in the Notes Funds.

94.     During the May 2, 2019, meeting, and in subsequent phone calls, I have been advised by Morgan's counsel that Morgan is seeking to hire a third party to take over the management and operations of the Notes Funds.

95.     During a phone call with Morgan's counsel on May 13, 2019, the Commission staff asked for a copy of any final engagement letter that Morgan entered into with that third party, and Morgan's counsel agreed to provide any such final engagement letter.  To date, the Commission staff have not received a final engagement letter from Morgan.

96.     Also on or about May 13, 2019, Scott Cresswell ("Cresswell"), a former

executive at Morgan Management and Grand Atlas, entered a guilty plea to a one-count

information for conspiracy to commit wire fraud.  Cresswell implicated Morgan in the wire fraud

conspiracy to which he pleaded.  Attached hereto as Exhibit 39 are true and correct copies of the

Cresswell information and plea agreement.

97.     According to news reports in the *Rochester Democrat and Chronicle*, a day after

the Cresswell plea, Morgan listed his primary residence in Pittsford, New York for sale.

Attached hereto as Exhibit 40 is a true and correct copy of an article in the *Rochester Democrat

and Chronicle*, published on May 16, 2019, which describes the listing of Morgan's primary

residence for sale.

98.     According to news reports, Morgan's real estate portfolio is in various stages of

marketing and sale.  Attached hereto as Exhibit 41 is a true and correct copy of an article in the

*The Buffalo News*, published on May 21, 2019, which describes Morgan's recent attempts to sell

various properties to satisfy cash needs.


Dated:  New York, New York
        May 22, 2019


                                        /s/ Lee A. Greenwood
                                        Lee A. Greenwood
                                        Attorney for the Plaintiff
                                        SECURITIES AND EXCHANGE
                                          COMMISSION
                                        New York Regional Office
                                        Brookfield Place
                                        200 Vesey Street, Suite 400
                                        New York, NY 10281-1022
                                        (212) 336-1060