UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

----------------------------------------------------------x

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 19 Civ. 00661-EAW |
| | : | |
| ROBERT C. MORGAN,  MORGAN MEZZANINE FUND MANAGER LLC, and MORGAN ACQUISITIONS LLC | : | |
| | : | |
| Defendants. | : | |

----------------------------------------------------------x

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT ROBERT C. MORGAN IN OPPOSITION TO THE SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ASSET FREEZE, RECEIVER, AND OTHER RELIEF**

GIBSON, DUNN & CRUTCHER LLP
Joel M. Cohen
Lee G. Dunst
Caitlin S. Walgamuth
200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Attorneys for Defendant
ROBERT C. MORGAN

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................... 3

    **A.**    The Commission Has Long Been On Notice of the Criminal Investigation into Mr. Morgan and his Real Estate Portfolio .................................... 3

    **B.**    The Commission's Opportunistic "Emergency" Application Omits Key Facts that Refute Its Need for Emergency Relief .................................... 4

ARGUMENT ................................................................................................................ 7

    **A.**    The Commission Has Failed To Satisfy Its Burden to Show Mr. Morgan Must be Temporarily Restrained and Enjoined From Further Violations of the Federal Securities Laws ........................................... 7

        **1.**    The Commission Has Failed to Establish that Mr. Morgan Violated the Federal Securities Laws ...................................... 8

        **2.**    The Commission Has Not Proven Any Risk of Repetition ..................... 14

    **B.**    The Commission Fails to Satisfy its Burden to Seek an Asset Freeze ................ 16

        **1.**    The Commission Fails to Allege a Dissipation of Assets ........................ 16

        **2.**    An Asset Freeze Raises Serious Constitutional Concerns for Mr. Morgan's Ability to Choose Counsel In the Pending Criminal Proceeding ........................................................ 17

    **C.**    The Commission Has Failed to Show a Receiver is Needed on an Emergency Basis .......................................................... 18

    **D.**    The Commission has Not Put Forth Evidence that Other Relief Should be Granted on a Temporary Basis .......................................... 20

CONCLUSION ............................................................................................................ 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Batson v. Rim San Antonio Acquisition*, *LCC*
   2016 WL 6901312 (S.D.N.Y. Nov. 22, 2016)..........................................................................10

*Commodity Futures Trading Comm'n v. Walsh*,
   2010 WL 882875 (S.D.N.Y. March 9, 2010) ........................................................................18

*F.T.C. v. Campbell Capital LLC*,
   2018 WL 5781458 (W.D.N.Y. Oct. 24, 2018) ......................................................................16

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)...................................................................................................10

*Pollack v. Laidlaw Holdings, Inc.*,
   27 F.3d 808 (2d Cir. 1994).....................................................................................................14

*Reves v. Ernst & Young*,
   494 U.S. 56, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990)...........................................................14

*S.E.C. v. Aequitas Mgmt., LLC*,
   2017 WL 1206691 (D. Or. Jan. 9, 2017) ..............................................................................13

*S.E.C. v. Am. Bd. of Trad., Inc.*,
   645 F. Supp. 1047 (S.D.N.Y. 1986).......................................................................................19

*S.E.C. v. Cavanagh*,
   1 F. Supp. 2d 337 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998) ....................................7, 8

*S.E.C. v. Coates*,
   1994 WL 455558 (S.D.N.Y. Aug. 23, 1994).........................................................................18

*S.E.C. v. Infinity Grp. Co.*,
   212 F.3d 180 (3d Cir. 2000)...................................................................................................17

*S.E.C. v. Manor Nursing Ctrs., Inc.*,
   458 F.2d 1082 (2d Cir. 1972)......................................................................................16, 17, 19

*S.E.C. v. Oxford Capital Sec., Inc.*,
   794 F. Supp. 104 (S.D.N.Y. 1992).........................................................................................21

*S.E.C. v. Unifund SAL*,
   910 F.2d 1028 (2d Cir. 1990)...................................................................................................7

*S.E.C. v. Universal Express, Inc.*,
   2007 WL 2469452 (S.D.N.Y. Aug. 31, 2007).......................................................................19

# TABLE OF AUTHORITIES
(continued)

Page(s)

*S.E.C. v. Watermark Fin. Servs. Grp., Inc.*,
   2012 WL 501450 (W.D.N.Y. Feb. 14, 2012) ........................................................................13

*S.E.C. v. Yorkville Advisors, LLC*,
   305 F. Supp. 3d 486 (S.D.N.Y. 2018) ............................................................................9, 14

*SEC v. Lybrand*,
   2000 WL 913894 (S.D.N.Y. July 6, 2000) ..........................................................................20

*SEC v. McNulty*,
   137 F.3d 732 (2d Cir. 1998) ................................................................................................14

*SEC v Pentagon Capital Mgmt.*,
   192 F.3d 295 (2d Cir. 2013) ..................................................................................................9

*U.S. v. Monsanto*,
   924 F.2d 1186 (2d. Cir. 1991) .............................................................................................18

**Statutes**

15 U.S.C. § 78j(b) ...........................................................................................................................9

15 U.S.C. § 77q(a) ..........................................................................................................................8

**Regulations**

17 C.F.R. § 240.10b–5(b) ...............................................................................................................9

## INTRODUCTION

The Securities and Exchange Commission (the "Commission") comes before the Court seeking extraordinary emergency relief against Robert C. Morgan, Morgan Mezzanine Fund Manager LLC (the "Fund Manager") and Morgan Acquisitions LLC ("Morgan Acquisitions") (collectively "Defendants") including a freeze of Mr. Morgan's assets. What is truly extraordinary about this "emergency" application is that the Commission does so while it concedes that it has no proof that Mr. Morgan has transferred or otherwise hidden assets from the Commission's investigation or the ongoing criminal investigation. The Commission's own words to the Court on May 22, 2019 bear repeating:

> THE COURT: Do you have any proof that Mr. Morgan has transferred assets up until today? . . . . **Is there any proof that he has either transferred assets or misused -- not misused -- transferred assets or tried to hide assets in an effort to protect them from this investigation or any criminal investigation?**
>
> MR. GREENWOOD: **We don't know.** In terms of his –
>
> THE COURT: **I'm asking whether or not you have any proof of it.**
>
> MR. GREENWOOD: Currently proof?
>
> THE COURT: Right.
>
> **MR. GREENWOOD: Not at this tim**e. . .

Cohen Decl. ¶ 23, Ex. 5, at 8:6–19 (emphasis added).

The Commission's application must be denied because (1) it has failed to satisfy its burden of demonstrating a substantial likelihood of success on the merits of any violation of the Securities Act of 1933 or the Securities Exchange Act of 1934 (collectively, the "Federal Securities Laws"), and (2) it has manufactured a phony urgency to try unsuccessfully to justify this extraordinary and onerous relief.

The Commission does not set forth facts sufficient to establish a substantial likelihood of success on the merits that Mr. Morgan violated the Federal Securities Laws. The Commission fundamentally misunderstands or ignores the broad discretion afforded by the relevant operating documents and loan agreements to the Fund Manager and Morgan Acquisitions, respectively, and alleges misuse of the Notes Fund and Morgan Acquisitions investments without basis.

Moreover, the Commission has failed to stitch together a coherent, genuine showing of urgency sufficient to justify the emergency relief it seeks. It is undisputed that the government investigation of Mr. Morgan has been a publicly-known fact based on press reporting **since at least September 2017**. The Commission has not identified any recent developments, nor any other circumstances related to investors, which necessitates emergency relief. It offers no evidence of Mr. Morgan's dissipation or transfer of assets. It makes no allegation that Mr. Morgan has improperly taken investor funds for his own benefit. It ignores the many, unprompted efforts by Mr. Morgan to confer with the Commission and allay its concerns, no matter their merit, and to retain a reputable, third party, independent fund manager. The Commission's action and emergency application was filed on May 22, 2019 obviously to dovetail with Mr. Morgan's May 21 indictment and May 22 arraignment on charges in a criminal action before this court. *See* Cohen Decl. ¶ 23, Ex. 5, at 15:16-22. However, the indictment's 114 counts (to which Mr. Morgan has pled not guilty) mention nothing whatsoever about Notes Funds or Morgan Acquisitions investors, offering no basis for the Commission's newfound urgency.

In an effort to distract from its insufficient allegations and manufactured urgency, the Commission resorts to inflammatory and unsupported allegations, and repeats that Mr. Morgan has operated these investments as a "Ponzi-like scheme" eleven times in its pleadings, and once

more in its press release.  *See* Pls.' Mem. of Law (hereinafter the "Memo") at 1, 4, 7;

Greenwood Decl. ¶¶ 2, 58; Compl. at ¶¶ 1, 9, 63, 83; *see also* Cohen Decl. ¶ 24, Ex. 6.  In the

absence of any allegation of Mr. Morgan's dissipation of assets or theft of investor funds, the

Commission has unfairly maligned Mr. Morgan in its highly-public pleadings.

In light of the Commission's lack of diligence, factual misrepresentations, inaccuracies,

and invented urgency, the Court cannot rely on the Commission's bald representations absent

supporting evidence.  As the Commission has failed to satisfy its burden for any form of

emergency relief it seeks, its emergency application should be denied.

## FACTUAL BACKGROUND

The Commission's application for emergency relief misstates and omits undisputed facts

critical to the Court's evaluation of whether the Commission has satisfied its burden (which it

clearly has not), including (i) the long-running, public government investigation; and (ii) Mr.

Morgan's voluntary and extensive efforts to address the Commission's apparent concerns

(regardless of their lack of merit).

**A.     The Commission Has Long Been On Notice of the Criminal Investigation into Mr.
        Morgan and his Real Estate Portfolio**

The Commission is well aware of the long-running criminal investigation into Mr.

Morgan's real estate business.  Simply put, the government investigation of Mr. Morgan was one

of the worst-kept secrets in the Western District of New York.  It has been heavily reported on

by the local and national press beginning as early as September 2017.  Cohen Decl. ¶ 7, Exs. 1–

2.  This investigation included a highly-publicized FBI search of Morgan Management, the

property management company Mr. Morgan then owned, and a sweeping criminal indictment

against two Morgan Management executives and two mortgage brokers in May of 2018.  Cohen

Decl. ¶ 7, Ex. 3; Greenwood Decl. ¶ 69, Ex. 26.  Since then, in December 2018, March 2019, and

May 2019, three individuals have pled guilty to charges related to the ongoing criminal investigation.  *See* Greenwood Decl. ¶¶ 70, 96, Exs. 27, 49; Cohen Decl. ¶ 8. On May 21, 2019, the U.S. Attorney's Office of the Western District of New York indicted Mr. Morgan and another former Morgan Management and Grand Atlas Property Management executive.  Yet, the superseding indictment makes no allegations of criminal activity with regard to Notes Fund or Morgan Acquisitions investors.

## B.     The Commission's Opportunistic "Emergency" Application Omits Key Facts that Refute Its Need for Emergency Relief

The Commission has been unclear with the Court about when it actually began its investigation of Mr. Morgan.  In response to questioning from the Court on May 22, the Commission stated that the first subpoenas were issued in "October or November of 2018." Cohen Decl. ¶ 23, Ex. 5, at 8:4.  At the same time, the Commission conceded that "I'm not suggesting that a larger investigation on other issues hadn't been opened for some time."  *Id.* at 7:24-8:2.  However, upon information and belief, government investigators previously spoke to many Notes Fund investors (the "victims" claimed by the Commission) who stated that they were satisfied with the investments, and exonerated Mr. Morgan.  In its application to the Court, the Commission omits the fact of these government interviews of satisfied investors.[1]

In any event, since October 2018, upon information and belief, the Commission issued two subpoenas to Grand Atlas, the property management company that had purchased Morgan Management in June 2018.[2]  To date, Defendants have not received a subpoena or request for

---

[1]  Unless the Commission withdraws its motion, the Court should require the Commission to state under oath when they actually began their investigation, when they first learned of government interviews of investors and when they first began communicating with the United States Attorney's Office for the Western District of New York about Mr. Morgan.

[2]  The Commission erroneously states that Mr. Morgan sold Morgan Management to Grand Atlas in April 2018. *See* Greenwood Decl. ¶ 4.  The sale occurred on June 4, 2018, and an amendment was executed on July 2, 2018. *See* Cohen Decl. ¶ 4.

testimony from the Commission.  Cohen Decl. ¶ 13.  Indeed, during its investigation, the

Commission never contacted Mr. Morgan or its counsel until Mr. Morgan reached out to the

Commission on April 5, 2019.  *Id.* at ¶ 10.

The Commission omits from its emergency application that Mr. Morgan's counsel

initiated contact with the Commission on April 5, 2019, and thereafter continued dialogue with

the Commission in an effort to allay their concerns, no matter the lack of their merit.  To that

end, Mr. Morgan, through his counsel, voluntarily offered to repay investors at an accelerated

rate, and to retain a highly-recommended new fund manager.  Among the facts omitted by the

Commission are:

- On April 9, 2019 (a date and time the Commission set at its earliest convenience after Mr. Morgan's counsel first offered to speak), Mr. Morgan's counsel informed the Commission of Mr. Morgan's intention to transition the Notes Funds' management to a third party and to pay down Notes Funds' investors.  *Id.* at ¶ 12.  At no point on that call did the Commission raise a concern about investor redemptions.  *Id.*

- On April 23, 2019, Mr. Morgan, through counsel, again reached out to the Commission in response to learning inflammatory and unsupported accusatory statements the Commission apparently had made to counsel for Grand Atlas.  *Id.* at ¶ 14.

- On April 24, 2019, in response to Mr. Morgan's counsel's request for a call, the Commission relayed its accusatory statements about the Notes Funds' plan to redeem investors with available funds from the Notes Funds and—for the first time—requested a meeting with Mr. Morgan's counsel.  *Id.* at ¶ 15.  Despite the Commission's vague and unspecified concerns, counsel for Mr. Morgan confirmed that Mr. Morgan would refrain from making any Notes Funds' redemptions until further notice.  *Id.*

- On May 2, 2019, counsel for Mr. Morgan met with the Commission at its office and reiterated Mr. Morgan's plan to replace the fund manager with an independent third party and agreed to update the Commission accordingly.  *Id.* at ¶ 16.

- On May 9, 2019, Mr. Morgan's counsel informed the Commission that Mr. Morgan was in the process of engaging Goldin Associates ("Goldin"), the Commission-appointed receiver in *S.E.C. v. Platinum Management (NY) LLC, et al.,* Cohen Decl. ¶¶ 17–18, Ex. 4*,* to independently manage the Notes Funds and Morgan Acquisitions, answered the Commission's questions about Goldin's independence, and offered the Commission the opportunity to suggest specific terms for Goldin's engagement.  *Id.* at ¶ 17.  The Commission did not provide any such guidance.  *Id.*

- Four days later, on May 13, 2019, Mr. Morgan's counsel again reached out to the Commission to update them that a Goldin team was planning a diligence visit to Rochester and offered the Commission the opportunity to meet with Goldin to discuss Goldin's findings. *Id.* at ¶ 19.

- On May 20, 2019, Mr. Morgan's counsel requested a call with the Commission to provide a further update on Goldin's engagement. *Id.* at ¶ 20. The Commission did not respond. *Id.*

- On May 21, 2019, at approximately 6:30 P.M., the Commission advised Mr. Morgan's counsel by phone of its plan to file an emergency application in this District. *Id.* at ¶ 21. During this call, the Commission attorneys (who are based in New York City) stated that they already were in Buffalo and they intended to seek an appearance before the Court on May 22. *Id.* Oddly, the Commission attorneys then asked Mr. Morgan's counsel where they would be on May 22. *Id.* In response, Mr. Morgan's counsel stated that the Commission obviously already knew that they would be in Buffalo on May 22 for Mr. Morgan's arraignment on the criminal indictment. *Id.*

- Shortly after midnight on May 22, 2019, the Commission provided a copy of its emergency application to counsel for Mr. Morgan. *Id.* at ¶ 22. Later that day, the Commission filed the emergency application with the Court.

These events, notably absent from the Commission's Complaint, hardly supports the Commission's allegation of a massive "Ponzi-like scheme." The Commission opted not to learn more about Mr. Morgan's imminent engagement of an independent, third-party fund manager, as those facts undercut the narrative in their about-to-be filed and publicized emergency application. It cannot be disputed that the Commission filed for emergency relief to coincide with the arraignment of Mr. Morgan on unrelated charges brought by the U.S. Attorney's Office. At the date of filing, the Commission was aware that, since April 24, 2019, no redemptions had been made, nor would be made until further notice. Goldin, an independent, third party, recently vetted with favorable outcome by the Commission in another active matter, was poised to take over management and control of the Notes Funds and Morgan Acquisitions. The Commission's application for relief that Mr. Morgan had already voluntarily begun to implement is nothing

more than a thinly-veiled attempt to ride on the coat tails of the criminal indictment against Mr.

Morgan.

## ARGUMENT

**A.  The Commission Has Failed To Satisfy Its Burden to Show Mr. Morgan Must be Temporarily Restrained and Enjoined From Further Violations of the Federal Securities Laws**

The prohibition against future securities law violations is a sanction that the Second

Circuit has "characterized as having grave consequences" because it "accomplishes significantly

more than preservation of the status quo." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1040 (2d Cir.

1990).  Therefore, the Commission must "make a substantial showing of likelihood of success as

to both a current violation and the risk of repetition." *Id.; see also S.E.C. v. Cavanagh*, 1 F.

Supp. 2d 337, 384 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998).

The Commission fails to make a substantial showing of a likelihood to succeed on the

merits because it provides plainly insufficient evidence to support each element of the asserted

violations and instead relies on inaccurate and conclusory assertions of purported limitations to

the use of Notes Funds and Morgan Acquisitions investments that fall apart upon examination of

the relevant operating documents.  Similarly, the Commission restates its own unsupported

conclusions that the alleged violations occurred in an attempt to manufacture a risk of repetition

of events it has not demonstrated happened in the first instance.

Moreover, equitable circumstances weigh strongly in favor of a denial of the relief

requested against Mr. Morgan.  *See Cavanagh*, 1 F. Supp. 2d at 384 (reasoning that "[a]lthough a

preliminary injunction is a useful device where a court finds that it is necessary to deter future

violations, there are cases where an injunction may do more harm than good.").  The

Commission has not credibly alleged that any investors have been harmed, nor that Mr. Morgan

has attempted to dissipate funds for personal gain or even transfer funds to avoid detection.

Rather, Mr. Morgan has persistently demonstrated to the Commission that he fully intends to be cooperative, allay any Commission concerns, and to make payments to investors in a manner that satisfies investors and the Commission.

### 1.    The Commission Has Failed to Establish that Mr. Morgan Violated the Federal Securities Laws

The Commission alleges Defendants violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) thereunder, and that Mr. Morgan is both primarily liable and liable as a control person for the alleged violations of Morgan Acquisitions and the Fund Manager.  Memo at 5 n.3.  Section 17(a) of the Securities Act makes it unlawful for a person, in connection with the offer or sale of a security, to (1) "employ any device, scheme, or artifice to defraud"; (2) "obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"; or (3) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a).  To establish a violation under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Commission must prove that Mr. Morgan "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  *S.E.C. v Pentagon Capital Mgmt.,* 192 F.3d 295, 308 (2d Cir. 2013) (quoting *Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5(b).   To establish scienter, the Commission must evidence "an intent to deceive, manipulate or defraud," a showing of conduct that is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care."  *S.E.C. v. Yorkville Advisors, LLC,* 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018).

### a.    The Commission Has Not Made a Showing of Material Misrepresentations and Omissions

While the Commission alleges that the "representations and disclosures Defendants made to investors concerning how their investments would be used, and how the Notes Funds[3] would operate, did not permit" the alleged transactions, it fails to cite a provision of the governing documents in support of that claim, and in fact ignores the provisions which permit broad discretion to the Fund Manager.  Compl. at ¶ 63;  *see also* Memo at 6–7.  In light of those contradictions between the Complaint and the offering memoranda, the Commission has failed to adequately plead its claim.  *See Batson v. Rim San Antonio Acquisition, LCC*, 2016 WL 6901312, at *4–6 (S.D.N.Y. Nov. 22, 2016) (dismissing § 10(b)(5) claim where alleged misrepresentation was contradicted by the terms of an offering memorandum); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) (upholding dismissal of § 10(b) claims contradicted by defendants' tender offer documents).

Indeed, the Notes Funds' offering memoranda provides the Fund Manager with sole discretion to select and make Portfolio Loans to Affiliate Borrowers—exactly the conduct that the Commission now complains about.  *See* Greenwood Decl. ¶ 12, Ex. 2, at 19 (AI I Offering Mem.); Ex. 3, at 19 (QP I Offering Mem.); Ex. 4, at 20 (AI II Mem. at 17);  Ex. 5, at 20 (QP II Offering Mem. at 17);  Ex. 6, at 21 (AI III Offering Mem. at 18);  Ex. 7, at 21 (QP III Offering

---

[3]  Hereinafter "Notes Funds" refers to the six investment funds with substantially similar offering memoranda and operating agreements, managed by Morgan Mezzanine Fund Manager.  Cohen Decl. ¶ 5.  Investors purchased membership interests in Notes Funds pursuant to substantially similar subscription agreements.  The definition of Notes Funds does not include Morgan Acquisitions, a separate entity that provide promissory notes to "investors" in exchange for loans that differed in loan term, interest rate, and the loan's stated purpose.  Cohen Decl. ¶ 6.  In its papers, the Commission confusingly defines Notes Funds to include Morgan Acquisitions and, despite its acknowledgement that the Morgan Acquisitions' loan agreements do not use the defined terms "Portfolio Loan" and "Affiliate Borrower" found in the Notes Funds' offering memoranda, blithely "use[s] those terms to refer" to Morgan Acquisitions' investments as well, based on its unsupported assertion that Morgan Acquisitions and the Notes Funds "operated in a substantially similar manner." *See* Greenwood Decl. ¶32; *see also* Compl. ¶ 2 (defining "Notes Funds").

Mem. at 18).[4]  In the offering memoranda and operating agreements provided to Notes Fund investors, a "Portfolio Loan" is consistently defined only as a "loan made by the [Fund] to an Affiliate Borrower which may be on such terms and conditions as the Fund Manager may determine in its discretion, but which generally will be subordinated to indebtedness owed by an Affiliate Borrower to a senior mortgage lender and unsecured."  *See, e.g., id.* Ex 2, at 67 ("Definitions").

Similarly, the Notes Funds' Subscription Packages also explain the Funds' "plan to make Portfolio Loans to the Affiliate Borrowers to *reduce their cost of capital . . .* so that they, or their affiliates, *may more efficiently acquire, manage, operate,* hold, or sell . . multi-family properties."  *Id.* Ex. 2, at 13.  The operating memoranda specify that Portfolio Loans may be used to purchase existing loans an Affiliated Borrower had with other lenders.  *Id.* at 22. This broad discretion to *purchase existing loans* held by an Affiliate Borrower to *reduce* the Affiliate Borrower's *cost of capital* contemplates, under a plain reading of the offering memoranda, a later Notes Fund's purchase of Portfolio Loans an Affiliate Borrower holds from an earlier Notes Fund.  In addition, the offering memoranda repeatedly discloses that investing in the Notes Funds is risky, describing the investment as "long-term," expressly providing "no assurance as to when or whether we will have sufficient cash for distribution," and dedicating more than ten pages to disclose the various conflicts of interest of the Fund Manager in managing and administering the Notes Funds, which include conflicts related to "compensation arrangements between our Fund Manager and certain affiliates" and the "selection and allocation of lending opportunities to Affiliate Borrowers."  *See, e.g.,* Greenwood Decl. ¶ 12, Ex. 3 at 9, 22, 26 and

---

[4]  For purposes of this paragraph, unless otherwise stated, the definitions described hereto are consistent across all six Notes Funds' offering memoranda, Greenwood Decl. ¶ 12 Exs. 2–7, and the offering memorandum of Morgan 11% Notes Fund LLC ("AI I") is cited.

29–39 (setting forth conflicts of interest and other risk factors in the investment).  These additional highly relevant factors also were not mentioned by the Commission in their motion, and they further undercut the emergency narrative the Commission has invented. In sum, the Commission's "Ponzi-like scheme" allegation falls apart upon a plain reading of the Notes Funds' governing documents.

Nor can the Commission demonstrate a substantial likelihood to succeed on the merits with respect to any allegation of a misrepresentation or omission with respect to the Morgan Acquisitions' investments.  The Commission not only misstates or ignores the relevant disclosures and permissive use found in the Notes Funds' governing documents, it also omits from its submission the "packet of documents" it alleges Morgan Acquisitions provided to investors that contained a "*similar but less detailed descriptions of the nature of investment being offered*," *id*. at ¶ 29 (emphasis added), and the Court is left to rely on the Commission's bare conclusion.

<b>b.     The Commission Has Not Met Its Burden to Demonstrate that that<br>Defendants Employed Fraudulent Devices</b>

The Commission's fails to meet its obligation to factually support its allegations that Defendants employed fraudulent devices.  As noted above, the allegations are premised on a mischaracterization of the governing documents of the Notes Funds, ignoring the broad discretion they provide to the Fund Manager to make loans for myriad purposes.  The Commission alleges that Defendants misused the Notes Funds to make "redemptions of investors in prior or different Notes Funds," to "cover interest satisfy payments owed to investors" and to "pay[] off a prior loan."  Memo at 8.  In doing so, the Commission asserts, without support, that the documented Portfolio Loans involved in these transactions were "sham[s]" used to "create the appearance that Defendants were using investor money properly."  *Id*.  However, nothing in

the offering memoranda prohibits or limits the use of a Portfolio Loan to reduce the cost of capital of an Affiliate Borrower, be it by paying off an existing debt, including an Affiliate Borrower's loans from an earlier Notes Fund, or providing funds for an Affiliate Borrower to meet its monthly interest payment on an existing loan from an earlier Notes Fund.

To the extent the Commission alleges misuse of investor funds from loans to Morgan Acquisitions, it has also failed to meet its burden.  The Morgan Acquisitions' investments are not subject to the governing documents of the Notes Funds.  The Commission fails to support its allegation that Morgan Acquisitions' loan proceeds were misused because it has not pointed to any violation in the particular promissory notes governing the relevant loans.  Additionally, because the Commission concedes that Morgan Acquisitions is not used exclusively for receiving investor loans, Greenwood Decl. ¶ 6, it cannot, without more evidence, credibly claim that the funds allegedly misapplied were in fact investor funds.

The two nonbinding, unpublished district court opinions cited by the Commission do not support their position.  In  *S.E.C. v. Watermark Fin. Servs. Grp., Inc.*, the defendant did not use any of the investor funds for the stated purpose, "misappropriated and converted nearly $1,000,000 of investor funds for his own purposes ... [and] also provided investor funds to family members."  2012 WL 501450, at *6 (W.D.N.Y. Feb. 14, 2012) (Skretny, J.)  In *Watermark*, Judge Skretny found the defendant "knowingly and voluntarily, and with the intent to profit" engaged in an "egregious" and "extensive" Ponzi scheme.  The Commission also cites to a decision from Oregon in which defendants used 75% to 85% of investor funds in an attempt to cover up expenses and losses from a Ponzi scheme, in a manner that expressly violated fund governing documents, and also diverted to themselves millions of dollars in salary and bonuses from investor funds.  *S.E.C. v. Aequitas Mgmt.*, *LLC*, 2017 WL 1206691, at *4; *13 (D. Or. Jan.

9, 2017).  Here, by contrast, the Commission has failed to show investor funds were misused at all, let alone misused extensively, or in a manner demonstrating an intentionally fraudulent scheme for the purpose of undue personal profit.  In fact, the Commission previously conceded that it does not have any such proof.

### c.      Commission's Conclusory Declaration of Mr. Morgan's Scienter Is Insufficient To Establish Scienter

The Commission's conclusory statement that Mr. Morgan either "knew or was at least reckless in not knowing he was misusing investor assets" is insufficient to establish scienter as required under Section 10(b) of the Exchange Act and Rule 10b-5.  Rather, it merely restates the statutory language.  Scienter requires more than mere recklessness;  rather, "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care" must be shown.  *S.E.C. v. McNulty*, 137 F.3d 732,  741 (2d Cir. 1998); *see also Yorkville Advisors*, 305 F. Supp. 3d at 511.  As set forth above, the Notes Funds investors participated on the basis of governing documents that afforded broad discretion to the Fund Manager in the use of invested funds, and the actual uses the Commission enumerates in their emergency motion comport with that broad discretion.  The Commission has not introduced any evidence that would establish an "extreme departure from the standards of ordinary care."  *Id.*

### d.      The Commission Has Failed to Provide Sufficient Evidence to Demonstrate the Morgan Acquisitions' Promissory Notes Are Securities

The Commission provides no factual support, beyond its bare assertions that Morgan Acquisitions qualifies as a security under *Reves v. Ernst & Young.*  494 U.S. 56, 110 S. Ct. 945, 108 L. Ed. 2d 47 (1990).  Under *Reves*, the Court must consider the following factors in determining whether a "note" is a non-security, not subject to the securities laws: "(1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the

13

plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary." *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994) (citing *Reves*).

The Commission ignores these factors and, in any event, has not identified evidence supporting its position. Specifically, the Commission baldly concludes, without evidence, (i) the purported purpose of the Morgan Acquisitions' investments, (ii) the "broad segment of the public" it was offered (referencing only ten investors), and (iii) what, if any, representations Mr. Morgan allegedly made these investors about the investments. Memo at 11. The Morgan Acquisitions investments are individual loan agreements and promissory notes that differed in term, nature of investment, and specific uses, and the Commission fails to evidence how, if at all, these individual investments were represented to investors. *See* Greenwood Decl. ¶ 16 ("the Morgan Acquisition promissory notes contain terms ranging from two to seven years"); ¶ 29 (stating, without evidence that the "package of documents Defendants provided to [Morgan Acquisitions] investors . . . provided a *similar but less detailed description of the nature of the investment being offered.*"); ¶ 30 (acknowledging the Morgan Acquisitions' loans "typically" required monthly 11% interest payments).

### 2. The Commission Has Not Proven Any Risk of Repetition

The Commission not only fails to demonstrate a substantial likelihood of success on the merits that there was a violation of the Securities Laws, it also fails to satisfy its burden to demonstrate a risk of further alleged misconduct. The Commission merely restates its allegations of past violations, its own unsupported conclusions that the alleged violations were done "with a high degree of scienter," and cites Defendants' purported control of the Notes Funds and Morgan Acquisitions. Unsupported accusations are not proven simply because they

are repeated again and again.  Nor can there be a tangible risk of repetition of actions unproven to have occurred in the first place.

At the time of its filing, the Commission was aware that Mr. Morgan had taken substantial steps to finalize an engagement with Goldin to replace Mr. Morgan as Fund Manager for the Notes Funds through no fewer than five phone calls and meetings with Mr. Morgan's counsel between April 9 and May 13.  Cohen Decl. ¶ 32.  Goldin had received a retainer for the engagement, met with Mr. Morgan, conducted due diligence on site in Rochester, and provided final comments to the proposed engagement letter and related operating documents.  Cohen Decl ¶ 31.  The Commission's application for emergency relief, which includes the appointment of a receiver, interrupted the transfer of control of the Notes Funds and Morgan Acquisitions from Mr. Morgan to Goldin.

The Commission confusingly points to the "nature of the [alleged] conduct" and alleges the conduct included "the covering up of other fraud."  Memo at 12.  As noted previously, the Subscription Package provides that Note Funds' assets could be used to repay an existing mortgage loan owed by an Affiliate Borrower under the operating documents.  *See, e.g.,* Greenwood Decl. ¶ 12, Ex. 2, at 13; *see also id.* at ¶ 21 (disclosing that the Fund, at the Fund Manager's discretion, "plans to make Portfolio Loans to the Affiliate Borrowers to *reduce their cost of capital*" so they  "may more efficiently . . . *manage" or "operate"  the properties*, and that Funds "may *purchase existing Portfolio Loans* that were originated with Affiliate Borrowers by other lenders.").  Incanting the incendiary words "covering up of other fraud" where the allegation of an initial fraud is belied by the operative documents that the Commission ignores, obviously fails to meet the Commission's burden.

15

**B.      The Commission Fails to Satisfy its Burden to Seek an Asset Freeze**

The Commission's broad request for a temporary freeze of Mr. Morgan's assets also must

be denied.  The Commission's request to "preserve the status quo" is outweighed by its failure to

meet its burden of a likelihood of success on the merits, its lack of evidence of any dissipation of

assets, and the impingement on Mr. Morgan's Fifth and Sixth Amendment constitutional rights.

**1.      The Commission Fails to Allege a Dissipation of Assets**

A court considering whether to issue an asset freeze must weigh "the disadvantages and

possible deleterious effect of a freeze. . . against the considerations indicating the need for such

relief."  *S.E.C. v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1106 (2d Cir. 1972).  An asset

freeze is appropriate relief where there is a "significant risk of the dissipation of defendants'

assets during the course of the litigation."  *F.T.C. v. Campbell Capital LLC*, 2018 WL 5781458,

at *4 (W.D.N.Y. Oct. 24, 2018) (citing *S.E.C. v. Manor Nursing Trs., Inc.*, 458 F.2d 1082, 1106

(2d Cir. 1972)); *see also S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (The

purpose of an asset freeze is "to preserve the status quo by preventing dissipation and diversion

of assets"); *see also* Cohen Decl. ¶ 23, Ex. 5, at 8:21–24 (Greenwood) ("The goal here is with

respect to the sort of . . . SEC asset freeze standard in cases like *Infinity Group* . . . is to preserve

the status quo").

An asset freeze is inappropriate because the Commission has failed to establish a

likelihood of success on the merits, as set forth *infra* Section A(1), and offers no credible

evidence that Mr. Morgan has dissipated or diverted any assets. Cohen Decl. ¶  23, Ex. 5, at 8:6–

19.  The Commission relies on two newspaper articles, without more, to suggest that there is a

"potential for" the dissipation of assets because a Morgan-owned residence and some properties

in Mr. Morgan's expansive real estate portfolio currently are for sale.  Memo at 13.  Those

references are unpersuasive.  Like most homeowners, Mr. Morgan and his wife put their house

16

on the market after purchasing a new house in or around March 2019.  Cohen Decl. ¶ 33.  The

Commission's suggestion is illogical:  the marketing and eventual sale of a $990,000 home—a

value less than 2% of the total values of the outstanding Notes Funds which Mr. Morgan has

personally guaranteed—does not evidence a dissipation risk.   Moreover, in a real estate portfolio

of over 36,000 apartment units, sales are part of the ordinary course of business, as the

newspaper article the Commission cites correctly observed.  *See* Greenwood Decl. ¶ 98, Ex. 41

at 2, 3.  Also, the sales of properties owned by Affiliate Borrowers could result in the

prepayment of principal, increasing available funds for investors.  *See, e.g.,* Greenwood Decl. ¶

12, Ex. 15, at 4–5 (prepayment of the principal of the note is triggered by "the future . . . sale or

transfer of title of real property").

### 2.  An Asset Freeze Raises Serious Constitutional Concerns for Mr. Morgan's Ability to Choose Counsel In the Pending Criminal Proceeding

The Commission filed this action seeking to freeze Mr. Morgan's personal assets on the

same day he was arraigned in a criminal proceeding in this District.  In doing so, the

Commission has hindered Mr. Morgan's ability to obtain counsel of his choice to defend him in

the criminal action.  When an asset freeze may hinder the defendant's ability to obtain counsel of

his choosing in a criminal case, the court must pay "particular attention to the defendant's Fifth

and Sixth Amendment rights."  *S.E.C. v. Coates*, 1994 WL 455558, at *3 (S.D.N.Y. August 23,

1994) (finding the court's hearing for a temporary restraining order seeking a pre-judgment

freeze of the defendant's assets insufficient to "safeguard the Fifth and Sixth Amendment rights

at issue").

In this circumstance, the Commission bears the burden of making a *prima facie* case of a

securities law violation and that providing evidence that the personal assets it seeks to freeze are

traceable to the fraudulent conduct alleged in the civil case.  *Coates*, 1994 WL 455558, at *4

(citing *U.S. v. Monsanto*, 924 F.2d 1186 (1991)); *see also Commodity Futures Trading Comm'n v. Walsh*, 2010 WL 882875, at *2 (S.D.N.Y. March 9, 2010) (holding certain personal assets shall become available to defendants in order to pay legal fees in a parallel criminal case "if the Government cannot meet its burden of demonstrating that there is a probable cause to believe that those funds are tainted by fraud.").   Mr. Morgan has not yet engaged criminal counsel for the indicted case because the mere threat of an asset freeze profoundly affects Mr. Morgan's ability to choose his counsel for that criminal proceeding.   Cohen Decl. at ¶ 25, Ex. 7.   The court must deny the request to freeze Mr. Morgan's assets because the Commission has failed to establish a likelihood of success on the merits, as set forth *infra* Section A (1), and has made no allegation (much less a showing) that the assets it seeks to freeze are tainted by fraud but rather admitted it has no proof that Mr. Morgan has even transferred or hid assets.   Cohen Decl. at ¶ 23 Ex. 7, at 8:6–21.   Its application, on its face, fails to satisfy its heightened burden required to safeguard Mr. Morgan's constitutional rights.

## C.     The Commission Has Failed to Show a Receiver is Needed on an Emergency Basis

The Securities Act and the Exchange Act do not specifically vest the court with the power to appoint a receiver or monitor in a civil injunction action brought by the Commission, but courts' authority to do so is well-established.   *Manor Suring Ctrs., Inc.*, 458 F.2d at 1105. The purpose of appointing a receiver is to "prevent a diversion or waste of assets to the detriment of those for whose benefit . . . [the] injunctive action is being brought." *Id.* (internal quotation omitted).   Courts have recognized, however, that the appointment of a receiver is an "extraordinary remedy to be invoked only in cases of necessity and upon a clear showing that an emergency exists,"   *S.E.C. v. Universal Express, Inc.*, 2007 WL 2469452 (S.D.N.Y. Aug. 31, 2007) (citing *S.E.C. v. Am. Bd. Of Trad, Inc.*, 645 F. Supp. 1047, 1052 (S.D.N.Y. 1986), and that

an appointment "should not follow requests by the SEC as a matter of course," *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105.

No such emergency exists here.  The May 21, 2019 criminal indictment against Mr. Morgan does not allege any conduct related to Notes Funds' investors or Morgan Acquisitions' investors.  Mr. Morgan has pled not guilty to all charges.  The underlying investigation into Mr. Morgan and his real estate portfolio has been public since September 2017.  The Commission's other bases for an emergency appointment are out of date and factually incomplete.  The Commission alleges that investor redemptions were satisfied as recently as February 2019, and the Notes Funds received additional funds from a sale last month.  Memo at 15.  However, the Commission omits the fact that, on or about April 24, 2019, in response to learning of the Commission's concerns third-hand, Mr. Morgan's counsel assured the Commission that redemption payments would not be made in response to the Commission's stated concerns about the additional funds received.  Cohen Decl. at ¶ 15.

The very responsibilities and independence Goldin was poised to undertake as manager of the Notes Funds overlap with what the Commission now says is urgently needed through Court intervention.  The timing of events makes this plain:  Goldin was in Rochester on a site visit and poised to begin its work the day before the Commission filed this action, and once it filed, Goldin opted not to continue in pursuing the underlying steps the Commission says are needed on an emergency basis.  The Commission's own actions have created the very environment that the Commission now asserts requires a receiver on an emergency basis.  Accordingly, the Commission has failed to make a clear showing for this extraordinary relief.

**D.     The Commission has Not Put Forth Evidence that Other Relief Should be Granted on a Temporary Basis**

The Commission's requests for an order for a verified accounting, and for an order granting expedited discovery and prohibiting the destruction of documents, should also be denied.[5]

The Commission  has not made a showing that it is entitled to a verified accounting.  The Commission cites to an unpublished opinion (*S.E.C. v. Lybrand*, 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000)), which found an accounting was appropriate where the "threat of dispersal of assets" was "uncontested."  Of course, the Commission already has conceded that it has no such proof regarding Mr. Morgan.  The only other authority the Commission cites is a nonbinding district court opinion in a contempt proceeding for failure to comply with an order for an accounting; it does not discuss whether the ordering the accounting was appropriate nor the applicable standard.  *See S.E.C. v. Oxford Capital Sec., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992).

The Commission's request for an order permitting expedited discovery and prohibiting the destruction of documents should also be denied, because the Commission failed to make a showing that it is entitled to such relief.  The Commission does not cite any legal authority or provide any factual basis for why it is entitled to this relief.  For the reasons other emergency relief is inappropriate, these requests should be denied.

---

[5] The Commission also seeks additional relief against the codefendant entities, including a litigation injunction and the appointment of a receiver.  This Memorandum of Law does not address those requests because they are not brought against Mr. Morgan.  Mr. Morgan does not consent to that relief, and reserves his rights to object to any and all such requests for additional relief.

## <u>CONCLUSION</u>

For the reasons set forth herein, Mr. Morgan respectfully requests that this Court deny

Plaintiff's application for any and all emergency relief sought.


Dated:   May 31, 2019
     New York, New York

                   GIBSON, DUNN & CRUTCHER LLP


                   By:   s/ Joel M. Cohen
                          Joel M. Cohen
                          Lee G. Dunst
                          Caitlin S. Walgamuth


                         200 Park Avenue
                         New York, NY  10166-0193
                         Telephone:  212.351.4000

                         Attorneys for Defendant Robert C. Morgan

21