Daniel Michael
Osman Nawaz
Alexander Vasilescu
Neal Jacobson
Joshua I. Brodsky
Lee A. Greenwood
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1060 (Greenwood)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>      v.<br><br>ROBERT C. MORGAN, MORGAN MEZZANINE FUND MANAGER LLC, and MORGAN ACQUISITIONS LLC,<br><br>      Defendants. | 19 Civ. 661 (EAW) |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ASSET FREEZE, RECEIVER, AND OTHER RELIEF**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT .....................................................................................................................2

    I.   THE COMMISSION HAS MADE A SUBSTANTIAL SHOWING THAT MORGAN VIOLATED THE ANTIFRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS. .................................................................................................................2

    II.  THE COMMISSION HAS MADE A SUBSTANTIAL SHOWING THAT EMERGENCY RELIEF IS NECESSARY AND APPROPRIATE TO PRESERVE THE STATUS QUO AND PROTECT INVESTORS. ........................................................6

CONCLUSION ................................................................................................................10

**Cases**

*SEC v. Coates*, No. 94 Civ. 5361, 1994 WL 455558 (S.D.N.Y. Aug. 23, 1994) ............................8

*SEC v. Infinity Group*, 212 F.3d 180 (3d Cir. 2000) ..................................................................6, 7

*SEC v. Santillo*, No. 18 Civ. 5491, 2018 WL 3392881 (S.D.N.Y. July 11, 2018) ....................7, 8

*SEC v. Spongetech Delivery Systems*, No. 10 Civ. 2031, 2011 WL 887940
  (E.D.N.Y. Mar. 14, 2011) .........................................................................................................7, 8

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ..................................................................6, 7

*Smith v. SEC*, 653 F. 3d 121 (2d Cir. 2011) ....................................................................................7

**Statutes**

15 U.S.C. § 78u ................................................................................................................................2

Plaintiff Securities and Exchange Commission ("Plaintiff" or the "Commission") respectfully submits this reply memorandum of law in further support of its emergency application for a temporary restraining order, preliminary injunction, asset freeze, receiver, and other relief (ECF No. 4) (the "Emergency Application").[1]

## PRELIMINARY STATEMENT

In his opposition, Morgan, against whom the Commission has presented compelling evidence of defrauding innocent retail investors, and who has separately been criminally indicted for other types of fraud, attempts to distract the Court with a series of side issues that ignore both Second Circuit law and Morgan's own conduct. The Commission has made a substantial showing that Morgan has violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with his fraudulent operation of four, separate Notes Funds, through which he has raised more than $80 million, and which he has repeatedly misused since at least 2016 up through at least February 2019. To this day, Morgan still controls the Notes Funds, investors are owed more than $63 million, and the Notes Funds' only assets are the unsecured loans Morgan has made with investor money to his various companies (which he has personally guaranteed).

The Emergency Application, which concerns misconduct only recently uncovered by the Commission and not addressed in Morgan's criminal case, seeks to protect these innocent Notes Fund investors, many of whom are located in this District and who invested their retirement savings in these products. Accordingly, among other things, the Commission seeks an exercise of the Court's long-established broad equitable powers to "grant any equitable relief that may be

---

[1] All terms not otherwise defined herein shall have the meaning ascribed in them in the Emergency Application.

appropriate or necessary for the benefit of investors,"[2] to temporarily freeze Morgan's assets, with an appropriate carve-out for reasonable legal and other expenses; an independent, Court-appointed fiduciary to administer, unwind, and pursue claims on behalf of Notes Fund investors; and a verified accounting from Morgan of his assets, the assets of the Notes Funds, and the assets of the companies to which he has lent investor money.

# ARGUMENT

## I. THE COMMISSION HAS MADE A SUBSTANTIAL SHOWING THAT MORGAN VIOLATED THE ANTIFRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS.

The Commission's Emergency Application more than adequately supports the relief the Commission is seeking. The Emergency Application makes both a substantial showing of likelihood of success on the merits as to a current violation of the federal securities laws by Morgan (as required for the entry of a temporary restraining order) (*see* Mem. of Law at 5, ECF No. 4-1), and that an inference can be drawn that Morgan violated the federal securities laws (as required for the imposition of a temporary asset freeze) (*see id.* at 12-13). Morgan's arguments to the contrary rely on a tortured reading of the offering documents that strains credulity.

First, Morgan argues that the fact that the offering documents for the Notes Funds "specify that Portfolio Loans may be used to purchase existing loans an Affiliated Borrower had with other lenders," means that the offering documents contemplate "a later Notes Fund's purchase of Portfolio Loans an Affiliate Borrower holds from an earlier Notes Fund." (Opp. at 10.) This argument is contrary to the very offering documents he cites. At no point does Morgan disclose to investors that these "other lenders" include "earlier Notes Funds," which, in the offering memoranda for the later Notes Funds, Morgan references elsewhere by name on

---

[2] 15 U.S.C. § 78(u)(d)(5).

numerous occasions. (*See, e.g.*, Greenwood Decl. Ex. 4 at 11-12, 23, Ex. 6 at 11-12, 24-26.) Morgan could have easily identified "other Notes Funds" as these "other lenders" if he wanted new investors to know that he would use their funds to purchase loans made by prior Notes Funds. He did not. Furthermore, the sentences and charts immediately following the language Morgan cites to, as well as the "Investment Opportunity" section of the offering memoranda, make clear that Morgan is referring to other, ***non-Notes Fund lenders*** who had previously lent funds to an Affiliate Borrower at a ***higher interest rate*** than the Notes Funds, and which had a security interest in the underlying property backing their loans. (*See id.* Ex. 2 at 13, 21, Ex. 4 at 14, 22-23, Ex. 6 at 14, 23.) The offering memoranda provide lists of existing loans the Notes Funds plan to purchase and refinance in this manner, which are not Portfolio Loans made by earlier Notes Funds, with each such loan bearing an interest rate of 16%. (*See id.* Ex. 2 at 21, Ex. 4 at 22-23.) As the offering memoranda make clear, each and every Portfolio Loan made by the Notes Funds charged either 11.0% or 11.5% (not 16%) and were unsecured. (*See id.* Ex. 4 at 23, Ex. 6 at 24-26.)

Moreover, the transfers identified by the Commission were not structured as straightforward purchases of existing Portfolio Loans. When Morgan used later Notes Funds to make payments to investors in earlier Notes Funds, he papered these transactions using new promissory notes that made it appear as though a later Notes Fund was making a new Portfolio Loan to an Affiliate Borrower, not purchasing an existing Portfolio Loan. (*See id.* ¶¶ 42-45, Exs. 15-18, 35.) In reality, though Morgan often moved funds from one Notes Fund to another by running the money through the bank account of an Affiliate Borrower, these transactions served no legitimate business purpose—the only purpose was to pay off an older, non-performing

3

Portfolio Loan and to infuse cash into the earlier Notes Fund (often to satisfy investor redemptions).  (*See* Palen Decl. ¶¶ 13-14, 18, 23-29, Exs. 1-4.)

Morgan further argues that nothing in the offering memoranda prohibits or limits his ability to use the Notes Funds to reduce the "cost of capital" of an Affiliate Borrower, whether to pay off a debt owed to an earlier Notes Fund, to make interest payments back to Notes Fund investors, or even to pay off a mortgage loan owed by an Affiliate Borrower.  (*See* Opp. 11-12, 15.)  Though the offering memoranda do provide Morgan significant discretion, that discretion does not encompass the Ponzi scheme-like payments identified by the Commission.  Morgan told investors their money would be used "to make Portfolio Loans to the Affiliate Borrowers to reduce their cost of capital and ***so that they may more efficiently acquire, manage, operate, hold and sell institutional grade*** [multifamily properties]," or "***in connection with the acquisition*** of real estate development properties.  (Greenwood Decl. Ex. 2 at 13, Ex. 4 at 13, Ex. 6 at 14 (emphasis added).)  As the promissory notes themselves make clear, these new Portfolio Loans did not reduce the "cost of capital" for the Affiliate Borrower at all—the new notes were made in the ***same amount*** and at the ***same interest rate*** (11.5%) as the old notes.  (*See* Greenwood Decl. Exs 15-18, 35.)

Morgan's use of Notes Fund money to make interest payments back to Notes Fund investors was similarly not consistent with the disclosures Morgan made to investors.  First, new Portfolio Loans to fund interest payments back to investors did not reduce an Affiliate Borrower's cost of capital at all; rather, their only purpose was to benefit Morgan personally, who was able to avoid using his own personal funds to pay earlier investors by using later investor money instead.  Second, Morgan told investors a much different story as to how he would and had been making interest payments.  Each offering memorandum states that the Notes

Fund would make the 11% interest payments "with the interest income generated from Portfolio Loans," and that, historically, the Portfolio Loans had always generated funds sufficient to make these payments. (*See id.* Ex. 2 at 11, Ex. 4 at 11, 23, Ex. 6 at 11, 24.) Morgan knew these statements were false; Morgan knowingly used additional Notes Fund money to make it appear as though the Portfolio Loans themselves were funding the interest payments to investors when, in fact, these interest payments were often funded by other Notes Fund money. (*See id.* Exs. 22-25; Palen Decl. ¶¶ 30-33, Exs. 5-6.)

Finally, Morgan fails to address his use of more than $11 million in Notes Fund investor money to pay off the Eden Square mortgage, which was clearly not to reduce the "cost of capital" to the Affiliate Borrower that owned the property. Rather, instead of continuing to service the existing mortgage loan (made less than five months earlier) at a rate of 4.28%, Morgan voluntarily *increased* the Affiliate Borrower's cost of capital by paying a prepayment penalty of more than $2.6 million and converting more than $11 million of the mortgage debt into Notes Fund debt bearing an interest rate of 11.5%. (*See id.* Ex. 31 at 1-2, Ex. 33, Ex. 35.) The reason he did so is clear—Morgan received document requests from Freddie Mac concerning the operating history of Eden Square and a request for a meeting at the property because Freddie Mac learned that Morgan's company may have misrepresented the true operating condition of the property. (*See id.* Exs. 29-30.) Rather than use his own funds to cover this shortfall, which he told Freddie Mac he had (*see id.* Ex. 30 at 1), Morgan used investor money to hide the fraud (*see id.* Exs. 33-34). These Portfolio Loans remain outstanding, they represent the largest concentration of Portfolio Loans for any single Affiliate Borrower, and Morgan concedes they are unlikely to be repaid through the sale of the property. (*See id.* ¶¶ 85-87, Ex. 36.)

5

With respect to the fourth Notes Fund operated by Morgan Acquisitions, contrary to Morgan's various assertions (*see* Opp. at 9 n.3, 11-12, 14), the Commission submitted significant documentary evidence concerning this Notes Fund in support of its Emergency Application. For example, the Commission submitted a representative package of documents provided to investors, which includes a description of the nature of the investment (*see* Greenwood Decl. Ex. 9 at 1 ("The proceeds of the Loan shall be used by the Borrower: to make a subordinated, unsecured loan to [an Affiliate Borrower], for use in the purchase and acquisition of [description of the Property]; and for transactional expenses in the acquisition and development of the Property; and/or for similar use with comparable properties.")), a representative email from a Morgan employee to these investors (*see id.* Ex. 10 at 10), and a list of the Portfolio Loans outstanding for this Notes Fund, along with the other Notes Funds, based on a review of the records kept by the Grand Atlas employees who have helped Morgan perform the administrative work on his Notes Funds (*see id.* ¶¶ 88-89, Ex. 37). The Emergency Application then sets forth specific examples of how Morgan misused these investor funds. (*See* Palen Decl. ¶¶ 26, 30, 33, Exs. 1, 3, 5, 6; Greenwood Decl. ¶ 66, Ex. 25.)

## II. THE COMMISSION HAS MADE A SUBSTANTIAL SHOWING THAT EMERGENCY RELIEF IS NECESSARY AND APPROPRIATE TO PRESERVE THE STATUS QUO AND PROTECT INVESTORS.

The Commission is seeking the relief it has requested in the Emergency Application to protect investors in the Notes Funds, whose sole source of repayment on the more than $63 million they are owed are the Portfolio Loans Morgan has made to his various companies, and which Morgan has personally guaranteed. Accordingly, the purpose of Plaintiff's proposed temporary asset freeze is to ensure there are sufficient funds to satisfy the Commission's claim for disgorgement, *see SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990), which is

focused on the funds Morgan fraudulently raised from Notes Fund investors, and to prevent the dissipation or diversion of assets in advance of the resolution of that claim, *see SEC v. Infinity Grp.*, 212 F.3d 180, 197 (3d Cir. 2000). Plaintiff "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *See Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (citations omitted). Though not required in *Smith*, certain post-*Smith* district courts in this Circuit have also stated that the Commission must demonstrate "a concern that the defendant will dissipate the assets within the defendant's control ***or*** will transfer the assets beyond the jurisdiction of the United States." *SEC v. Santillo*, No. 18 Civ. 5491, 2018 WL 3392881, at *2 (S.D.N.Y. July 11, 2018) (emphasis added) (citing, among other authorities, *Unifund SAL*, 910 F.3d at 1041).

For the reasons described in the Emergency Application, and as further discussed above, Plaintiff has made a showing that, at the very least, an inference can be drawn that Morgan has violated the federal securities laws. Though Morgan makes much of the fact that the Commission does not currently have evidence he is actively trying to transfer or hide assets from the government (*see* Opp. at 1, 16-17),[3] such a showing is not required to impose the requested asset freeze. As Morgan concedes, many of his assets, including his personal residence, are in various stages of the marketing and sale process (*see* Opp. at 16-17). It is therefore undisputed that there is "a concern that the defendant will dissipate the assets within the defendant's control," *Santillo*, 2018 WL 3392881, at *2, and the purpose of the requested freeze is to ensure that sufficient funds are available to pay a Commission judgment (*see* Mem. of Law at 13). In addition, Morgan's conduct involves fraud characterized by moving Notes Fund assets through multiple bank accounts in order to conceal the true nature of his transactions. *Cf. SEC v.*

---

[3] Whether Morgan is transferring or hiding assets are facts only he knows, and which the request for verified accounting (discussed in further detail below) will disclose to the Court, the Commission, and investors.

7

*Spongetech Delivery Sys.*, No. 10 Civ. 2031, 2011 WL 887940, at 9 (E.D.N.Y. Mar. 14, 2011) (finding defendant likely to dispose of assets absent an asset freeze because "[n]ot only did [the defendant's] conduct involve fraud, it involved a scheme to funnel and conceal illegal proceeds through nominees and affiliates"). Plaintiff is not seeking to prevent arms-length sales of assets owned by Morgan's companies to third parties at market prices; it is, however, seeking to temporarily freeze any distributions to Morgan from the proceeds of such sales for the benefit of investors. Accordingly, Plaintiff requests that the Court order the requested temporary freeze of Morgan's assets.

Contrary to Morgan's assertions (*see* Opp. at 17-18), the SEC's proposed asset freeze does not seek to interfere with his Sixth Amendment right to counsel in his criminal case. As Plaintiff advised Morgan's counsel (Joel Cohen) on both May 21 (before filing) and May 22 (after filing), the proposed freeze specifically contemplates Morgan making applications to the Court to unfreeze assets to pay reasonable living and legal expenses. (*See* Proposed TRO at 1, 7, ECF No. 4-2.) Such legal expenses would include legal expenses related to Morgan's criminal case. In situations such as this one, where an individual is a defendant in both a Commission enforcement action and a criminal case, "[a] defendant may seek to unfreeze assets to pay for attorneys' fees in any criminal action if the defendant can establish that the assets are not traceable to fraud." *Santillo*, 2018 WL 3392881, at *5 (citing, among other authorities, *SEC v. Coates*, No. 94 Civ. 5361, 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994)). Here, Morgan has the unique ability to produce an accounting showing that any funds he proposes to use to pay legal fees are not the proceeds of fraud, and the Commission requests that the Court require him to do so.

In light of the Commission's substantial showing of Morgan's violation of the federal securities laws, along with his criminal indictment, the Court should appoint a receiver, subject to the Court's equitable jurisdiction and with the power to marshal assets, to protect investors in the Notes Funds. Morgan has already conceded the necessity of an independent manager over the Notes Funds by seeking to retain Goldin Associates, LLC ("Goldin"), to take his place as manager, apparently to assuage the Commission's concerns because of Goldin's prior appointment as financial adviser to a receiver[4] in another Commission action. (*See* Opp. at 4-6.) What is necessary here, and what the Commission seeks, however, is an independent, court-appointed and supervised fiduciary who can administer and unwind the Notes Funds, recover assets on their behalf, bring appropriate avoidance and other actions, including against Morgan himself, and devise an equitable plan of distribution for the benefit of all investors. (*See* Mem. of Law at 14-15.) Hard as he may try, Morgan simply cannot impose his own private receiver, paid at his discretion, over his own Notes Funds.

Finally, a verified accounting is necessary to determine how Morgan has made use of investor funds. Only Morgan, who has signatory authority on all of the Notes Fund bank accounts (*see* Greenwood Decl. ¶ 37, Ex. 13), knows how the Notes Fund money was used. Upon information and belief, Morgan also knows how the Affiliate Borrowers who have received Portfolio Loans have used both Notes Fund investments and other cash flow, including whether Morgan has diverted any of such funds for his own use and used investor funds to cover such deficiencies.

---

[4] Paragraph 27 of the Declaration of Joel M. Cohen ("Cohen Decl.") states that Goldin was "an SEC-appointed receiver on *SEC v. Platinum Management (NY) LLC, et al.*" (ECF No. 17-4.) Receivers in Commission enforcement actions are appointed by the Court, not by the Commission. As an accommodation to the Court, the Commission often obtains proposals from potential receiver candidates to present to the Court for consideration, which it has also done in this action. In the *Platinum* matter, Goldin was retained as financial advisor to the receiver, not as the receiver itself, after approval by the court. (*See* Cohen Decl. Ex. 4.)

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Emergency Application and accompanying declarations and exhibits thereto, the Commission respectfully requests that the Court grant its application for emergency relief.

Dated: New York, New York
June 3, 2019

Respectfully submitted,

By: /s/ Neal Jacobson
Neal Jacobson
Daniel Michael
Osman Nawaz
Alexander Vasilescu
Joshua I. Brodsky
Lee A. Greenwood
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE
 COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1060 (Greenwood)