UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
JUN 0 5 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

———————————————————————

SECURITIES AND EXCHANGE
COMMISSION,

           Plaintiff,

    v.

ROBERT C. MORGAN, MORGAN
MEZZANINE FUND MANAGER LLC, and
MORGAN ACQUISITIONS LLC,

           Defendants.

———————————————————————

**DECISION AND ORDER**

1:19-CV-00661 EAW

## **INTRODUCTION**

The Securities and Exchange Commission (the "SEC" or "Plaintiff") commenced the instant action on May 22, 2019, alleging that defendants Robert C. Morgan ("Morgan"), Morgan Fund Manager LLC (the "Fund Manager"), and Morgan Acquisitions LLC ("Morgan Acquisitions") (collectively "Defendants") have violated § 17(a) of the Securities Act of 1933 (the "Securities Act") and § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder. (Dkt. 1). Currently before the Court is the SEC's emergency application for a temporary restraining order, preliminary injunction, asset freeze, appointment of a receiver, and other relief. (Dkt. 4). For the reasons set forth below, the Court grants the SEC's motion in part and denies it in part.

- 1 -

# BACKGROUND

The following facts are taken from the Declaration of Lee A. Greenwood (Dkt. 5) and the Declaration of Kerri L. Palen (Dkt. 6), with all attached exhibits, submitted in support of the emergency application, and the Declaration of Joel M. Cohen (Dkt. 17), with all attached exhibits, submitted in opposition to the emergency application.

## I. Structure of the Investment Entities

For more than 30 years, Morgan has developed commercial and residential real estate, including multifamily properties, through his companies. (Dkt. 5 at ¶ 4). From 1998 until 2018, Morgan managed his portfolio of multifamily properties through the company Morgan Management, LLC ("Morgan Management"), before selling Morgan Management to Grand Atlas in 2018. (*Id.*; Dkt. 17 at ¶ 4).[1] To finance his projects, Morgan used, among other sources of capital, the proceeds from sales of securities to investors and loans made by investors. (Dkt. 4-1 at 5). Between October 2013 and September 2018, Morgan raised approximately $80 million from investors in connection with three separate notes funds ("Notes Funds") and a separate investment company, Morgan Acquisitions. (Dkt. 5 at ¶ 7).

Morgan manages three Notes Funds—Notes Fund I, Notes Fund II, and Notes Fund III—through a limited liability company formed in 2013 called the Fund Manager. (*Id.* at

---

[1] The SEC asserts this sale occurred in April 2018 (Dkt. 5 at ¶ 4), while Morgan contends it happened in June 2018 (Dkt. 17 at ¶ 4).

¶¶ 5, 8).[2] Each of these Notes Funds are divided into investments made by either purportedly accredited investors ("AI Fund") or qualified purchasers ("QP Fund"). (*Id.* at ¶ 8). Morgan formed, and was the managing member of, two Delaware limited liability companies for each of these three Notes Funds, one for each AI Fund and one for each QP Fund. (*Id.* at ¶ 9). Investors would purchase membership interests in either an AI Fund or a QP Fund pursuant to a subscription agreement with the Fund Manager that was signed by Morgan. (*Id.*).

David Rumsey ("Rumsey") worked at Morgan Management, and later at Grand Atlas, in an investor relations role and as general counsel. (*Id.* at ¶ 10). He was also an officer of the Fund Manager. (*Id.*). Rumsey would email subscription packages to potential investors. (*Id.* at ¶ 11). These packages contained an offering memorandum, the operating agreement for the limited liability company in which the investor wished to purchase a membership interest, a subscription agreement with the Fund Manager, a copy of Morgan's personal guaranty agreement, and the redemption policy. (*Id.*).

The investments involving Morgan Acquisitions ("Morgan Acquisitions Investments") were managed differently. Morgan, as the managing member and sole

---

[2]    The SEC alleges that Morgan is liable as a "control person" of the Fund Manager and Morgan Acquisitions pursuant to § 20(a) of the Exchange Act. (Dkt. 1. at ¶¶ 131-135). To make out a *prima facie* case of control person liability, the SEC must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Solow v. Citigroup, Inc.*, 507 F. App'x 81, 83 (2d Cir. 2013) (quotation omitted). The record before the Court demonstrates that, assuming satisfaction of the first prong (primary violation by the Fund Manager and/or Morgan Acquisitions), Morgan did in fact control both those entities so as to satisfy the second and third prongs of this standard.

owner of Morgan Acquisitions, entered into a loan agreement with each investor and issued a promissory note to the investor in the amount of the loan. (*Id.* at ¶¶ 6, 13). Each loan agreement advised that the corresponding promissory note was not registered with Plaintiff under the Securities Act and required the investor to represent that she or he was an accredited investor for purposes of Securities Act Rule 501. (*Id.* at ¶ 14).

Morgan and Rumsey would both meet, speak with, and email potential investors in the Notes Funds. (*Id.* at ¶ 22). Rumsey interfaced directly with current and potential investors, relaying questions and other developments to Morgan. (*Id.*). Rumsey would also set up meetings and dinners with potential investors, which Rumsey and Morgan both attended, to discuss the Notes Funds and Morgan Acquisitions investment opportunities. (*Id.*). Morgan urged Ramsey to raise as much money as possible from these investors. (*Id.*). More than 200 individuals and entities invested in the Notes Funds and Morgan Acquisitions Investments over time. (*Id.* at ¶ 20).

## II.    <u>Representations and Disclosures Made to Investors</u>

For Notes Funds I, Notes Fund II, and Notes Fund III, Defendants told investors through the offering memoranda and various emails that their investments would be used to make unsecured subordinated loans ("Portfolio Loans") to affiliated Morgan-controlled entities ("Affiliate Borrowers"). (Dkt. 4-1 at 2). Investors were told the loans would allow Affiliate Borrowers to more efficiently acquire, manage, operate, hold, or sell multifamily properties or to acquire real estate development projects. (Dkt. 5 at ¶ 23). Defendants also told these investors that they would use their investments to make Portfolio Loans at rates sufficient to meet 11% target return rates, and that the Notes Funds would make interest

payments to them using the interest income generated by the Portfolio Loans. (*Id.*). The Portfolio Loans were interest-only loans until their maturity. (*Id.*).

The offering memoranda for Notes Fund II and Notes Fund III stated that Portfolio Loans made by prior Notes Funds had always generated sufficient interest to fund the 11% interest payment to investors. (*Id.* at ¶ 25). For example, the offering memorandum for Notes Fund II states that "[a]ll of the Fund I Portfolio Loans are paying the 11% target return on schedule," and that "[s]ince its inception Fund I has paid, and is paying, its investors the 11% target return as projected therein totaling more than $1.7 million in distributions to date." (Dkt. 5-4 at 11, 23). Similarly, the offering memorandum for Notes Fund III states that "[a]ll of the Fund I Portfolio Loans are paying the 11% target return on schedule," "[a]ll of the Fund II Portfolio Loans are paying the 11% target return on schedule," and "[s]ince its inception Fund I and Fund II have paid, and are paying, investors the 11% target return as projected therein totaling more than $5.0 million in distributions to date." (Dkt. 5-6 at 11-12, 24). Morgan personally guaranteed the repayment of each Portfolio Loan, including all principal and interest due, back to the various Notes Funds. (Dkt. 5-2 at 121-22; Dkt. 5-4 at 126-27; Dkt. 5-6 at 133-34).

For the Morgan Acquisitions Investments, the loan agreements generally required Morgan Acquisitions to make monthly 11% interest payments, with Morgan personally guaranteeing both the interest and the principal return. (Dkt. 5-9 at 10, 17). They also specified the property, owned by a Morgan-controlled entity, for which the investor's funds would be used. (*Id.* at 1).

## III.    The Portfolio Loans and Payoffs

The overall investment strategy was to make Portfolio Loans to Affiliate Borrowers, and to then use the proceeds of the Portfolio Loans to make 11% interest payments back to investors and ultimately return their principal. (Dkt. 5 at ¶ 32). Morgan or a senior employee would request funds from the Notes Funds or Morgan Acquisitions Investments on behalf of an Affiliate Borrower, then accounting personnel at Morgan Management or Grand Atlas would review the account balances to determine if the Notes Funds or Morgan Acquisitions Investments had available cash to lend, and then Morgan would approve the transfer on behalf of the Affiliate Borrower. (*Id.* at ¶¶ 34-36). After the funds were transferred, Rumsey would typically prepare a form promissory note for the Portfolio Loan, sometimes several months after the loans were funded, and then present the promissory note to the managing member of the Affiliate Borrower for his or her signature. (*Id.* at ¶ 38).

The SEC contends Defendants engaged in three different types of fraudulent conduct. First, it asserts that some or all of the Defendants improperly transferred at least $15.6 million from later Notes Funds to facilitate redemptions of earlier investors and repay maturing loans made by earlier formed Notes Funds. (Dkt. 4-1 at 8). Next, it contends that Defendants used the Notes Funds and the Morgan Acquisitions Investments to make the 11% interest payments back to investors because Defendants lacked sufficient funds from the Affiliate Borrowers and because Morgan did not want to make good on his personal guaranty. (*Id.*). Finally, Plaintiff asserts Morgan directed the use of more than $11 million from the Notes Funds and/or the Morgan Acquisitions Investments to help pay

off a loan and more than $2.6 million in prepayment penalties for The Eden Square Apartments in Cranberry Township, Pennsylvania ("Eden Square") to conceal that the loan was fraudulently obtained. (*Id.*). Criminal charges are currently pending against Morgan regarding, among other things, his involvement with Eden Square.

Investors have more than $63 million in principal remaining in the Notes Funds and the Morgan Acquisitions Investments. (Dkt. 5 at ¶ 91). As of February 15, 2019, investors had submitted more than $20 million of redemption requests. (*Id.*).

## IV.   Criminal Case and Procedural Background

On May 22, 2018, a 62-count indictment was returned by a federal grand jury as to Frank Giacobbe, Patrick Ogiony, Kevin Morgan, and Todd Morgan, charging them with wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud, for allegedly defrauding financial institutions to obtain loans for various multifamily properties. *United States v. Giacobbe*, No. 1:18-cr-00108-EAW-HKS-5, Dkt. 1 (W.D.N.Y. May 22, 2018). Kevin Morgan pleaded guilty to one count of conspiracy to commit bank fraud on December 21, 2018, *id.*, Dkt. 30, and Patrick Ogiony pleaded guilty to one count of conspiracy to commit bank fraud on March 15, 2019, *id.*, Dkt. 36. On May 13, 2019, Scott Cresswell, the former Chief Operating Officer for Morgan Management, pleaded guilty to conspiracy to commit wire fraud. *United States v. Cresswell*, No. 1:19-cr-00099-EAW-1, Dkt. 3 (W.D.N.Y. May 13, 2019). Defendant Morgan listed his primary residence in Pittsford, New York for sale on May 14, 2019. (Dkt. 5-40).

On May 9, 2019, counsel for Morgan informed the SEC that Morgan had identified Goldin Associates ("Goldin") to replace Morgan as a fund manager, and to independently

manage the Notes Funds and Morgan Acquisitions. (Dkt. 17 at ¶¶ 17-18). On May 13, 2019, Morgan paid Goldin a $75,000 retainer, and Morgan's counsel informed the SEC that Goldin planned to meet with an employee who manages the day-to-day operations of the Notes Funds and Morgan Acquisitions to conduct due diligence as part of the transition, and that they were designing the terms of the engagement to safeguard Goldin's independence as a third-party manager. (*Id.* at ¶¶ 19, 28). The SEC requested a copy of the engagement letter once executed, which Morgan's counsel agreed to provide. (*Id.*).

On May 21, 2019, a 114-count superseding indictment was returned by a federal grand jury as to Robert Morgan, Frank Giacobbe, Todd Morgan, and Michael Tremiti, charging them with wire fraud, bank fraud, conspiracy to commit wire fraud and bank fraud, and conspiracy to money launder. *United States v. Giacobbe*, No. 1:18-cr-00108-EAW-HKS-5, Dkt. 42 (W.D.N.Y. May 21, 2019). Morgan was arraigned on May 22, 2019, and entered a plea of not guilty. *Id.*, Dkt. 45.

Also on May 22, 2019, Plaintiff filed the instant civil action (Dkt. 1), an emergency application for a temporary restraining order, preliminary injunction, asset freeze, appointment of a receiver, and other relief (Dkt. 4), and a motion to expedite the hearing on the emergency application (Dkt. 7). In the emergency application, Plaintiff requests an order that: (1) enjoins Defendants from directly or indirectly committing future violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5; (2) freezes Morgan's assets; (3) appoints a receiver over the Notes Funds, Fund Manager, and Morgan Acquisitions; (4) enjoins the filing of any bankruptcy, foreclosure, or receivership actions by or against the Notes Funds, Fund Manager, and Morgan

Acquisitions; (5) directs Defendants to submit a verified accounting of their assets; (6) expedites discovery; and (7) restrains and enjoins Defendants from destroying, altering, concealing, or otherwise interfering with Plaintiff's access to records.

The Court held a conference on May 22, 2019 (Dkt. 9), and granted the motion to expedite (Dkt. 10). On May 31, 2019, Morgan filed a memorandum in opposition to the emergency application (Dkt. 16), and a declaration in support of the memorandum (Dkt. 17). Plaintiff filed a reply memorandum in further support of the emergency application on June 3, 2019. (Dkt. 21). Oral argument was held before the undersigned on June 5, 2019. (Dkt. 10).

## DISCUSSION

### I. **Legal Standard**

"In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction." *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997). Generally, a party seeking a preliminary injunction or a temporary restraining order must demonstrate: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 484 (W.D.N.Y. 2018) (quotation omitted).

However, "the SEC, in discharging its statutory responsibilities, is relieved of the burden of showing a risk of irreparable injury so that it may secure a preliminary injunction more easily than a private litigant." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir. 1990). "A preliminary injunction enjoining violations of the securities laws is appropriate

if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition. An asset freeze requires a lesser showing; the SEC must establish only that it is likely to succeed on the merits. Unlike a private litigant, the SEC need not show risk of irreparable injury." *S.E.C. v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (footnotes omitted).

The SEC also seeks various other forms of relief in addition to an injunction enjoining violations of the securities law and an asset freeze, which are discussed in more detail below. "Where something more than an asset freeze is in question, . . . the required degree of likelihood of success on the merits varies depending upon the nature of the relief sought," and "[l]ike any litigant, the SEC should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks." *Smith v. S.E.C.*, 653 F.3d 121, 128 (2d Cir. 2011) (citations, quotations, and alteration omitted); *see also S.E.C. v. Bremont*, 954 F. Supp. 726, 729-30 (S.D.N.Y. 1997) ("The SEC is entitled to relief if it has established a likelihood that the securities laws have been violated, although the strength of the showing required varies inversely with the severity of the restraint sought." (footnote omitted)).

## II.     Likelihood of Success on the Merits

As a threshold matter, the Court assesses whether the SEC has met its burden of making a substantial showing of a likelihood of success on the merits. As previously noted, the SEC alleges Defendants have violated § 17(a) of the Securities Act of 1933 and § 10(b) of the Exchange Act, as well as Rule 10b-5 thereunder. (Dkt. 1 at 27-28).

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5 are collectively referred to as the antifraud provisions of the federal securities laws. Together, the antifraud provisions make it unlawful to defraud purchasers of securities by, *inter alia*, making misleading or false statements of material fact or omitting material facts.

*S.E.C. v. Watermark Fin. Servs. Grp., Inc.*, No. 08-CV-361S, 2012 WL 501450, at *5 (W.D.N.Y. Feb. 14, 2012) (citing *VanCook v. S.E.C.*, 653 F.3d 130, 137 (2d Cir. 2011), and *S.E.C. v. Parklane Hosiery Co., Inc.*, 558 F.2d 1083, 1085 n.1 (2d Cir. 1977)). The Second Circuit has explained:

> [T]o violate Section 10(b) and Rule 10b-5, a party must have (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. The requirements for a violation of Section 17(a) apply only to a sale of securities but in other respects are the same as Section 10(b) and Rule 10b–5, except that no showing of scienter is required for the SEC to obtain an injunction under Section 17(a)(2) or (a)(3).

*S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (quotations and original alterations omitted).

A.     **Material Misrepresentation and Duty to Speak**

The Second Circuit has held that a statement or omission is material if "a reasonable investor would have considered [it] significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) ("[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))).

Moreover, "the nondisclosure of material information . . . is insufficient to state an actionable misrepresentation absent a duty to disclose." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). In addition to affirmative duties to disclose created by particular statutes and regulations, there is also a general duty for a corporation to "disclose all facts necessary to ensure the completeness and accuracy of their public statements." *Id.*

Here, the SEC has identified two specific statements in the Notes Funds' offering materials that it contends were materially misleading so as to constitute a violation of the federal securities laws' antifraud provisions: (1) "Defendants told investors in the Notes Funds that their investments would be used to make Portfolio Loans to Affiliate Borrowers so that those entities could more efficiently acquire, manage, and operate existing multifamily properties, or so that they could acquire new real estate development properties"; and (2) "Defendants . . . told investors that the prior Portfolio Loans made by earlier Notes Funds had always performed so as to generate the funds necessary to make the monthly 11% interest payments." (Dkt. 4-1 at 10-11).

In opposition to the SEC's request for a temporary restraining order, Morgan disputes that the offering materials were misleading, and contends that the relevant provisions of the governing documents "permit broad discretion to the Fund Manager" with respect to the selection and issuance of Portfolio Loans to Affiliate Borrowers and do not prohibit "a later Notes Fund's purchase of Portfolio Loans an Affiliate Borrower holds from an earlier Notes Fund." (Dkt. 16 at 13-14). However, Morgan's opposition papers

do not address the second alleged misrepresentation, regarding the performance of the Portfolio Loans made by earlier Notes Funds.

The Court agrees with Morgan that it is not clear, at this point in the proceedings, that the first alleged misrepresentation identified by the SEC was in fact a misrepresentation. The governing documents do make clear that the Fund Manager has broad discretion with respect to the making of Portfolio Loans, that such Portfolio Loans would not be made on an arm's-length basis, and that Portfolio Loans could be made to reduce the Affiliate Borrowers' cost of capital. (*See, e.g.*, Dkt. 5-2 at 11, 13; Dkt. 5-6 at 12, 14). Moreover, the governing documents appear to acknowledge that payment of the 11% returns may be achieved through a mechanism other than performance of the loan. (*See, e.g.*, Dkt. 5-2 at 13 ("The Fund Manager may advance funds to the Fund to pay the 11% per annum target return in its sole discretion, in the event the timing of payment from the Portfolio Loans does not permit payment during a particular month."); Dkt. 5-4 at 16-17 ("Fund II . . . may borrow funds from time to time to pay Fund II's 11% per annum target cash-on-cash return for its Investors or for other purposes determined by Fund Manager, including redemptions pursuant to Fund II's Redemption Policy.")). Moreover, while mentioning possible properties that may be financed through the Notes Funds (*see, e.g.*, Dkt. 5-2 at 21), none of the governing documents appear to tie a Notes Fund to any specific properties—in other words, the funding of loans was within Morgan's discretion.

The Court acknowledges the SEC's claims that notwithstanding the lack of any prohibitory language in the governing documents restricting Morgan from using later funds to pay off the debts and obligations of earlier funds, Morgan nonetheless created a paper

- 13 -

trail so as to purportedly disguise (according to the SEC) the true nature of the transactions. However, based on the current record before the Court, there are enough questions about whether the transactions were authorized by the governing documents to prevent the Court from concluding that the SEC has met its burden of establishing a substantial showing of likelihood of success on the merits with respect to the first alleged misrepresentation relied upon by the SEC.

On the other hand, the Court does find that the SEC has made a substantial showing of likelihood of success on the merits as to Morgan and the Fund Manager with respect to the second alleged misrepresentation, regarding the performance of Portfolio Loans made by earlier Notes Funds. (*See, e.g.*, Dkt. 5-6 at 11-12 (offering memorandum for Notes Fund III stating that "[a]ll of the Fund I Portfolio Loans are paying the 11% target return on schedule" and that "[a]ll of the Fund II Portfolio Loans are paying the 11% target return on schedule")).

First, with respect to materiality, the Court finds that, based on the current record, a reasonable investor likely would have found it material that the Portfolio Loans made by earlier Notes Funds had "performed" on target because those Portfolio Loans had been purchased by later Notes Funds. *Cf. Susie Ong v. Chipotle Mexican Grill, Inc.*, No. 16 CIV. 141 (KPF), 2017 WL 933108, at *12-13 (S.D.N.Y. Mar. 8, 2017) (rejecting argument that statement that there had been no "material changes" in restaurant chain's risk factors without discussing four food-borne illness outbreaks was not material, even where that information was already publicly known).

The Court further finds it likely that Defendants had a duty to disclose this information. It is true that "the securities laws do not impose a general duty to disclose corporate mismanagement." *In re Marsh & Mclennan*, 501 F. Supp. 2d at 469; *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b) is likewise unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing."), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006). However, "corporations are obligated to disclose facts necessary to ensure that their statements are not misleading," *In re Marsh & Mclennan*, 501 F. Supp. 2d at 469, and "courts presented with the specific context here—of undisclosed corporate malfeasance or allegations of the same—have held that disclosure was not required except where doing so was necessary to prevent the corporation's *other* statements from being misleading." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752-53 (S.D.N.Y. 2017) (collecting cases).

The *In re Braskem* decision is instructive. In that case, the court found that a defendant's failure to disclose that they were involved in a bribery scheme that allowed them to obtain raw materials at substantially below market price was an actionable omission where the documents at issue "made a variety of statements . . . explaining the bases of the price it paid for [the raw materials]" but "omitted to reveal the—or at least an—elephant in the room: that the favorable purchase price that Braskem secured was substantially due to its bribery." *Id.* at 758-59. Similarly, in this case, while it may have been true that the Portfolio Loans made by earlier Notes Funds had performed on target,

the Fund Manager and Morgan omitted the key fact that the reason (at least in part) for that on-target performance was the purchase of those Portfolio Loans by later Notes Funds. The Court is persuaded, at this stage of the proceedings, that a trier of fact would likely conclude that the omitted information rendered the statements about the performance of the Portfolio Loans misleading, therefore violating a duty to disclose.

However, the SEC has not presented evidence reasonably tying Morgan Acquisitions to this alleged misrepresentation. As the Court discusses in more detail below, the evidence of record indicates that unlike the Notes Funds, the Morgan Acquisitions Investments consisted of individual loan agreements related to specific properties. The SEC has provided only one of these loan agreements (*see* Dkt. 5-9), which it maintains is "representative" of all the Morgan Acquisitions Investments loan agreements. This "representative" loan agreement makes no mention of the Notes Funds or the prior performance of any Portfolio Loans. (*See id.*). The Court therefore finds that, at this stage, the SEC has not made a substantial showing that Morgan Acquisitions engaged in actionable misrepresentation under the securities' laws anti-fraud provisions, and the Court will not issue a temporary restraining order as to Morgan Acquisitions.

**B.    Use of a Fraudulent Device**

The SEC contends it has not only made a substantial showing that Defendants made material misrepresentations, but also that Defendants used a fraudulent device. (Dkt. 4-1 at 12-13). The Court finds that, at this stage of the proceedings, the SEC has not met its burden of demonstrating use of a fraudulent device so as to justify issuance of a temporary restraining order. As one court in this Circuit has explained:

Subsections (a) and (c) of Rule 10b-5. . . . make it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, [or] . . . (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

*S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (alterations in original) (quoting

17 C.F.R. § 240.10b-5(a), (c)). Courts in this Circuit refer to subsections (a) and (c) of

Rule 10b-5 as governing "scheme liability." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,

164 F. Supp. 3d 568, 586 (S.D.N.Y. 2016); *see also S.E.C. v. Wey*, 246 F. Supp. 3d 894,

915 (S.D.N.Y. 2017) ("Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of

the Securities Exchange Act and Rules 10b–5(a) and (c) thereunder create what courts have

called 'scheme liability' for those who, with scienter, engage in deceitful conduct.")

(quotation omitted). "[C]laims under subsections (1) and (3) of Section 17(a) are treated

the same as claims under subsections (a) and (c) of Rule 10b–5." *Kelly*, 817 F. Supp. 2d

at 346. Importantly, "'where the sole basis for such claims is alleged misrepresentations

or omissions, plaintiffs have not made out' a claim under those subsections." *S.E.C. v. Rio

Tinto PLC*, No. 17 CIV. 7994 (AT), 2019 WL 1244933, at *15 (S.D.N.Y. Mar. 18, 2019)

(quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005)).

The SEC contends that Defendants are liable for engaging in a fraudulent scheme

because they have misused investor funds to make loans not anticipated by the governing

documents. (*See* Dkt. 4-1 at 12-13). However, the facts that underlie this claim are

essentially identical to the facts that underlie the SEC's first claim of misrepresentation by

Defendants. The SEC has made a conclusory allegation that Defendants created "sham"

loan documents (*see id.* at 12), but, as previously discussed, the documents submitted by the SEC do not, on their face, demonstrate that the Portfolio Loans in question were not made (as opposed to being made for purposes that the SEC contends are illegitimate).

The SEC's allegations regarding the alleged cover-up of mortgage fraud involving the Eden Square property also do not support a finding of scheme liability, at least at this stage. In order to support a claim for scheme liability, "the proscribed schemes or acts" must be "done in connection with the purchase or sale of any security." *Taylor v. Westor Capital Grp.*, 943 F. Supp. 2d 397, 402 (S.D.N.Y. 2013) (quotation omitted). Allegedly wrongful acts that post-date the sale of the securities do not satisfy this requirement. *Id.*; *see S.E.C. v. Zandford*, 535 U.S. 813, 822 (2002) (explaining that the "scheme to defraud" and the sale of securities must "coincide" in order to satisfy the in-connection-with-the-sale-of-securities requirement). Here, the SEC has not presented any evidence to support the conclusion that the alleged Eden Square scheme coincided with any particular sale of securities. To the contrary, the SEC's own submissions indicate that the Notes Funds' initial offering dates occurred at the latest in January 2016 (*see* Dkt. 5-1 at 1), while the alleged Eden Square scheme did not begin until December 2016, and the use of Notes Funds' proceeds in connection with the alleged Eden Square scheme did not occur until the spring of 2017 (*see* Dkt. 5 at ¶¶ 67-87).[3] The SEC has not cited, nor has the Court

---

[3] The SEC does summarily assert that sales of securities via Notes Fund III continued from 2016 into 2018. (*See* Dkt. 5-1 at 1). However, the SEC has not provided the Court with any evidence of this beyond its own summary assertions, nor has it set forth the dates of the sales with any particularity. Accordingly, at a minimum, there is insufficient information before the Court to demonstrate the alleged Eden Square fraud coincided with a sale of securities.

found in its own research, a case holding that the in-connection-with-the-sale-of-securities requirement of scheme liability is satisfied where a defendant sells securities and then, at some later date, decides to use the proceeds to cover-up an unrelated fraud. *See Zandford*, 536 U.S. at 820 (indicating that there would not be scheme liability where "the securities sale and [a defendant's] fraudulent practices were . . . independent events," nor where "after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so").

Moreover, the cases cited by the SEC in support of their claim of a fraudulent scheme are factually distinguishable. *S.E.C. v. Aequitas Mgmt., LLC*, No. 3:16-CV-438-PK, 2017 WL 1206691 (D. Or. Jan. 9, 2017), *report and recommendation adopted*, No. 3:16-CV-00438-PK, 2017 WL 1429190 (D. Or. Apr. 20, 2017), an unreported, out-of-circuit district court case, involved defendants who had raised funds under fraudulent pretenses and used them to pay themselves "millions of dollars in salaries and bonuses," along with "expensive perquisites." *Id.* at *4. Similarly, in *Watermark Financial*, the defendants had devised a fraudulent scheme to falsely tell investors that their funds would be used to purchase waterfront property, when instead the funds were being used for personal expenses, including paying commissions to the defendants. 2012 WL 501450 at *1-2.

Unlike in *Aequitas Mgmt.* and *Watermark Financial*, the SEC has not alleged that Defendants sold securities for the purpose of pocketing the proceeds. Instead, the record before the Court at this time shows, at most, that Defendants sold securities and then, at some later point, used the proceeds to fund Portfolio Loans in order to cover-up an

unrelated mortgage fraud. In other words, the fraudulent "scheme" alleged by the SEC in this case is the use of investor funds to make purportedly illegitimately-motivated Portfolio Loans to Affiliate Borrowers.

However, because the Court finds the SEC has made a substantial showing that Morgan and the Fund Manager made a material representation with respect to the Notes Funds, and the first prong of the securities violation analysis requires the SEC to show Defendants "made a material misrepresentation or a material omission as to which [they] had a duty to speak, *or* used a fraudulent device," *Pentagon Capital Mgmt.*, 725 F.3d at 285 (emphasis added), the Court will proceed to the scienter portion of the analysis as to the claims regarding the Notes Funds.

**C.    Scienter**

Morgan argues that the SEC has made only a "conclusory statement" with respect to scienter, and that this is insufficient to bear its burden on a motion for a temporary restraining order. (Dkt. 16 at 17). The Court notes as a threshold matter that the SEC need not establish scienter to succeed on its claim under § 17(a)(2) and (3) of the Securities Act. *See Pentagon Capital Mgmt.*, 725 F.3d at 285 ("[N]o showing of scienter is required for the SEC to obtain an injunction under Section 17 (a)(2) or (a)(3)." (quotation and alteration omitted)).

Moreover, on a request for a preliminary injunction or a temporary restraining order, the SEC may satisfy the scienter requirement by submitting evidence that shows "defendants knowingly engaged in [the challenged] conduct." *S.E.C. v. Princeton Econ. Int'l Ltd.*, 73 F. Supp. 2d 420, 423 (S.D.N.Y. 1999). Here, there does not appear to be any

- 20 -

factual dispute as to Morgan's knowledge that Portfolio Loans made by earlier Notes Funds had been purchased by later Notes Funds, and, as explained above, the omission of this information is what likely rendered the offering materials misleading. At this stage of the proceedings, the SEC has adequately satisfied its burden with regard to scienter to warrant issuance of a temporary restraining order.

### D. Connection to the Purchase or Sale of Securities

Finally, the Court finds that the SEC has met is burden of showing that the challenged misrepresentation was made in connection with the sale of securities with respect to the Notes Funds, a point which Defendants have not contested. However, in addition to finding that the SEC has not met its burden of showing an actionable misrepresentation by Morgan Acquisitions, the Court agrees with Morgan that the SEC has not met its burden of demonstrating that the Morgan Acquisitions Investments are securities.

"The Supreme Court has described a modified version of the Second Circuit's 'family resemblance' test for determining whether a note constitutes a security." *S.E.C. v. Riel*, 282 F. Supp. 3d 499, 522 (N.D.N.Y. 2017). Under this test, "[a]ll notes are presumed to be securities unless they 'bear a strong resemblance' to instruments widely held to be non-security notes." *Id.* (original alteration omitted) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990)). Examples of non-security notes include notes secured by a mortgage on a home, short-term notes secured by liens on small business assets, notes evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, notes that formalize open-account debt incurred in the ordinary course of

business, and notes that evidence loans by commercial banks for current operations. *Id.* This list "is not graven in stone" and is "capable of expansion." *Reves*, 494 U.S. at 66 (quotation omitted). "If the note at issue is not sufficiently similar to one of the enumerated non-security categories, the Court next applies . . . four factors identified in *Reves*" to ascertain whether the note is a security. *Riel*, 282 F. Supp. 3d at 499.

> The four *Reves* factors to be considered in this examination are: (1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary.

*Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 973 F.2d 51, 55 (2d Cir. 1992).

Morgan argues, and the Court agrees, that the current record is insufficient to allow the Court to apply these tests to the Morgan Acquisitions Investments. The Morgan Acquisitions Investments consist of individual loan agreements and promissory notes, the terms of which have not been presented to the Court. In the sole "representative" loan agreement and promissory note provided by the SEC (which the SEC has provided no evidence is in fact "representative"), the name of the lender has been redacted (*see* Dkt. 5-9 at 1), despite the fact that the nature of the lender is a relevant inquiry in assessing whether a note is a security. The SEC has not, at this point, presented the Court with adequate evidence related to the Morgan Acquisitions Investments to warrant a finding that the promissory notes issued in connection therewith constitute securities. This is an additional reason why the Court will not extend the temporary restraining order to Morgan Acquisitions.

## III.    Risk of Repetition

The Court's next inquiry is whether the SEC has met its burden of showing a risk of repetition. Morgan argues that it has not, relying largely on his efforts to engage Goldin to replace him as manager for the Notes Funds. (*Id.* at 19).

In assessing whether there is a likelihood of repetition of the challenged conduct, "it is appropriate to weigh the degree of a defendant's scienter, the sincerity of any assurances that the violation will not be repeated, whether the violation was an isolated one, any acknowledgement by a defendant of the wrongful nature of his conduct, and the defendant's opportunity because of his profession to repeat the violation." *S.E.C. v. Cavanagh*, 1 F. Supp. 2d 337, 373 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). Based on those factors, the SEC has sufficiently established a likelihood of repetition to warrant entry of a temporary restraining order. Notwithstanding any efforts Morgan may have made to transfer control of the Notes Funds to Goldin, those efforts were not ultimately successful, and Morgan retains that control. Moreover, the violation was not isolated, the nature of the transactions establish scienter, and Morgan has not acknowledged any wrongdoing or made any other assurances that the conduct will not be repeated.

## IV.    Relief Requested

Having determined that the SEC has met its initial burden of showing a likelihood of success on the merits and the risk of repetition, the Court next considers the appropriate relief to be granted. The SEC has requested numerous forms of relief, each of which the Court considers below.

## A.     **Restraint Against Further Violations of the Securities Laws**

The first form of relief sought by the SEC is that the Court temporarily restrain Defendants from engaging in further violations of the securities laws. (Dkt. 4-1 at 9). "A preliminary injunction enjoining violations of the securities laws is appropriate if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *Cavanagh*, 155 F.3d at 132 (footnote omitted). The Court has concluded that the SEC has satisfied these requirements as to the Fund Manager and Morgan and therefore grants the SEC's request for this relief with respect to those defendants.

## B.     **Asset Freeze**

The SEC also seeks a freeze of Morgan's assets. "An asset freeze requires a lesser showing; the SEC must establish only that it is likely to succeed on the merits." *Id.* "[T]he decision to order a temporary freeze on defendants' assets as ancillary relief in an SEC enforcement action requires particularly careful consideration by the district court," and "the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief." *S.E.C.* v. *Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972). In addition, certain district courts in this Circuit have stated that in order to obtain an asset freeze, the SEC must demonstrate "a concern that the defendant will dissipate the assets within the defendant's control or will transfer the assets beyond the jurisdiction of the United States." *S.E.C. v. Santillo*, No. 18-CV-5491 (JGK), 2018 WL 3392881, at *2 (S.D.N.Y. July 11, 2018). The Second Circuit reviews an order freezing assets for abuse of discretion. *Smith v. S.E.C.*, 432 F. App'x 10, 12 (2d Cir. 2011).

Applying this standard, the Court will not issue an asset freeze. Although the Court has found that the SEC has made a substantial showing of likelihood of success on the merits with respect to a portion of its claims, the evidence in that regard is by no means conclusive, and the Court is not persuaded at this time that an asset freeze is necessary for the protection of investors. The Court further finds that the potential deleterious effects of such a freeze would outweigh the benefits, particularly inasmuch as the SEC has conceded that it has no evidence of any attempts by Morgan to transfer or dissipate assets.

The Court's analysis is further informed by the potential impact of an asset freeze on Morgan's ability to retain counsel in connection with the pending parallel criminal prosecution. "Although a court may impose an asset freeze in a civil case, notwithstanding a companion criminal case, these circumstances dictate that the court pay particular attention to the defendant's Fifth and Sixth Amendment rights." *S.E.C. v. Coates*, No. 94 CIV. 5361 (KMW), 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994). This is so because "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016). While this concern would not, standing alone, prevent the Court from issuing an asset freeze at this time, it is a further consideration the Court has taken into account in assessing this aspect of the SEC's emergency application.

### C.   Appointment of Receiver

It is well-established that a court may appoint a receiver as part of its "broad power to remedy violations of federal securities laws." *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010). "[A] primary purpose of appointing a receiver is to conserve the existing estate"

and "[r]eceivers appointed at the SEC's request are equipped with a variety of tools to help preserve the status quo while the various transactions **[are]** unraveled . . . to obtain an accurate picture of what transpired." *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) (quotations omitted) (bolded alterations in original). Under the circumstances of this case, the Court finds appointment of a receiver warranted for the Notes Funds and Fund Manager. However, given the failure of the SEC to establish at this stage that Morgan Acquisitions Investments qualify as securities or that Morgan Acquisitions has made material misrepresentations, the Court will not include Morgan Acquisitions as an entity placed into receivership, at least at this time.

Moreover, while the SEC has presented to the Court three proposals for potential receivers, the Court finds that additional proposals should be solicited. *Cf. S.E.C. v. Byers*, 590 F. Supp. 2d 637, 647 (S.D.N.Y. 2008) (where circumstances allow, the Court can "solicit other proposals or . . . consider other receivers," and further expressing opinion that even on an emergency application, the SEC "should have made more of an effort to present the Court with more options"). The Court will afford each side the opportunity to submit additional proposals.

### D.    Anti-Litigation Injunction

With respect to the SEC's request that the Court enjoin the filing of any bankruptcy, foreclosure, or receivership actions by or against the Notes Funds, the Fund Manager, or Morgan Acquisitions (*see* Dkt. 4 at 2), "while it is a power to be exercised cautiously, district courts may issue anti-litigation injunctions barring bankruptcy filings as part of their broad equitable powers in the context of an SEC receivership." *Byers*, 609 F.3d at 91

(2d Cir. 2010) (affirming district court's issuance of a preliminary injunction that enjoined nonparties from filing involuntary bankruptcy petitions against the defendants); *see also S.E.C. v. Callahan*, 2 F. Supp. 3d 427, 436 (E.D.N.Y. 2014) ("The Second Circuit has recognized that an anti-litigation injunction or litigation stay in a receiver order is a valid exercise of a district court's equitable powers." (quotation omitted)). The Court finds that an anti-litigation injunction is warranted in this case to protect against the potential for disparate actions in other courts that could ultimately have a negative impact on the assets involved in this action. However, because Morgan Acquisitions' assets are not being put into receivership at this time, the Court will not extend this anti-litigation injunction to Morgan Acquisitions.

**E.     Request for an Accounting**

With respect to the SEC's request for an accounting, an accounting is warranted where the SEC has shown that the defendants are likely in possession of assets that have been improperly obtained from investors. *S.E.C. v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997); *see also S.E.C. v. Dawson*, 2007 WL 9711173, at *6 (E.D.N.Y. Feb. 2, 2007) ("A verified accounting may be proper in cases where the defendant obtains funds improperly from investors."). This standard is satisfied here with respect to Morgan and the Fund Manager.

However, with respect to Morgan, the Court notes that compelling an accounting with respect to an individual defendant is inappropriate where there is a parallel criminal proceeding and the defendant has asserted his Fifth Amendment right against self-incrimination. *See Dawson*, 2007 WL 9711173, at *6; *cf. S.E.C. v. Durante*, 641 F. App'x

73, 79 (2d Cir. 2016) (regarding defendant who had failed to argue before the district court that requiring him to provide an accounting violated his Fifth Amendment rights: "[t]o the extent he can raise a colorable claim of self-incrimination in opposition to any part of the order, he may certainly do so, at which point that court, with the benefit of such arguments as the parties may present, can decide whether to modify its order in any respect").

Nonetheless, the Fifth Amendment privilege "does not extend to artificial entities, such as corporations." *S.E.C. v. Oxford Capital Sec., Inc.*, 794 F. Supp. 104, 107 (S.D.N.Y. 1992); *see also In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155, 157 (2d Cir. 2010) ("Under the long-established 'collective entity rule,' however, corporations cannot avail themselves of the Fifth Amendment privilege."); *S.E.C. v. Ryan*, 747 F. Supp. 2d 355, 364 (N.D.N.Y. 2010) ("[B]oth the United States Supreme Court and the Second Circuit have continuously held that corporations and other artificially created collective entities do not have the authority to invoke a Fifth Amendment protection against incrimination.") (collecting cases). As such, corporate (and other artificial entity) defendants may not refuse to provide an accounting on Fifth Amendment grounds. *Oxford Capital Sec.*, 794 F. Supp. at 107. "Such a rule does not leave the individual unprotected against prosecution—since the act of production is in the custodian's representative capacity instead of his individual capacity, 'the Government . . . may make no evidentiary use of the "individual act" against the individual,'" and "the signing of the accountings on behalf of [the corporate defendants can] not be used against the corporate officers as individuals." *Id.* at 108 (alteration in original) (quoting *Braswell v. United States*, 487 U.S.

- 28 -

99, 117-18 (1988)).  Accordingly, at this stage of the proceedings, the Court limits this aspect of the temporary restraining order to the Fund Manager.

**F.**     **Request for Expedited Discovery**

The SEC also seeks expedited discovery to prepare for a hearing on its request for a preliminary injunction.  However, the SEC has failed to set forth any information regarding what discovery it requires, nor has it submitted a proposed time frame. Accordingly, this aspect of the motion is denied without prejudice.

**G.**     **Injunction Against Destruction of Evidence**

Finally, the SEC asks the Court to enjoin Defendants from destroying or altering relevant documents.  (Dkt. 4-1 at 21).  It is well-established that parties to litigation have an affirmative obligation to preserve relevant evidence. *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).  Accordingly, this request does not impose any significant additional burden on Defendants, and it is granted at least as to Morgan and the Fund Manager.   While the Court is not expressly imposing this condition on Morgan Acquisitions, since at this stage the SEC has not met its burden to establish entitlement to relief, Morgan Acquisitions nonetheless is obliged to comply with its affirmative obligation to preserve relevant evidence and the failure to do so may result in sanctions or other appropriate relief.

## CONCLUSION

For the foregoing reasons, the Court grants the SEC's request for a temporary restraining order in part and denies it in part. An Order will be entered separately setting forth the details of the relief granted by the Court.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: June 5, 2019
   Buffalo, New York