UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          v.

ROBERT C. MORGAN, MORGAN
MEZZANINE FUND MANAGER LLC, and
MORGAN ACQUISITIONS LLC,

                    Defendants.

---

**DECISION AND ORDER**


1:19-CV-00661 EAW

## INTRODUCTION

The Securities and Exchange Commission (the "SEC") asserts various claims against defendants Robert C. Morgan ("Morgan"), Morgan Mezzanine Fund Manager LLC (the "Fund Manager"), and Morgan Acquisitions LLC ("Morgan Acquisitions") (collectively "Defendants") for violations of the federal securities laws.   (Dkt. 1). Currently before the Court is a motion filed by Court-appointed receiver Robert Knuts for disbursement of funds and settlement of certain claims. (Dkt. 117). The SEC supports the relief sought by the Receiver.   (Dkt. 132).   However, certain investors in Morgan Acquisitions have lodged objections to the Receiver's proposed distribution plan. (*See* Dkt. 125; Dkt. 126; Dkt. 133; Dkt. 136; Dkt. 143).   Defendants have also urged the Court to adopt a distribution plan different than the one proposed by the Receiver.  (Dkt. 134)

The Court has considered the objecting investors' contentions and the parties' respective positions and concludes, for the reasons set forth below, that the Receiver's

proposed distribution plain is fair and reasonable. The Court accordingly grants the Receiver's motion in its entirety.

## **BACKGROUND**

Morgan has owned, operated, and developed commercial real estate, primarily in the northeastern United States, for more than 30 years. (Dkt. 5 at ¶ 4)[1]. From 1998 to April 2018, Morgan managed his portfolio of multifamily properties through his company, Morgan Management. (*Id.*). Morgan sold Morgan Management in April 2018. (*Id.*).

Morgan is the managing member and sole owner of the Fund Manager, which was formed in 2013 to manage and control the business affairs of certain Notes Funds. (*Id.* at ¶¶ 5, 8).[2] These Notes Funds are divided into investments by either accredited investors (an "AI fund") or qualified purchasers (a "QP fund"). (*Id.* at ¶ 8). Investors purchased membership interests in either an AI fund or a QP fund by entering into a subscription agreement with the Fund Manager, signed by Morgan. (*Id.* at ¶ 9).

Morgan is also the managing member and sole owner of Morgan Acquisitions, which he used to put properties he planned to acquire under contract, before transferring ownership to another entity. (*Id.* at ¶ 6). Morgan Acquisitions was also used to raise

---

[1]   The Court's factual recitation is taken from the SEC's submissions made in support of its motion for a temporary restraining order. The Court notes that the SEC's allegations of wrongdoing against Defendants have not been proven; the Court summarizes the SEC's allegations in order to provide the context for the instant Decision and Order.

[2]   As used in this Decision and Order, the term "Notes Funds" means specifically the following: Morgan 11% Notes Fund LLC; Morgan 11% Notes Fund QP LLC;  Morgan Notes Fund II LLC; Morgan Notes Fund QP II LLC; Morgan Notes Fund III LLC; and Morgan Notes Fund QP III LLC.

investor funds. (*Id.*). In connection with the Morgan Acquisitions investments, Morgan would enter into a loan agreement with each investor and issue a promissory note to the investor in the amount of the loan. (*Id.* at ¶ 13).

Defendants represented to investors in the Notes Funds managed by the Fund Manager that their investments would be used to make portfolio loans to affiliate borrowers to enable those affiliate borrowers to "more efficiently acquire, manage, operate, hold, or sell multifamily properties, or in connection with their acquisition of real estate development projects." (*Id.* at ¶ 23). The Notes Funds had 11% target returns, paid in monthly installments. (*Id.* at ¶ 24). Morgan personally guaranteed the repayment of the portfolio loans back to the Notes Funds. (*Id.* at ¶ 28). However, Morgan did not personally guarantee the targeted 11% interest for investors in the Notes Funds. (Dkt. 134 at 3). The Morgan Acquisitions investments "typically required Morgan Acquisitions to pay monthly 11% interest payments, with both interest and the return of principal personally guaranteed by Morgan." (Dkt. 5 at ¶ 30).

The SEC claims that Morgan improperly "used Notes Funds created later in time to repay Portfolio Loans made to Affiliate Borrowers by previously-created Notes Funds, either to facilitate the redemptions of earlier investors or to pay off non-performing or maturing loans." (*Id.* at ¶ 40). The SEC further alleges that Morgan improperly "us[ed] additional Notes Fund assets to make the 11% interest payments back to investors" (*id.* at ¶ 58) and to "cover a shortfall of more than $11 million, including prepayment penalties, to pay off a loan" that had purportedly been fraudulently obtained on a property known as Eden Square (*id.* at ¶ 67-87).

The SEC commenced the instant action on May 22, 2019.  (Dkt. 1).  Along with filing the Complaint, the SEC also filed a motion for a temporary restraining order ("TRO").  (Dkt. 4).

Defendants opposed the SEC's motion for a TRO.  (Dkt. 16; Dkt. 17).  The Court held a hearing (Dkt. 24) and granted the motion in part and denied it in part on June 5, 2019 (Dkt. 25; Dkt. 26).  As relevant here, the Court found that a receiver should be appointed as to the Notes Funds and the Fund Manager and further ordered an accounting of the Fund Manager's assets.  (Dkt. 25 at 25-26, 28-29).  However, the Court did not include Morgan Acquisitions as an entity to be placed into receivership, in part because the Court found the SEC had not established that the Morgan Acquisition investments "qualify as securities," nor had it "met its burden of showing an actionable misrepresentation by Morgan Acquisitions."  (Dkt. 25 at 21, 26).

On June 14, 2019, at the request of the parties, the Court entered a Preliminary Injunction on Consent.  (Dkt. 34).  The Preliminary Injunction on Consent provided that the Court would appoint a receiver as to the Notes Funds, the Fund Manager, and Morgan Acquisitions (collectively the "Receivership Entities") and that the to-be-appointed receiver would be required to submit a written accounting of the Receivership Entities' assets.  (Id.).

The Court appointed the Receiver by Order dated June 19, 2019.  (Dkt. 39).  The Receiver was empowered to "(a) preserve the status quo; (b) ascertain the financial condition of the Receivership Entities and determine the disposition of investor funds; (c) oversee and manage . . . the Receivership Entities; (d) prevent the encumbrance or disposal

- 4 -

of the assets of the Receivership Entities contrary to the Receiver's mandate; (e) preserve the books, records, and documents of the Receivership Entities; and (f) be available to respond to investor inquiries." (*Id.* at 2). The Receiver was further specifically empowered to conduct the accounting described in the Preliminary Injunction on Consent and to "[d]evelop a plan for the administration of the Receivership Estate[.]" (*Id.* at 4).

By Stipulation and Order entered on July 15, 2019, the term "Morgan Acquisitions" as used in the Preliminary Injunction on Consent and the Order appointing the Receiver was defined to mean "(a) the Morgan Acquisitions bank account at M&T bank ending in 9672; (b) the investments received in that account from certain non-parties pursuant to loan agreements executed by Morgan Acquisitions LLC; and (c) the loans made from that account to other persons and entities in exchange for promissory notes in favor of Morgan Acquisitions LLC." (Dkt. 49 at 1-2). As a result of this narrowing of the scope of the term "Morgan Acquisitions," the Receiver often refers to Morgan Acquisitions in his submissions as the "Loan Account Receivership Entity," while referring to the Notes Funds as the "LLC Receivership Entities." (*See, e.g.*, Dkt. 118 at ¶ 1).

The Receiver submitted Accountings for the Receivership Entities to the Court on August 9, 2019. (Dkt. 53). These Accountings showed that the Receivership Entities held more than $68 million in assets and owed investors approximately $63 million. (*Id.* at 2).

On October 7, 2019, the Receiver filed a motion for authorization to transfer $3,106,788.97 in proceeds from the sales of certain real estate properties to the sellers of those properties. (Dkt. 62). In particular, the Receiver explained that two properties in connection with which the Receivership Entities had advanced funds—specifically,

properties known as Cedar Ridge and Hunters Chase—had been sold to independent buyers in July and August of 2019. (Dkt. 62-1 at ¶ 2-3). However, the title insurance companies involved in these sales required that all net sales proceeds be delivered to the Receiver, irrespective of the amounts of those sale proceeds actually payable to the Receivership Entities. (*Id.* at ¶ 4). Accordingly, the Receiver received $4,312,219.31 in net proceeds from the sale of Cedar Ridge and $9,645,946.32 in net proceeds from the sale of Hunters Chase. (*Id.* at ¶ 5). The Receiver received a further $50,000 after an escrow hold was released in connection with the sale of Hunters Chase. (*Id.*). These amounts exceeded the amounts that had been advanced to Cedar Ridge and Hunters Chase by the Receivership Entities, including accrued interest, which totaled $9,322,840.75. (*Id.* at ¶ 6, Ex. A).

Two of the sellers of Cedar Ridge and Hunters Chase were RM LP III, an entity owned and controlled by Morgan, and Kevmo LLC, an entity owned and controlled by non-party Kevin Morgan. (*Id.* at ¶ 8). Morgan and Kevin Morgan agreed to have $1,578,535.91 retained by the Receiver as security against potential claims against them. (*Id.* at ¶¶ 1, 8). Specifically, the Receiver retained $1,403,535.91 as to Robert Morgan and $175,000.00 as to Kevin Morgan. (*Id.* at Ex. A). The Receiver requested leave of Court to distribute the remaining $3,106,788.97 in excess proceeds to the sellers of Cedar Ridge and Hunters Chase. The Court granted the Receiver's motion on November 19, 2019. (Dkt. 70).

In October 2019, in the related criminal action of *United States v. Robert Morgan et al.*, No. 18-cr-108, the Court approved an agreement between the United States, Morgan, co-defendant Todd Morgan, and an entity known as MP KOP JV LLC to permit the sale

of 94 properties, including six properties identified in the Superseding Indictment as subject to criminal forfeiture. (*See* Dkt. 130-3). As a result of this transaction, which the Receiver refers to as the "KOP Joint Venture transaction" (*see* Dkt. 131 at ¶ 3), the Receivership Entities received approximately $48 million in proceeds (*id.*).

On January 15, 2020, the Receiver filed a motion for an initial disbursement of funds to investors. (Dkt. 76). Specifically, the Receiver sought leave to distribute $63,286,548.64 to all investors in the Receivership Entities. (Dkt. 77 at 1). These funds were to be distributed based on the "the actual capital account balances held by the investors in the LLC Receivership Entities and the actual amounts advanced by investors to the Loan Account Receivership Entity." (*Id.* at 6). The Receiver indicated that after the proposed distribution, the Receivership would "retain more than $4.2 million in funds both to pay expenses of the Receivership and, if possible, to make a supplemental pro rata distribution of funds to investors." (*Id.*).

The SEC and Defendants consented to the Receiver's request for an initial disbursement of funds. (Dkt. 80; Dkt. 81). The Court did not receive any objections to the proposal from investors, and entered a Decision and Order granting the motion on January 21, 2020. (Dkt. 82).

On July 17, 2020, the Receiver moved for the payment of $334,704.60 in interim fees and expenses to himself and the professional firms he had engaged to provide services to the Receivership. (Dkt. 106). The Court received a response to this application from E. Philip Saunders, The Saunders Foundation, and Mark and Patricia Redding, investors in the Notes Funds. (Dkt. 114). These investors did not object to the fees and expenses sought

- 7 -

by the Receiver, but questioned why such fees and expenses were to be paid out of the Receivership Estate, rather than by Morgan pursuant to the terms of his personal guarantee. (*Id.*).

In June 2020, Morgan provided to the Receiver a "final allocation" of the proceeds from the KOP Joint Venture transaction. (Dkt. 118 at ¶ 6; *see also* Dkt. 144). Pursuant to this allocation, the principal balance of all loans made by the Notes Funds to real estate projects associated with Morgan and all accrued interest on those loans have been fully paid. (Dkt. 118 at ¶ 6). However, as discussed in more detail below, there are two loans made out of the Morgan Acquisitions bank account ending in 9672 that remain outstanding. (*Id.*).

On August 24, 2020, the Receiver filed a motion for leave to disburse additional funds and to settle certain claims. (Dkt. 117) (the "Second Distribution Motion").  In particular, the Receiver proposes a distribution of: (1) an additional $3,300,000 to the investors in the Notes Funds; (2) $237,434.61 to RM LP III; and (c) $175,000 to Kevmo LLC. (Dkt. 118 at 1-2).  The Receiver indicates that after these proposed disbursements, the Receivership Estate will retain approximately $600,000, and that such funds "will be used, subject to Court approval, to pay expenses incurred in connection with the Receivership, taxes owed by the Receivership Entities, if any, and a third distribution to investor-members of the [Notes Funds] to the extent such funds remain available for such a distribution." (*Id.* at 2).  The Receiver's proposal would not make any further distribution to investors in Morgan Acquisitions.

The Receiver also sought leave of Court to enter into a settlement agreement with Morgan as to any liability he might have, under the terms of his personal guarantee, for the payment of Receivership expenses. (*Id.* at 6). In particular, the Receiver proposes to settle such claims in exchange for a payment of $350,000 from Morgan. (*Id.* at 6-7). Morgan has submitted to the Court an Amended Stipulation and Proposed Settlement Agreement in connection with this request. (Dkt. 136).

On August 28, 2020, the Court entered a Decision and Order granting the Receiver's motion for payment of interim fees and expenses. (Dkt. 124). The Court noted that its Order appointing the Receiver expressly provided that his fees and expenses would be reimbursed from the Receivership Estate. (*Id.* at 4 (citing Dkt. 39 at 5)).

The Court received two responses from investors to the Receiver's Second Distribution Motion. Jeffrey Cerini, an investor in both the Notes Funds and Morgan Acquisitions, sent an email to the Court in which he expressed his view that "the first priority for payment should be to fully settle the Morgan Acquisition obligations (interest and penalty for approximately 9 months) and then distribute any remaining monies to the Notes Fund investors." (Dkt. 125). Counsel for Herbert Morgan, an investor in Morgan Acquisitions, submitted a declaration contending that the proposed distribution should be made on a *pro rata* basis to Notes Funds investors and Morgan Acquisitions investors. (Dkt. 126). Herbert Morgan also requested that the Receiver be required to provide "a further accounting concerning monies in and out of the Morgan Acquisitions LLC account

number [9672][3] from August 9, 2019, the date of the last accounting to the present." (*Id* at 4-5).

With leave of the Court, the Receiver filed additional information regarding the basis for his proposed distribution on September 16, 2020. (Dkt. 129; Dkt. 130). The Receiver provided more information regarding the outstanding Morgan Acquisition loans. The first is an outstanding loan of approximately $350,000 related to the Chemical Building in St. Louis, Missouri. (Dkt. 131 at ¶ 7). The second is an outstanding loan of approximately $2,000,000 related to the Nathaniel apartment building in downtown Rochester, New York. (*Id.*). As to the Chemical Building, which is a landmark building in St. Louis requiring redevelopment, an attempted sale of the project was proposed in November 2019, but was not completed. (*Id.* at ¶ 8). The Nathaniel apartment building was completed in 2019, but has not yet generated sufficient revenues "to pay all operating expenses of the building, including the mortgage on the building, and make additional interest payments on the loan made by the Loan Account Receivership Entity." (*Id.* at ¶ 9).

Herbert Morgan thereafter filed a supplemental response reiterating his position that any further distribution should be made on a *pro rata* basis to all investors. (Dkt. 133). In particular, Herbert Morgan contends that Morgan's June 2020 allocation of the KOP Joint Venture transaction proceeds was "self-interested" and should not form the basis for a

---

[3]     The Receiver and Herbert Morgan have both sometimes referred to the account as ending in 9642 in filings. (*See, e.g.,* Dkt. 53 at ¶ 1; Dkt. 126 at ¶ 12). At oral argument, the Court confirmed that the account in question ends in 9672, as stated in the Stipulation and Order entered on July 15, 2019. (*See* Dkt. 49 at 1-2).

distribution plan. (*Id*. at ¶ 8). Jeffrey Cerini also filed a supplemental submission in which he contends that the individuals who provided funds to Morgan Acquisitions are "lenders" and not "investors" and that they should be paid first. (Dkt. 137).

The SEC supports the Receiver's proposed distribution plan. (Dkt. 132). However, Defendants take the position that "the money remaining in the Receivership Estate should be distributed on a pro rata basis" to the Notes Funds investors and Morgan Acquisitions investors. (Dkt. 134 at 3 n.2).

Oral argument on the Second Distribution Motion was held on October 1, 2020. (Dkt. 138). The Receiver, the SEC, Defendants, Herbert Morgan, and Jeffrey Cerini were all afforded an opportunity to be heard, and the Court reserved decision. The Court further instructed the Receiver and Defendants to provide additional information regarding Morgan's June 2020 allocation of the KOP Joint Venture transaction proceeds. The Receiver and Defendants filed their supplemental submissions on October 7, 2020. (Dkt. 139; Dkt. 141; Dkt. 144). On October 14, 2020, the Court received a supplemental letter from Herbert Morgan's counsel. (Dkt. 143).

## DISCUSSION

## I.   Legal Standard

In deciding whether to approve a receiver's distribution plan, the Court must assess whether such plan "is fair and reasonable." *SEC v. Wang*, 944 F.2d 80, 83-84 (2d Cir. 1991); *see also SEC v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) ("In general, this Court has broad authority to craft remedies for violations of the federal securities laws. Courts have held that within that broad authority lies the power to approve a plan of

- 11 -

distribution proposed by a federal receiver.  The Court has the authority to approve any

plan provided it is fair and reasonable." (citations and quotations omitted)), *aff'd sub nom.*

*SEC v. Malek*, 397 F. App'x 711 (2d Cir. 2010).  "In making its decision, a court may defer

to the receiver's choices for the plan's details and should give substantial weight to the

SEC's views regarding a plan's merits."  *SEC v. Amerindo Inv. Advisors Inc.*, No. 05-CV-

5231 (RJS), 2017 WL 3017504, at *2 (S.D.N.Y. July 14, 2017) (alteration and citation

omitted).  As to the objections raised by investors, "[c]laimants to receivership property

have standing to object to a distribution plan where the method of distribution will affect

their financial interests such that they have a legitimate interest in the method of

distribution of the . . . remaining assets."  *SEC v. Illarramendi*, No. 3:11CV78 JBA, 2014

WL 5460816, at *2 n.4 (D. Conn. Oct. 27, 2014) (quotation omitted), *aff'd sub nom. SEC*

*v. Michael Kenwood Capital Mgmt., LLC*, 630 F. App'x 89 (2d Cir. 2015).  The Court's

approval of a proposed distribution plan is reviewable for abuse of discretion.  *See SEC v.*

*Credit Bancorp, Ltd.*, 290 F.3d 80, 87 (2d Cir. 2002).

## II.    Allocation of Funds Between Notes Funds Investors and Morgan Acquisitions Investors

The primary issue the Court must resolve in connection with the instant motion is

whether it is fair and reasonable to treat the Notes Funds investors and the Morgan

Acquisitions investors differently, as proposed by the Receiver.  The Court notes that as a

general rule, investors who are "similarly situated" should be treated consistently in a

distribution plan.  *Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 750 (2d

Cir. 2013).  However, investors are not similarly situated solely by virtue of the fact that

they have all been defrauded.  *Id.*  Instead, the Court should consider the totality of the circumstances, including whether "the funds of the defrauded victims were commingled" and whether "the victims were similarly situated with respect to their relationship to the defrauders." *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002).

The Second Circuit has noted that a *pro rata* distribution plan is "especially appropriate for fraud victims of a Ponzi scheme[.]" *Id.* (internal quotation marks omitted). On the other hand, where there are distinct groups of investors who are not similarly situated in material aspects, the Court need not distribute funds on a *pro rata* basis. *See SEC* v. *Enter. Tr. Co.*, 559 F.3d 649, 652 (7th Cir. 2009) ("District judges possess discretion to classify claims sensibly in receivership proceedings.").  Where the funds available for distribution to the defrauded investors are limited, "hard choices must be made." *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006) (internal quotation marks omitted).  "This kind of line-drawing—which inevitably leaves out some potential claimants—is . . . appropriately left to the experience and expertise of the SEC in the first instance." *SEC v. Wang*, 944 F.2d 80, 88 (2d Cir. 1991).

Here, the SEC and the Receiver urge the Court to draw a distinction between the Notes Funds investors and the Morgan Acquisitions investors, on the basis that the loans and accrued interest payable to the Notes Funds investors have been fully repaid by the proceeds of the KOP Joint Venture transaction, while there are still two outstanding loans related to the Morgan Acquisitions investments—namely, the Chemical Building and the Nathaniel apartment building.  The Court is persuaded that this is an appropriate and

reasonable basis on which to distinguish between these two distinct sets of investors. The Court further finds, taking into account the totality of the circumstances, that a *pro rata* distribution is not appropriate here. The Notes Funds investors and the Morgan Acquisitions investors had different relationships with Defendants, the terms of their agreements with Defendants were different, and there is no evidence before the Court to support the conclusion that their funds were commingled in a manner supporting a *pro rata* distribution.

The Court is cognizant that a "receiver devising a distribution plan is not required to apportion assets in conformity with . . . arbitrary allocations that were made by the defrauder," lest "the whim of the defrauder . . . control the process that is supposed to unwind the fraud." *Walsh*, 712 F.3d at 749 (citation and original alterations omitted). However, in this case, having reviewed the allocation made by Morgan with respect to the KOP Joint Venture transaction, the Court does not find that it was arbitrary. Instead, as Morgan has explained, the allocation was the result of a careful and lengthy process, requiring Morgan and his agents to "review multiple promissory notes, documented advances, and accounts for 28 properties, identify the outstanding principal amount due to each fund, the interest amount, maturity dates, and total accrued interest." (Dkt. 141 at 2). Further, Morgan has explained that the Nathaniel apartment building and Chemical Building advances "were not repaid as part of the allocation because there is no executed promissory note documenting the advances made to the two properties and Mr. Morgan did not personally guarantee these advances." (Dkt. 134 at 4-5). The Receiver and the SEC have also explained that there are substantial reasons to believe that litigation to

attempt to recover these advances would be costly and have a limited chance of success. (*See* Dkt. 132 at 5-6). The Receiver also cannot sue Morgan directly in an attempt to recover the funds because he did not personally guarantee those particular advances. (*Id.* at 6; *see also* Dkt. 141 at 3). For these reasons, the Court agrees with the SEC and the Receiver that it is appropriate for the Court to treat the approximately $2.3 million dollars in outstanding loans related to the Chemical Building and the Nathanial apartment building as unrecoverable and that it would be unfair and unreasonable to require the Notes Funds investors to bear the burden of these losses. Indeed, as the Receiver has explained, the Morgan Acquisitions investors have already benefited at the expense of the Notes Funds investors, because they received approximately $800,000 more in the initial disbursement of funds than had been collected on loans outstanding to Morgan Acquisitions. (Dkt. 131 at ¶ 5). The Court accordingly rejects Herbert Morgan's objections to the proposed distribution plan.[4]

Turning to Jeffrey Cerini's objections, he argues that Morgan Acquisitions investors should be treated more favorably than Notes Funds investors because "Notes Funds investments were purchases into an investment fund that was stated to have sorts of risks, required that the investor be accredited, and had no obligation to provide a specific return on the investment, only a hope and expectation," while "Morgan Acquisitions involved loans . . . with a prescribed 11% interest rate and a specification of a 5% penalty in the case

---

[4]     With respect to Herbert Morgan's request for an accounting of the $1,873,130.76 that was in the Morgan Acquisitions account ending in 9672 as of August 2019, the Receiver confirmed at oral argument that the $1,873,130.76 was distributed to investors as part of the initial distribution approved by the Court.

of default." (Dkt. 125 at 1). It is true that Morgan "did not personally guarantee the targeted 11% interest for the Notes Fund investors." (Dkt. 134 at 3). However, "[b]ecause no investor knowingly takes the risk that she will be defrauded, the distribution plan need not take into account the fact that [the Morgan Acquisitions investors] initially purchased less risky investments." *SEC v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017). Further, the fact that the Morgan Acquisitions investors have contractual rights beyond those of the Notes Funds investors also means that they can pursue individual legal action. The Court does not find that the difference in risk between the Notes Funds investments and the Morgan Acquisitions investments is a sufficient basis to reject the Receiver's proposed distribution plan.

For all these reasons, and having carefully considered the investor objections received, the Court concludes that the Receiver's distribution plan, endorsed by the SEC, satisfies the fair and reasonable standard, and thus approves it.

## III.   <u>Settlement with Morgan as to Receivership Expenses</u>

No party or investor has raised any object to the Receiver's proposed $350,000 settlement with Morgan related to any potential claim for expenses associated with the Receivership. Further, the proposed settlement falls within the Receiver's authority. *See SEC v. Credit Bancorp, Ltd.,* No. 99 CIV. 11395(CIV), 2001 WL 1658200, at *2 (S.D.N.Y. Dec. 27, 2001) (court will approve settlement agreement proposed by a receiver where it is within his authority and he has "made a determination that the interests of all parties are best served by [the] settlement"). The Court agrees with the Receiver and the SEC that the

proposed settlement is "reasonable and in the best interests of investors" (Dkt. 132 at 7) and accordingly approves this portion of the Receiver's motion.

**IV.     Proposed Distributions to RM LP III and Kevmo LLC of the Balances from the Cedar Ridge and Hunters Chase Sales**

Finally, the Court approves the Receiver's proposed distribution of $237,434.61 to RM LP III and $175,000 to Kevmo LLC, representing the remaining balances of the Cedar Ridge and Hunters Chase sales.[5] No investor has raised any specific objection to this portion of the Receiver's motion, and the SEC has indicated that it "is not currently aware of a basis for the Receiver to continue to retain these funds." (Dkt. 132 at 7). In particular, the Receiver does not intend to pursue any further claims against Morgan, and the SEC "is not seeking any additional monetary relief from Morgan" in light of its having reached a proposed settlement of the matter with him. (*Id.*). The Court accordingly finds this aspect of the Receiver's request both fair and reasonable, and it is approved.

## CONCLUSION

For the foregoing reasons, the Court grants the Receiver's Second Disbursement Motion (Dkt. 117) in its entirety. The Receiver is directed to distribute a copy of the instant Decision and Order to the investors in the Receivership Entities by email no later than November 10, 2020.

---

[5]     The Receiver has explained that Morgan has previously directed the application of $1,166,101.30 of his share of the proceeds from the sales of Cedar Ridge and Hunters Chase to the Receivership Entities. Specifically he directed $506,039.86 to satisfy his personal guarantee as to the outstanding advances made by the Notes Funds to the Chemical Building project, $310,061.44 to repay an outstanding advance made by Morgan Acquisitions as to a property known as Villa Capri, and $350,000.00 for the settlement agreement referred to above. (Dkt. 118 at ¶ 18).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: November 6, 2020
      Rochester, New York